UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| _____ | ) | |
| MARK C. STEVENSON | ) | Civ. No. 3:22-cv-00601-JBA |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | |
| CHRISTINE E. WORMUTH, | ) | |
| Secretary of the Army, | ) | |
| | ) | |
| *Defendant.* | ) | September 30, 2022 |
| _____ | ) | |

**PLAINTIFF'S LOCAL RULE 56(a)(1) STATEMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(a)(1), the Plaintiff

Mark Curtis Stevenson, respectfully submits this Statement of Material Facts Not in Dispute in

support of his motion for summary judgment in the above-captioned case. All material facts in

this statement are reflected in the certified Administrative Record.[1]

**A. Mr. Stevenson's life before the Army and developing Substance Use Disorder.**

1.   Born in 1958 to a large, loving family, Mark Curtis Stevenson grew up the ninth of

fourteen siblings in Bridgeport, Connecticut. A.R. 91. Mr. Stevenson was raised in Father Panik

Village, then Connecticut's largest low-income housing project. A.R. 91.

2.   At an early age, Mr. Stevenson began working to help support his family financially,

including taking out neighbors' garbage, shining shoes, and selling candy. A.R. 91.

3.   Mr. Stevenson also demonstrated a commitment to the community even in his youth,

starting with his time as a Boy Scout. A.R. 91. His high school jobs reflected community-

---

[1] Citations to the Administrative record, ECF No. 016, will be denoted as "A.R. ___."

oriented values as well: he worked as a summer camp counselor at Action for Bridgeport

Community Development, Inc. and mentored younger teens through an after-school program at

Hall Neighborhood House. A.R. 91, 99.

4.    Mr. Stevenson attended Bridgeport public schools, except for his junior year of high

school, when he lived in Michigan with his father. A.R. 91. After returning to Bridgeport for his

senior year, Mr. Stevenson was told he would need to repeat a year due to insufficient credits.

A.R. 91. Embarrassed to be in high school as his friends left for college, Mr. Stevenson dropped

out—a decision he regrets. A.R. 91.

5.    Before deploying, Mr. Stevenson did not drink or use drugs. A.R. 93. Mr.

Stevenson's sister, Deborah Vereen, states that "he was too afraid" of going to jail to use drugs

or misbehave in high school and stayed away from "the street."  A.R. 99. A childhood friend also

confirms that Mr. Stevenson did not use substances before enlisting. A.R. 191.

6.    Without college prospects, Mr. Stevenson viewed the Army as a chance to improve

himself and "to pursue educational and economic opportunities." A.R. 92.

**B. Mr. Stevenson enlisted in the Army.**

7.    At nineteen, Mark Curtis Stevenson enlisted in the Army. A.R. 37, 92.

8.    He enlisted in the Army Reserve's Delayed Entry Program on April 25, 1977 but

changed his status to Active Duty Army on June 7, 1977. A.R. 104-07. He completed basic

training at Fort Dix, New Jersey and finished a six-week training course as a Power Generation

and Wheeled Vehicle Mechanic. A.R. 92.

9.    When Mr. Stevenson enlisted, he was planning to serve for at least twenty years,

until military retirement. A.R. 37, 92.

10.  He excelled in basic training, which reminded him of his experience in Boy Scouts. A.R. 37, 92. He completed a rigorous training course and received awards for his exemplary conduct and dedication to the U.S. Army. A.R. 102, 588.

11.  Mr. Stevenson was selected as a squad leader, and he earned an M-16 Rifle Qualification Badge and an Army Service Ribbon. A.R. 37, 92, 102.

**C.  Mr. Stevenson deployed to Germany amidst stressful conditions.**

12.  In October of 1977, the Army deployed Mr. Stevenson to Ludwigsburg, West Germany, near the East German border.  A.R. 37, 92.

13.  He was attached to the Headquarters Battery, 3rd Battalion, 71st Air Defense Artillery. A.R. 37, 92. This unit was tasked with missile defense near the East German border. A.R. 92.

14.  Life in Germany was a "culture shock." A.R. 93.

15.  Mr. Stevenson, who is Black, faced profound racism from his fellow soldiers. A.R. 93. Having been raised in a predominantly Black community, Mr. Stevenson abruptly found himself in a largely white, racially divided environment. A.R. 93.

16.  Soldiers strictly self-segregated in the Non-Commissioned Officers' ("NCO") club. A.R. 168.

17.  Violent, race-based altercations were "common." A.R. 93. White soldiers wrote racial slurs in the showers and on Mr. Stevenson's door. A.R. 168. On one occasion, a soldier physically assaulted Mr. Stevenson and "called [him] the 'n-word,'" leading to a fight. A.R. 93.

18.  Outside of the base, locals also targeted Mr. Stevenson because of his race: many Germans had never seen a Black person before and would stare at him and attempt to touch his

skin to see "if the color would rub off." A.R. 40, 93. Some Germans would also stare at him and other Black soldiers to "see if they grew tails at midnight." A.R. 40, 93.

19.  Mr. Stevenson estimates that thirty percent of the soldiers in his unit were Black. A.R. 93. Like other Black soldiers on the base, Mr. Stevenson felt that he could not report these incidents to his superior officers and that Black soldiers "had to stick together." A.R. 92.

20.  Army documents confirm that superior officers, who were predominately white, likely would have diminished or ignored concerns about racism. A.R. 40. Even as incidents of racial violence doubled from 1977 to 1978 and organizations like the Ku Klux Klan were active on Army bases, the Army continued to focus their disciplinary actions disproportionately on soldiers of color. A.R. 40.

21.  Adding to the stress of this hostile environment, the servicemen lived in "constant fear of violence." A.R. 92.

22.  Mr. Stevenson had deployed to West Germany during the "German Autumn," a period of increased anti-American sentiment and heightened violence against U.S. targets by far-left terrorist groups. A.R. 38, 92. The Red Army Faction, also known as the Baader-Meinhof Gang, opposed America's presence in Germany. Throughout the 1970s and 1980s, the Baader-Meinhof gang targeted "U.S. soldiers and airmen stationed in Germany" with repeat terrorist attacks, leaving "scores . . . wounded," and some service members killed. A.R. 38, 92.

23.  The terrorist threat in West Germany was "formidable," and Army Captain and Team Commander Edward Partridge described the conditions as "favorable for terrorist attacks on U.S. military organizations." A.R. 155.

24.  Mr. Stevenson arrived after several terrorist attacks had targeted U.S. Army installations specifically, and was stationed in Ludwigsburg, only fifteen kilometers from the Stuttgart prison holding the Baader-Meinhof leaders. A.R. 92.

25.  Mr. Stevenson's unit "was responsible for missile defense" and the soldiers were "under constant stress." A.R. 92. The base environment was tense, with frequent, unpredictable lockdowns. A.R. 38, 93.

26.  As a Wheeled Vehicle Mechanic that was part of a unit responsible for missile defense, Mr. Stevenson's duties made him especially vulnerable to attack and exposed him to additional trauma. A.R. 39, 92.

27.  Mr. Stevenson traveled to remote line batteries across West Germany to maintain generators and vehicles and transferred top-secret material and prisoners across the region as a courier. A.R. 92. Mr. Stevenson often performed courier missions to remote batteries that were vulnerable to terrorist attacks. A.R. 92.

28.  On one such mission, Mr. Stevenson and his fellow servicemembers swerved off the road and got trapped in a ravine for hours, "completely exposed." A.R. 92. After this accident, Mr. Stevenson began to feel a constant "dread and apprehension for his personal safety when he needed to travel outside his home base." A.R. 167.

29.  Due to his duties and the associated exposure to attack, Mr. Stevenson "worried about making it home from Germany" and was constantly concerned he would be targeted by the German terrorists. A.R. 93.

**D. Mr. Stevenson developed Substance Use Disorder during his military service.**

30.  Given the intense pressure the soldiers in Ludwigsburg were under, the mental health of many soldiers suffered. A.R. 93, 189.

31.  Many soldiers handled the constant anxiety by self-medicating with drugs or alcohol. A.R. 189. Mr. Stevenson remembers numerous overdoses on the base at the time. A.R. 93.

32.  Suicides were "common" on the base. A.R. 93, 189. Mr. Stevenson personally witnessed one soldier, who lived in his quarters, attempt suicide while high on drugs. A.R. 93.

33.  Around the time Mr. Stevenson was serving, a Brigadier General even warned Congress about a "serious," pervasive "drug abuse problem" in the European Command. A.R. 41. West Germany was a particular "hot spot" for drug use—one congressman estimated that fifteen to twenty percent of soldiers in West Germany used hard drugs. A.R. 41. This account is confirmed by a soldier who served with Mr. Stevenson. A.R. 189.

34.  Six months into his tour, Mr. Stevenson drank for the first time in his life to help ease his fear of terrorist attacks and cope with the anxiety and isolation he felt due to the continual barrage of racist incidents. A.R. 34, 93.

35.  Fellow soldiers then introduced Mr. Stevenson to hashish, and eventually heroin, which was readily available on base. A.R. 93.

36.  As he became increasingly dependent on alcohol and heroin, Mr. Stevenson did not feel that he could get any help from the military. A.R. 93.

37.  Soldiers understood that admitting to using drugs was a fast way to get court-martialed and discharged. A.R. 93-94.

38.  No one in Mr. Stevenson's chain of command spoke about mental health treatment, and Mr. Stevenson was not "aware of any rehabilitation centers." A.R. 94.

39.  These policies on the base, however, are no longer in practice today, as servicemembers have greater access to mental health and addiction resources. A.R. 62, 185.

### E. Mr. Stevenson's Substance Use Disorder caused his AWOL.

40.  To "cope" with the constant threat of terrorist attacks and pervasive racism, Mr. Stevenson began self-medicating with alcohol, hashish, and eventually heroin. A.R. 169-70, 183.

41.  When Mr. Stevenson returned to the United States, he had developed two severe sub-categories of SUD: Alcohol Use Disorder and Opioid Use Disorder. A.R. 9, 179.

42.  His Opioid Use Disorder was so severe that he had to use heroin immediately "as soon as he woke up." A.R. 170. His symptoms included a compulsive need to seek out drugs to satisfy his addiction. A.R. 170.

43.  Psychiatrist Dr. Bhinna Park and psychologist Dr. Madelon Baranoski conducted a psychiatric and psychological evaluation of Mr. Stevenson in 2019, concluding that he suffered from SUD during this time. A.R. 179.

44.  In their evaluation, the experts looked to the Fifth Edition of the American Psychiatric Associations' Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), in which SUD is defined as a mental health condition. A.R. 50-51.

45.  Dr. Bhinna Park concluded that "to a reasonable degree of medical certainty, Mr. Stevenson's substance use contributed significantly to his instances of going AWOL." A.R. 186.

46.  The substance-seeking symptoms and other behavioral symptoms of Mr. Stevenson's disorder caused him to go AWOL three times. A.R. 94, 169.

47.  Mr. Stevenson first went AWOL shortly after returning from Germany. A.R. 94, 169. After taking a leave of absence, Mr. Stevenson spent all his travel money on drugs and was only able to raise sufficient funds to return to the base after seventeen days. A.R. 94, 169.

48.  His second AWOL was also a direct result of his SUD. Traveling to find drugs, he ended up going on a heroin bender and running out of travel money again. A.R. 94, 169.

49.  His third AWOL was also the result of his SUD, as his addiction dictated his movements and fully took over his life. A.R. 94, 169. Living from high to high and in single-minded pursuit of drugs, Mr. Stevenson remained AWOL for three years. A.R. 169.

**F.  Mr. Stevenson battled with Substance Use Disorder and recovered.**

50.  During his three-year heroin bender starting in August of 1980, Mr. Stevenson used heroin around five or six times a day. A.R. 94, 170. In this state of perpetual intoxication, he "lost [his] sense of time," and he remembers "almost nothing from this time period." A.R. 94.

51.  In 1983, Mr. Stevenson surrendered to the military and was administratively separated with an Other than Honorable discharge. A.R. 10, 94, 169. Mr. Stevenson was also demoted from the rank of Specialist Four to Private E-1. A.R. 169.

52.  Mr. Stevenson's family and friends confirm symptoms indicating that he suffered from SUD for decades after returning from Germany. A.R. 99, 191-92, 194, 196.

53.  Mr. Stevenson's SUD also strained his relationships. A.R. 94. By 2002, he was homeless. A.R. 94. He was unable to care for himself, let alone his family. A.R. 94.

54.  At rock bottom, Mr. Stevenson proactively checked himself into a rehabilitation center and began the path to recovery. A.R. 95. After a difficult four-day detox, Mr. Stevenson spent a year recovering in the Salvation Army's Adult Rehabilitation Center. A.R. 95.

55.  Since the day he checked into rehab, Mr. Stevenson has fought to rebuild his life from the wreckage his SUD created. A.R. 95-96.

56.  In 2003, he completed the Salvation Army's program, and found a job as a shipping and mailing clerk at W.E. Bassett Company. A.R. 95. After that, he worked as a shipping and

receiving clerk at Homer G. Godfrey Masonry Supplies, and, in 2019, he began working at the

Board of Education in Bridgeport, CT as a custodian. A.R. 95.

57.    Mr. Stevenson has a clean criminal record. A.R. 172, 199-203. Even though his SUD

is in remission, Mr. Stevenson struggles with mental health conditions he developed in the

Army—he still experiences depression and anxiety symptoms. A.R. 172-73, 180.

58.    Mr. Stevenson has demonstrated his resilience and commitment to recovery by

maintaining remission for nearly twenty years. A.R. 96, 180.

**G.  Mr. Stevenson has continued to be dedicated to his community and veterans recovering from addiction.**

59.    After recovering, Mr. Stevenson repaired his fractured family relationships,

reconnected with his children, and started supporting them financially. A.R. 96. In 2009, he

married his current wife Reva, whom he describes as his "soulmate." A.R. 96.

60.    In 2013, he enrolled full time in Gateway Community College, earning his

Associates Degree in General Science. A.R. 95.

61.    Mr. Stevenson has dedicated his life to helping others, especially those struggling

with addiction. A.R. 96.

62.    Additionally, Mr. Stevenson leads his local chapter of Narcotics Anonymous. A.R.

96. He also became a certified substance use counselor and has additional certifications in

suicide prevention, nonviolent crisis intervention, and First Aid CPR. A.R. 95.

63.    Mr. Stevenson has worked as a substance abuse counselor since 2013. A.R. 95-96.

He has helped hundreds of people overcome addiction and SUD—previously at Crossroads, Inc.,

and currently at the Connecticut Renaissance. A.R. 95-96.

64.    Community members, friends, and family point to his commitment to recovery, and

his sincere desire to help others. A.R. 99-100, 189, 192, 194, 196-97. One fellow substance

abuse counselor told the ABCMR in his affidavit that he has "rarely seen clients connect with a counselor so deeply." A.R. 197.

65.  Mr. Stevenson works closely with veterans because he believes it "mak[es his] military service mean something" and makes sure no one suffers like he did. A.R. 96.

66.  Mr. Stevenson has won an award for his work on behalf of other people with SUD. A.R. 96.

67.  He is a devout Christian, and he aims to "inspire before [he] expire[s]." A.R. 96.

**H. Mr. Stevenson sought relief at the ABCMR.**

68.  Relying on the statutory obligation and Kurta and Wilkie Memos directives, Mr. Stevenson asked the ABCMR to upgrade his discharge status from Other than Honorable to Honorable or Under Honorable Conditions (General)." A.R. 3, 28.

69.  He also asked the Board to change the narrative reason for his separation from "Separation by Reason of Serious Misconduct" to "Secretarial Authority, Other."  A.R. 28.

70.  As Mr. Stevenson told the ABCMR, he applied for a discharge upgrade because he wanted "forgiveness" from the military, so that he could move on from the most painful parts of his life and show his clients that "you can recover from anything." A.R. 97.

71.  In his application, which was prepared by counsel, Mr. Stevenson explained that his SUD "developed during and because of his service and contributed to the AWOLs underlying his discharge." A.R. 45.

72.  Mr. Stevenson supported his application with an expert psychiatric and psychological evaluation from Dr. Bhinna Park and Dr. Madelon Baranoski. A.R. 163-186. They describe how the racial discrimination and constant risk of terrorist attacks that defined Mr. Stevenson's service in West Germany led him to develop SUD. A.R. 181-185.

73.   He also explicitly argued that SUD was a mental health condition meriting liberal consideration under the Kurta Memo. A.R. 46-52. His brief pointed to the fact that SUD is clearly defined as a mental health condition in the DSM-5. A.R. 47-49.

74.   Mr. Stevenson also cited ABCMR precedent indicating that medically recognized mental health conditions could "mitigate an [applicant's] periods of AWOL." A.R. 52.

75.   Finally, Mr. Stevenson demonstrated that he met many of the criteria for relief under the Wilkie Memo's standard of injustice. A.R. 58-67. In particular, he argued "his post-service self-rehabilitation, documented high character, and numerous civilian contributions merit[s] an upgrade." A.R. 64.

76.   Mr. Stevenson argued that under modern Army substance use policies that provide treatment rather than punishment, "he would have had a more favorable outcome." A.R. 58-59.

**I.   The ABCMR denied Mr. Stevenson's discharge upgrade application.**

77.   More than a year and a half later, the ABCMR denied Mr. Stevenson's application for a discharge upgrade. A.R. 1.

78.   The Army Review Board's psychologist agreed that Mr. Stevenson had SUD during service, finding that "[t]he evidence suggests that applicant likely met the criteria for Alcohol Use Disorder and Opioid Use Disorder at the time of service." A.R. 13.

79.   However, the ABCMR refused to apply liberal consideration to its review of Mr. Stevenson's application, though the Kurta Memo directs the ABCMR to apply liberal consideration "when the application for relief is based in whole or in part on matters relating to mental health conditions." A.R. 14; Kurta Memo ¶ 3.

80.   The ABCMR did not explain its failure to apply liberal consideration beyond concurring with its psychologist's unsupported assertion that "neither [Alcohol Use Disorder nor

11

Opioid Use Disorder] are a mitigating behavioral health consideration under Liberal

Consideration." A.R. 13-14.

81.   The ABCMR also failed to address many of the arguments Mr. Stevenson raised.

A.R. 13-14.

82.   For one, the denial did not respond to his argument that SUD is a mental health

condition under the Kurta Memo and therefore merits liberal consideration. A.R. 13-14, 46-52.

83.   Outside the summary of Mr. Stevenson's claims, the decision did not acknowledge

the role that the military played in encouraging SUD by providing soldiers with three gallons of

whiskey in lieu of mental health treatment. A.R. 13-14, 41.

84.   The decision also did not address the substance of Mr. Stevenson's claim that the

military's racially hostile environment—an environment the Army failed to ameliorate in

violation of its own regulations—contributed to Mr. Stevenson's SUD and eventual discharge.

A.R. 13, 39-40. Instead, the Board Discussion section contains a boilerplate statement that the

Board "found insufficient evidence of in-service mitigating factors for the misconduct." A.R. 14.

Dated: September 30, 2022

Respectfully submitted,
/s/ *Meghan E. Brooks*
Kathryn Bussey, Law Student Intern*
Joshua Herman, Law Student Intern*
Miriam Pierson, Law Student Intern*
Dena Shata, Law Student Intern
Meghan E. Brooks, ct31147
Michael J. Wishnie, ct27221
Jerome N. Frank Legal Services Organization
Veterans Legal Services Clinic
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
meghan.brooks@ylsclinics.org

* Motion for law student appearance pending.