## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| MARK C. STEVENSON | ) | Civ. No. 3:22-cv-00601-JBA |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | |
| | ) | |
| CHRISTINE E. WORMUTH, | ) | |
| Secretary of the Army, | ) | |
| | ) | |
| *Defendant*. | ) | September 30, 2022 |
| ———————————————— | ) | |

## <u>DECLARATION OF MIRIAM PIERSON</u>

In accordance with 28 U.S.C. § 1746, I, Miriam Pierson, make the following declaration:

1.      I am a law student intern with the Veterans Legal Services Clinic of the Jerome N. Frank Legal Services Organization at Yale Law School, which represents Plaintiff Mark Stevenson in the above-captioned matter.

2.      I respectfully submit this Declaration in support of Plaintiff's Motion for Summary Judgment to attach authorities not available in standard legal databases for the convenience of the Court.

3.      Attached as Exhibit A are true and correct copies of excerpts from the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5"), published May 18, 2013 by the American Psychiatric Association.

4.      Attached as Exhibit B is a true and correct copy of an excerpt from *Reading the Law: The Interpretation of Texts* by Justice Antonin Scalia and Bryan A. Garner, published in 2012 by Thomson/West.

1

5.      Attached as Exhibit C is a true and correct copy of the Army Board for Correction of Military Record's decision in case number AR20170015770, dated February 6, 2018.

6.      Attached as Exhibit D is a true and correct copy of the Army Board for Correction of Military Record's decision in case number AR20160000200, dated August 17, 2017.

7.      Attached as Exhibit E is a true and correct copy of the Army Board for Correction of Military Record's decision in case number AR20190013166, dated February 10, 2020.

8.      Attached as Exhibit F is a true and correct copy of an excerpt from Senate Report No. 100-439, dated August 1, 1988.

9.      Attached as Exhibit G is a true and correct copy of an excerpt of an article published in Behavioral Sciences by Sean M. Robinson and Bryon Adinoff titled "The Classification of Substance Use Disorders: Historical, Contextual, and Conceptual Considerations," dated August 18, 2016.

10.     Attached as Exhibit H is a true and correct copy of a webpage published by the National Institute on Alcohol Abuse and Alcoholism titled "Understanding Alcohol Use Disorder," dated April 2021, available at https://www.niaaa.nih.gov/publications/brochures-and-fact-sheets/understanding-alcohol-use-disorder.

11.     Attached as Exhibit I is a true and correct copy of an article published in the New England Journal of Medicine by Nora D. Volkow titled "Stigma and the Toll of Addiction," dated April 2, 2020.

12.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 30, 2022
New Haven, CT

Respectfully submitted,

/s/ *Miriam Pierson*
Miriam Pierson, Law Student Intern
Jerome N. Frank Legal Services Organization
Veterans Legal Services Clinic
P.O. Box 209090
New Haven, CT 06520-9090
Phone: (203) 432-4800

# EXHIBIT A

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5™

AMERICAN PSYCHIATRIC ASSOCIATION

# Contents

**DSM-5 Classification** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

**Preface** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .xli

## Section I
### DSM-5 Basics

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

**Use of the Manual** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

**Cautionary Statement for Forensic Use of DSM-5** . . . . . . . . . . .25

## Section II
### Diagnostic Criteria and Codes

**Neurodevelopmental Disorders** . . . . . . . . . . . . . . . . . . . . . . . . . . .31

**Schizophrenia Spectrum and Other Psychotic Disorders** . . . . .87

**Bipolar and Related Disorders** . . . . . . . . . . . . . . . . . . . . . . . . . . .123

**Depressive Disorders** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .155

**Anxiety Disorders.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .189

**Obsessive-Compulsive and Related Disorders** . . . . . . . . . . . .235

**Trauma- and Stressor-Related Disorders.** . . . . . . . . . . . . . . . . .265

**Dissociative Disorders** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .291

**Somatic Symptom and Related Disorders** . . . . . . . . . . . . . . . .309

**Feeding and Eating Disorders** . . . . . . . . . . . . . . . . . . . . . . . . . . .329

**Elimination Disorders** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .355

**Sleep-Wake Disorders.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .361

**Sexual Dysfunctions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .423

**Gender Dysphoria** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .451

Disruptive, Impulse-Control, and Conduct Disorders . . . . . . . . 461

Substance-Related and Addictive Disorders . . . . . . . . . . . . . . 481

Neurocognitive Disorders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 591

Personality Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 645

Paraphilic Disorders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 685

Other Mental Disorders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 707

Medication-Induced Movement Disorders
   and Other Adverse Effects of Medication  . . . . . . . . . . . . . . . 709

Other Conditions That May Be a Focus of Clinical Attention . . 715

# Section III
## Emerging Measures and Models

Assessment Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733

Cultural Formulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 749

Alternative DSM-5 Model for Personality Disorders . . . . . . . . . 761

Conditions for Further Study . . . . . . . . . . . . . . . . . . . . . . . . . . . 783

# Appendix

Highlights of Changes From DSM-IV to DSM-5 . . . . . . . . . . . . . 809

Glossary of Technical Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . 817

Glossary of Cultural Concepts of Distress . . . . . . . . . . . . . . . . 833

Alphabetical Listing of DSM-5 Diagnoses and Codes
   (ICD-9-CM and ICD-10-CM). . . . . . . . . . . . . . . . . . . . . . . . . . . 839

Numerical Listing of DSM-5 Diagnoses and Codes
   (ICD-9-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 863

Numerical Listing of DSM-5 Diagnoses and Codes
   (ICD-10-CM) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 877

DSM-5 Advisors and Other Contributors . . . . . . . . . . . . . . . . . 897

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 917

# Preface

The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (DSM) is a classification of mental disorders with associated criteria designed to facilitate more reliable diagnoses of these disorders. With successive editions over the past 60 years, it has become a standard reference for clinical practice in the mental health field. Since a complete description of the underlying pathological processes is not possible for most mental disorders, it is important to emphasize that the current diagnostic criteria are the best available description of how mental disorders are expressed and can be recognized by trained clinicians. DSM is intended to serve as a practical, functional, and flexible guide for organizing information that can aid in the accurate diagnosis and treatment of mental disorders. It is a tool for clinicians, an essential educational resource for students and practitioners, and a reference for researchers in the field.

Although this edition of DSM was designed first and foremost to be a useful guide to clinical practice, as an official nomenclature it must be applicable in a wide diversity of contexts. DSM has been used by clinicians and researchers from different orientations (biological, psychodynamic, cognitive, behavioral, interpersonal, family/systems), all of whom strive for a common language to communicate the essential characteristics of mental disorders presented by their patients. The information is of value to all professionals associated with various aspects of mental health care, including psychiatrists, other physicians, psychologists, social workers, nurses, counselors, forensic and legal specialists, occupational and rehabilitation therapists, and other health professionals. The criteria are concise and explicit and intended to facilitate an objective assessment of symptom presentations in a variety of clinical settings—inpatient, outpatient, partial hospital, consultation-liaison, clinical, private practice, and primary care—as well in general community epidemiological studies of mental disorders. DSM-5 is also a tool for collecting and communicating accurate public health statistics on mental disorder morbidity and mortality rates. Finally, the criteria and corresponding text serve as a textbook for students early in their profession who need a structured way to understand and diagnose mental disorders as well as for seasoned professionals encountering rare disorders for the first time. Fortunately, all of these uses are mutually compatible.

These diverse needs and interests were taken into consideration in planning DSM-5. The classification of disorders is harmonized with the World Health Organization's *International Classification of Diseases* (ICD), the official coding system used in the United States, so that the DSM criteria define disorders identified by ICD diagnostic names and code numbers. In DSM-5, both ICD-9-CM and ICD-10-CM codes (the latter scheduled for adoption in October 2014) are attached to the relevant disorders in the classification.

Although DSM-5 remains a categorical classification of separate disorders, we recognize that mental disorders do not always fit completely within the boundaries of a single disorder. Some symptom domains, such as depression and anxiety, involve multiple diagnostic categories and may reflect common underlying vulnerabilities for a larger group of disorders. In recognition of this reality, the disorders included in DSM-5 were reordered into a revised organizational structure meant to stimulate new clinical perspectives. This new structure corresponds with the organizational arrangement of disorders planned for ICD-11 scheduled for release in 2015. Other enhancements have been introduced to promote ease of use across all settings:

- **Representation of developmental issues related to diagnosis.** The change in chapter organization better reflects a lifespan approach, with disorders more frequently diagnosed in childhood (e.g., neurodevelopmental disorders) at the beginning of the manual and disorders more applicable to older adulthood (e.g., neurocognitive disorders) at the end of the manual. Also, within the text, subheadings on development and course provide descriptions of how disorder presentations may change across the lifespan. Age-related factors specific to diagnosis (e.g., symptom presentation and prevalence differences in certain age groups) are also included in the text. For added emphasis, these age-related factors have been added to the criteria themselves where applicable (e.g., in the criteria sets for insomnia disorder and posttraumatic stress disorder, specific criteria describe how symptoms might be expressed in children). Likewise, gender and cultural issues have been integrated into the disorders where applicable.
- **Integration of scientific findings from the latest research in genetics and neuroimaging.** The revised chapter structure was informed by recent research in neuroscience and by emerging genetic linkages between diagnostic groups. Genetic and physiological risk factors, prognostic indicators, and some putative diagnostic markers are highlighted in the text. This new structure should improve clinicians' ability to identify diagnoses in a disorder spectrum based on common neurocircuitry, genetic vulnerability, and environmental exposures.
- **Consolidation of autistic disorder, Asperger's disorder, and pervasive developmental disorder into autism spectrum disorder.** Symptoms of these disorders represent a single continuum of mild to severe impairments in the two domains of social communication and restrictive repetitive behaviors/interests rather than being distinct disorders. This change is designed to improve the sensitivity and specificity of the criteria for the diagnosis of autism spectrum disorder and to identify more focused treatment targets for the specific impairments identified.
- **Streamlined classification of bipolar and depressive disorders.** Bipolar and depressive disorders are the most commonly diagnosed conditions in psychiatry. It was therefore important to streamline the presentation of these disorders to enhance both clinical and educational use. Rather than separating the definition of manic, hypomanic, and major depressive episodes from the definition of bipolar I disorder, bipolar II disorder, and major depressive disorder as in the previous edition, we included all of the component criteria within the respective criteria for each disorder. This approach will facilitate bedside diagnosis and treatment of these important disorders. Likewise, the explanatory notes for differentiating bereavement and major depressive disorders will provide far greater clinical guidance than was previously provided in the simple bereavement exclusion criterion. The new specifiers of anxious distress and mixed features are now fully described in the narrative on specifier variations that accompanies the criteria for these disorders.
- **Restructuring of substance use disorders for consistency and clarity.** The categories of substance abuse and substance dependence have been eliminated and replaced with an overarching new category of substance use disorders—with the specific substance used defining the specific disorders. "Dependence" has been easily confused with the term "addiction" when, in fact, the tolerance and withdrawal that previously defined dependence are actually very normal responses to prescribed medications that affect the central nervous system and do not necessarily indicate the presence of an addiction. By revising and clarifying these criteria in DSM-5, we hope to alleviate some of the widespread misunderstanding about these issues.
- **Enhanced specificity for major and mild neurocognitive disorders.** Given the explosion in neuroscience, neuropsychology, and brain imaging over the past 20 years, it was critical to convey the current state-of-the-art in the diagnosis of specific types of disorders that were previously referred to as the "dementias" or organic brain diseases. Biological markers identified by imaging for vascular and traumatic brain disorders and

specific molecular genetic findings for rare variants of Alzheimer's disease and Huntington's disease have greatly advanced clinical diagnoses, and these disorders and others have now been separated into specific subtypes.

- **Transition in conceptualizing personality disorders.** Although the benefits of a more dimensional approach to personality disorders have been identified in previous editions, the transition from a categorical diagnostic system of individual disorders to one based on the relative distribution of personality traits has not been widely accepted. In DSM-5, the categorical personality disorders are virtually unchanged from the previous edition. However, an alternative "hybrid" model has been proposed in Section III to guide future research that separates interpersonal functioning assessments and the expression of pathological personality traits for six specific disorders. A more dimensional profile of personality trait expression is also proposed for a trait-specified approach.

- **Section III: new disorders and features.** A new section (Section III) has been added to highlight disorders that require further study but are not sufficiently well established to be a part of the official classification of mental disorders for routine clinical use. Dimensional measures of symptom severity in 13 symptom domains have also been incorporated to allow for the measurement of symptom levels of varying severity across all diagnostic groups. Likewise, the WHO Disability Assessment Schedule (WHODAS), a standard method for assessing global disability levels for mental disorders that is based on the International Classification of Functioning, Disability and Health (ICF) and is applicable in all of medicine, has been provided to replace the more limited Global Assessment of Functioning scale. It is our hope that as these measures are implemented over time, they will provide greater accuracy and flexibility in the clinical description of individual symptomatic presentations and associated disability during diagnostic assessments.

- **Online enhancements.** DSM-5 features online supplemental information. Additional cross-cutting and diagnostic severity measures are available online (www.psychiatry.org/dsm5), linked to the relevant disorders. In addition, the Cultural Formulation Interview, Cultural Formulation Interview—Informant Version, and supplementary modules to the core Cultural Formulation Interview are also included online at www.psychiatry.org/dsm5.

These innovations were designed by the leading authorities on mental disorders in the world and were implemented on the basis of their expert review, public commentary, and independent peer review. The 13 work groups, under the direction of the DSM-5 Task Force, in conjunction with other review bodies and, eventually, the APA Board of Trustees, collectively represent the global expertise of the specialty. This effort was supported by an extensive base of advisors and by the professional staff of the APA Division of Research; the names of everyone involved are too numerous to mention here but are listed in the Appendix. We owe tremendous thanks to those who devoted countless hours and invaluable expertise to this effort to improve the diagnosis of mental disorders.

We would especially like to acknowledge the chairs, text coordinators, and members of the 13 work groups, listed in the front of the manual, who spent many hours in this volunteer effort to improve the scientific basis of clinical practice over a sustained 6-year period. Susan K. Schultz, M.D., who served as text editor, worked tirelessly with Emily A. Kuhl, Ph.D., senior science writer and DSM-5 staff text editor, to coordinate the efforts of the work groups into a cohesive whole. William E. Narrow, M.D., M.P.H., led the research group that developed the overall research strategy for DSM-5, including the field trials, that greatly enhanced the evidence base for this revision. In addition, we are grateful to those who contributed so much time to the independent review of the revision proposals, including Kenneth S. Kendler, M.D., and Robert Freedman, M.D., co-chairs of the Scientific Review Committee; John S. McIntyre, M.D., and Joel Yager, M.D., co-chairs of the Clinical and Public Health Committee; and Glenn Martin, M.D., chair of the APA Assem-

bly review process. Special thanks go to Helena C. Kraemer, Ph.D., for her expert statistical consultation; Michael B. First, M.D., for his valuable input on the coding and review of criteria; and Paul S. Appelbaum, M.D., for feedback on forensic issues. Maria N. Ward, M.Ed., RHIT, CCS-P, also helped in verifying all ICD coding. The Summit Group, which included these consultants, the chairs of all review groups, the task force chairs, and the APA executive officers, chaired by Dilip V. Jeste, M.D., provided leadership and vision in helping to achieve compromise and consensus. This level of commitment has contributed to the balance and objectivity that we feel are hallmarks of DSM-5.

We especially wish to recognize the outstanding APA Division of Research staff—identified in the Task Force and Work Group listing at the front of this manual—who worked tirelessly to interact with the task force, work groups, advisors, and reviewers to resolve issues, serve as liaisons between the groups, direct and manage the academic and routine clinical practice field trials, and record decisions in this important process. In particular, we appreciate the support and guidance provided by James H. Scully Jr., M.D., Medical Director and CEO of the APA, through the years and travails of the development process. Finally, we thank the editorial and production staff of American Psychiatric Publishing—specifically, Rebecca Rinehart, Publisher; John McDuffie, Editorial Director; Ann Eng, Senior Editor; Greg Kuny, Managing Editor; and Tammy Cordova, Graphics Design Manager—for their guidance in bringing this all together and creating the final product. It is the culmination of efforts of many talented individuals who dedicated their time, expertise, and passion that made DSM-5 possible.

*David J. Kupfer, M.D.*
DSM-5 Task Force Chair

*Darrel A. Regier, M.D., M.P.H.*
DSM-5 Task Force Vice-Chair
December 19, 2012

# Posttraumatic Stress Disorder

## Diagnostic Criteria                                    **309.81** (F43.10)

### Posttraumatic Stress Disorder

**Note:** The following criteria apply to adults, adolescents, and children older than 6 years. For children 6 years and younger, see corresponding criteria below.

A. Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

1. Directly experiencing the traumatic event(s).
2. Witnessing, in person, the event(s) as it occurred to others.
3. Learning that the traumatic event(s) occurred to a close family member or close friend. In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.
4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains; police officers repeatedly exposed to details of child abuse).

   **Note:** Criterion A4 does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related.

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).

   **Note:** In children older than 6 years, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.
2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).

   **Note:** In children, there may be frightening dreams without recognizable content.
3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.)

   **Note:** In children, trauma-specific reenactment may occur in play.
4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).
5. Marked physiological reactions to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

C. Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic event(s) occurred, as evidenced by one or both of the following:

1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).
2. Avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

D. Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

1. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs).

    2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world (e.g., "I am bad," "No one can be trusted," "The world is completely dangerous," "My whole nervous system is permanently ruined").

    3. Persistent, distorted cognitions about the cause or consequences of the traumatic event(s) that lead the individual to blame himself/herself or others.

    4. Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).

    5. Markedly diminished interest or participation in significant activities.

    6. Feelings of detachment or estrangement from others.

    7. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

E. Marked alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

    1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects.

    2. Reckless or self-destructive behavior.

    3. Hypervigilance.

    4. Exaggerated startle response.

    5. Problems with concentration.

    6. Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

F. Duration of the disturbance (Criteria B, C, D, and E) is more than 1 month.

G. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

H. The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

*Specify* whether:

    **With dissociative symptoms:** The individual's symptoms meet the criteria for posttraumatic stress disorder, and in addition, in response to the stressor, the individual experiences persistent or recurrent symptoms of either of the following:

    1. **Depersonalization:** Persistent or recurrent experiences of feeling detached from, and as if one were an outside observer of, one's mental processes or body (e.g., feeling as though one were in a dream; feeling a sense of unreality of self or body or of time moving slowly).

    2. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

    **Note:** To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts, behavior during alcohol intoxication) or another medical condition (e.g., complex partial seizures).

*Specify* if:

    **With delayed expression:** If the full diagnostic criteria are not met until at least 6 months after the event (although the onset and expression of some symptoms may be immediate).

## Posttraumatic Stress Disorder for Children 6 Years and Younger

A. In children 6 years and younger, exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the following ways:

    1. Directly experiencing the traumatic event(s).

    2. Witnessing, in person, the event(s) as it occurred to others, especially primary caregivers.

     **Note:** Witnessing does not include events that are witnessed only in electronic media, television, movies, or pictures.

    3. Learning that the traumatic event(s) occurred to a parent or caregiving figure.

B. Presence of one (or more) of the following intrusion symptoms associated with the traumatic event(s), beginning after the traumatic event(s) occurred:

    1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).

    **Note:** Spontaneous and intrusive memories may not necessarily appear distressing and may be expressed as play reenactment.

    2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic event(s).

    **Note:** It may not be possible to ascertain that the frightening content is related to the traumatic event.

    3. Dissociative reactions (e.g., flashbacks) in which the child feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.) Such trauma-specific reenactment may occur in play.

    4. Intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

    5. Marked physiological reactions to reminders of the traumatic event(s).

C. One (or more) of the following symptoms, representing either persistent avoidance of stimuli associated with the traumatic event(s) or negative alterations in cognitions and mood associated with the traumatic event(s), must be present, beginning after the event(s) or worsening after the event(s):

**Persistent Avoidance of Stimuli**

    1. Avoidance of or efforts to avoid activities, places, or physical reminders that arouse recollections of the traumatic event(s).

    2. Avoidance of or efforts to avoid people, conversations, or interpersonal situations that arouse recollections of the traumatic event(s).

**Negative Alterations in Cognitions**

    3. Substantially increased frequency of negative emotional states (e.g., fear, guilt, sadness, shame, confusion).

    4. Markedly diminished interest or participation in significant activities, including constriction of play.

    5. Socially withdrawn behavior.

    6. Persistent reduction in expression of positive emotions.

D. Alterations in arousal and reactivity associated with the traumatic event(s), beginning or worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:

    1. Irritable behavior and angry outbursts (with little or no provocation) typically expressed as verbal or physical aggression toward people or objects (including extreme temper tantrums).

    2. Hypervigilance.

    3. Exaggerated startle response.

    4. Problems with concentration.

    5. Sleep disturbance (e.g., difficulty falling or staying asleep or restless sleep).

E. The duration of the disturbance is more than 1 month.

F. The disturbance causes clinically significant distress or impairment in relationships with parents, siblings, peers, or other caregivers or with school behavior.

G. The disturbance is not attributable to the physiological effects of a substance (e.g., medication or alcohol) or another medical condition.

*Specify* whether:

**With dissociative symptoms:** The individual's symptoms meet the criteria for post-traumatic stress disorder, and the individual experiences persistent or recurrent symptoms of either of the following:

1. **Depersonalization:** Persistent or recurrent experiences of feeling detached from, and as if one were an outside observer of, one's mental processes or body (e.g., feeling as though one were in a dream; feeling a sense of unreality of self or body or of time moving slowly).

2. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (e.g., the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

**Note:** To use this subtype, the dissociative symptoms must not be attributable to the physiological effects of a substance (e.g., blackouts) or another medical condition (e.g., complex partial seizures).

*Specify* if:

**With delayed expression:** If the full diagnostic criteria are not met until at least 6 months after the event (although the onset and expression of some symptoms may be immediate).

## Diagnostic Features

The essential feature of posttraumatic stress disorder (PTSD) is the development of characteristic symptoms following exposure to one or more traumatic events. Emotional reactions to the traumatic event (e.g., fear, helplessness, horror) are no longer a part of Criterion A. The clinical presentation of PTSD varies. In some individuals, fear-based re-experiencing, emotional, and behavioral symptoms may predominate. In others, anhedonic or dysphoric mood states and negative cognitions may be most distressing. In some other individuals, arousal and reactive-externalizing symptoms are prominent, while in others, dissociative symptoms predominate. Finally, some individuals exhibit combinations of these symptom patterns.

The directly experienced traumatic events in Criterion A include, but are not limited to, exposure to war as a combatant or civilian, threatened or actual physical assault (e.g., physical attack, robbery, mugging, childhood physical abuse), threatened or actual sexual violence (e.g., forced sexual penetration, alcohol/drug-facilitated sexual penetration, abusive sexual contact, noncontact sexual abuse, sexual trafficking), being kidnapped, being taken hostage, terrorist attack, torture, incarceration as a prisoner of war, natural or human-made disasters, and severe motor vehicle accidents. For children, sexually violent events may include developmentally inappropriate sexual experiences without physical violence or injury. A life-threatening illness or debilitating medical condition is not necessarily considered a traumatic event. Medical incidents that qualify as traumatic events involve sudden, catastrophic events (e.g., waking during surgery, anaphylactic shock). Witnessed events include, but are not limited to, observing threatened or serious injury, unnatural death, physical or sexual abuse of another person due to violent assault, domestic violence, accident, war or disaster, or a medical catastrophe in one's child (e.g., a life-threatening hemorrhage). Indirect exposure through learning about an event is limited to experiences affecting close relatives or friends and experiences that are violent or accidental (e.g., death due to natural causes does not qualify). Such events include violent per-

sonal assault, suicide, serious accident, and serious injury. The disorder may be especially severe or long-lasting when the stressor is interpersonal and intentional (e.g., torture, sexual violence).

The traumatic event can be reexperienced in various ways. Commonly, the individual has recurrent, involuntary, and intrusive recollections of the event (Criterion B1). Intrusive recollections in PTSD are distinguished from depressive rumination in that they apply only to involuntary and intrusive distressing memories. The emphasis is on recurrent memories of the event that usually include sensory, emotional, or physiological behavioral components. A common reexperiencing symptom is distressing dreams that replay the event itself or that are representative or thematically related to the major threats involved in the traumatic event (Criterion B2). The individual may experience dissociative states that last from a few seconds to several hours or even days, during which components of the event are relived and the individual behaves as if the event were occurring at that moment (Criterion B3). Such events occur on a continuum from brief visual or other sensory intrusions about part of the traumatic event without loss of reality orientation, to complete loss of awareness of present surroundings. These episodes, often referred to as "flashbacks," are typically brief but can be associated with prolonged distress and heightened arousal. For young children, reenactment of events related to trauma may appear in play or in dissociative states. Intense psychological distress (Criterion B4) or physiological reactivity (Criterion B5) often occurs when the individual is exposed to triggering events that resemble or symbolize an aspect of the traumatic event (e.g., windy days after a hurricane; seeing someone who resembles one's perpetrator). The triggering cue could be a physical sensation (e.g., dizziness for survivors of head trauma; rapid heartbeat for a previously traumatized child), particularly for individuals with highly somatic presentations.

Stimuli associated with the trauma are persistently (e.g., always or almost always) avoided. The individual commonly makes deliberate efforts to avoid thoughts, memories, feelings, or talking about the traumatic event (e.g., utilizing distraction techniques to avoid internal reminders) (Criterion C1) and to avoid activities, objects, situations, or people who arouse recollections of it (Criterion C2).

Negative alterations in cognitions or mood associated with the event begin or worsen after exposure to the event. These negative alterations can take various forms, including an inability to remember an important aspect of the traumatic event; such amnesia is typically due to dissociative amnesia and is not due to head injury, alcohol, or drugs (Criterion D1). Another form is persistent (i.e., always or almost always) and exaggerated negative expectations regarding important aspects of life applied to oneself, others, or the future (e.g., "I have always had bad judgment"; "People in authority can't be trusted") that may manifest as a negative change in perceived identity since the trauma (e.g., "I can't trust anyone ever again"; Criterion D2). Individuals with PTSD may have persistent erroneous cognitions about the causes of the traumatic event that lead them to blame themselves or others (e.g., "It's all my fault that my uncle abused me") (Criterion D3). A persistent negative mood state (e.g., fear, horror, anger, guilt, shame) either began or worsened after exposure to the event (Criterion D4). The individual may experience markedly diminished interest or participation in previously enjoyed activities (Criterion D5), feeling detached or estranged from other people (Criterion D6), or a persistent inability to feel positive emotions (especially happiness, joy, satisfaction, or emotions associated with intimacy, tenderness, and sexuality) (Criterion D7).

Individuals with PTSD may be quick tempered and may even engage in aggressive verbal and/or physical behavior with little or no provocation (e.g., yelling at people, getting into fights, destroying objects) (Criterion E1). They may also engage in reckless or self-destructive behavior such as dangerous driving, excessive alcohol or drug use, or self-injurious or suicidal behavior (Criterion E2).  PTSD is often characterized by a heightened sensitivity to potential threats, including those that are related to the traumatic experience (e.g., following a motor vehicle accident, being especially sensitive to the threat potentially

caused by cars or trucks) and those not related to the traumatic event (e.g., being fearful of suffering a heart attack) (Criterion E3). Individuals with PTSD may be very reactive to unexpected stimuli, displaying a heightened startle response, or jumpiness, to loud noises or unexpected movements (e.g., jumping markedly in response to a telephone ringing) (Criterion E4). Concentration difficulties, including difficulty remembering daily events (e.g., forgetting one's telephone number) or attending to focused tasks (e.g., following a conversation for a sustained period of time), are commonly reported (Criterion E5). Problems with sleep onset and maintenance are common and may be associated with nightmares and safety concerns or with generalized elevated arousal that interferes with adequate sleep (Criterion E6). Some individuals also experience persistent dissociative symptoms of detachment from their bodies (depersonalization) or the world around them (derealization); this is reflected in the "with dissociative symptoms" specifier.

## Associated Features Supporting Diagnosis

Developmental regression, such as loss of language in young children, may occur. Auditory pseudo-hallucinations, such as having the sensory experience of hearing one's thoughts spoken in one or more different voices, as well as paranoid ideation, can be present. Following prolonged, repeated, and severe traumatic events (e.g., childhood abuse, torture), the individual may additionally experience difficulties in regulating emotions or maintaining stable interpersonal relationships, or dissociative symptoms. When the traumatic event produces violent death, symptoms of both problematic bereavement and PTSD may be present.

## Prevalence

In the United States, projected lifetime risk for PTSD using DSM-IV criteria at age 75 years is 8.7%. Twelve-month prevalence among U.S. adults is about 3.5%. Lower estimates are seen in Europe and most Asian, African, and Latin American countries, clustering around 0.5%–1.0%. Although different groups have different levels of exposure to traumatic events, the conditional probability of developing PTSD following a similar level of exposure may also vary across cultural groups. Rates of PTSD are higher among veterans and others whose vocation increases the risk of traumatic exposure (e.g., police, firefighters, emergency medical personnel). Highest rates (ranging from one-third to more than one-half of those exposed) are found among survivors of rape, military combat and captivity, and ethnically or politically motivated internment and genocide. The prevalence of PTSD may vary across development; children and adolescents, including preschool children, generally have displayed lower prevalence following exposure to serious traumatic events; however, this may be because previous criteria were insufficiently developmentally informed. The prevalence of full-threshold PTSD also appears to be lower among older adults compared with the general population; there is evidence that subthreshold presentations are more common than full PTSD in later life and that these symptoms are associated with substantial clinical impairment. Compared with U.S. non-Latino whites, higher rates of PTSD have been reported among U.S. Latinos, African Americans, and American Indians, and lower rates have been reported among Asian Americans, after adjustment for traumatic exposure and demographic variables.

## Development and Course

PTSD can occur at any age, beginning after the first year of life. Symptoms usually begin within the first 3 months after the trauma, although there may be a delay of months, or even years, before criteria for the diagnosis are met. There is abundant evidence for what DSM-IV called "delayed onset" but is now called "delayed expression," with the recognition that some symptoms typically appear immediately and that the delay is in meeting full criteria.

# Substance-Related and Addictive Disorders

The substance-related disorders encompass 10 separate classes of drugs: alcohol; caffeine; cannabis; hallucinogens (with separate categories for phencyclidine [or similarly acting arylcyclohexylamines] and other hallucinogens); inhalants; opioids; sedatives, hypnotics, and anxiolytics; stimulants (amphetamine-type substances, cocaine, and other stimulants); tobacco; and other (or unknown) substances. These 10 classes are not fully distinct. All drugs that are taken in excess have in common direct activation of the brain reward system, which is involved in the reinforcement of behaviors and the production of memories. They produce such an intense activation of the reward system that normal activities may be neglected. Instead of achieving reward system activation through adaptive behaviors, drugs of abuse directly activate the reward pathways. The pharmacological mechanisms by which each class of drugs produces reward are different, but the drugs typically activate the system and produce feelings of pleasure, often referred to as a "high." Furthermore, individuals with lower levels of self-control, which may reflect impairments of brain inhibitory mechanisms, may be particularly predisposed to develop substance use disorders, suggesting that the roots of substance use disorders for some persons can be seen in behaviors long before the onset of actual substance use itself.

In addition to the substance-related disorders, this chapter also includes gambling disorder, reflecting evidence that gambling behaviors activate reward systems similar to those activated by drugs of abuse and produce some behavioral symptoms that appear comparable to those produced by the substance use disorders. Other excessive behavioral patterns, such as Internet gaming, have also been described, but the research on these and other behavioral syndromes is less clear. Thus, groups of repetitive behaviors, which some term *behavioral addictions,* with such subcategories as "sex addiction," "exercise addiction," or "shopping addiction," are not included because at this time there is insufficient peer-reviewed evidence to establish the diagnostic criteria and course descriptions needed to identify these behaviors as mental disorders.

The substance-related disorders are divided into two groups: substance use disorders and substance-induced disorders. The following conditions may be classified as substance-induced: intoxication, withdrawal, and other substance/medication-induced mental disorders (psychotic disorders, bipolar and related disorders, depressive disorders, anxiety disorders, obsessive-compulsive and related disorders, sleep disorders, sexual dysfunctions, delirium, and neurocognitive disorders).

The current section begins with a general discussion of criteria sets for a substance use disorder, substance intoxication and withdrawal, and other substance/medication-induced mental disorders, at least some of which are applicable across classes of substances. Reflecting some unique aspects of the 10 substance classes relevant to this chapter, the remainder of the chapter is organized by the class of substance and describes their unique aspects. To facilitate differential diagnosis, the text and criteria for the remaining substance/medication-induced mental disorders are included with disorders with which they share phenomenology (e.g., substance/medication-induced depressive disorder is in the chapter "Depressive Disorders"). The broad diagnostic categories associated with each specific group of substances are shown in Table 1.

**TABLE 1**   Diagnoses associated with substance class

| | Psychotic disorders | Bipolar disorders | Depressive disorders | Anxiety disorders | Obsessive-compulsive and related disorders | Sleep disorders | Sexual dysfunctions | Delirium | Neurocognitive disorders | Substance use disorders | Substance intoxication | Substance withdrawal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alcohol | I/W | I/W | I/W | I/W | | I/W | I/W | I/W | I/W/P | X | X | X |
| Caffeine | | | | I | | I/W | | | | | X | X |
| Cannabis | I | | | I | | I/W | | I | | X | X | X |
| Hallucinogens | | | | | | | | | | | | |
|   Phencyclidine | I | I | I | I | | | | I | | X | X | |
|   Other hallucinogens | I* | I | I | I | | | | I | | X | X | |
| Inhalants | I | | I | I | | | | I | I/P | X | X | |
| Opioids | | | I/W | W | | I/W | I/W | I/W | | X | X | X |
| Sedatives, hypnotics, or anxiolytics | I/W | I/W | I/W | W | | I/W | I/W | I/W | I/W/P | X | X | X |
| Stimulants** | I | I/W | I/W | I/W | I/W | I/W | I | I | | X | X | X |
| Tobacco | | | | | | W | | | | X | | X |
| Other (or unknown) | I/W | I/W | I/W | I/W | I/W | I/W | I/W | I/W | I/W/P | X | X | X |

**Note.** X = The category is recognized in DSM-5.
I = The specifier "with onset during intoxication" may be noted for the category.
W = The specifier "with onset during withdrawal" may be noted for the category.
I/W = Either "with onset during intoxication" or "with onset during withdrawal" may be noted for the category.
P = The disorder is persisting.
*Also hallucinogen persisting perception disorder (flashbacks).
**Includes amphetamine-type substances, cocaine, and other or unspecified stimulants.

# Substance-Related Disorders

# Substance Use Disorders

## Features

The essential feature of a substance use disorder is a cluster of cognitive, behavioral, and physiological symptoms indicating that the individual continues using the substance despite significant substance-related problems. As seen in Table 1, the diagnosis of a substance use disorder can be applied to all 10 classes included in this chapter except caffeine. For certain classes some symptoms are less salient, and in a few instances not all symptoms apply (e.g., withdrawal symptoms are not specified for phencyclidine use disorder, other hallucinogen use disorder, or inhalant use disorder).

An important characteristic of substance use disorders is an underlying change in brain circuits that may persist beyond detoxification, particularly in individuals with severe disorders. The behavioral effects of these brain changes may be exhibited in the repeated relapses and intense drug craving when the individuals are exposed to drug-related stimuli. These persistent drug effects may benefit from long-term approaches to treatment.

Overall, the diagnosis of a substance use disorder is based on a pathological pattern of behaviors related to use of the substance. To assist with organization, Criterion A criteria can be considered to fit within overall groupings of *impaired control, social impairment, risky use,* and *pharmacological criteria.* Impaired control over substance use is the first criteria grouping (Criteria 1–4). The individual may take the substance in larger amounts or over a longer period than was originally intended (Criterion 1). The individual may express a persistent desire to cut down or regulate substance use and may report multiple unsuccessful efforts to decrease or discontinue use (Criterion 2). The individual may spend a great deal of time obtaining the substance, using the substance, or recovering from its effects (Criterion 3). In some instances of more severe substance use disorders, virtually all of the individual's daily activities revolve around the substance. Craving (Criterion 4) is manifested by an intense desire or urge for the drug that may occur at any time but is more likely when in an environment where the drug previously was obtained or used. Craving has also been shown to involve classical conditioning and is associated with activation of specific reward structures in the brain. Craving is queried by asking if there has ever been a time when they had such strong urges to take the drug that they could not think of anything else. Current craving is often used as a treatment outcome measure because it may be a signal of impending relapse.

Social impairment is the second grouping of criteria (Criteria 5–7). Recurrent substance use may result in a failure to fulfill major role obligations at work, school, or home (Criterion 5). The individual may continue substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (Criterion 6). Important social, occupational, or recreational activities may be given up or reduced because of substance use (Criterion 7). The individual may withdraw from family activities and hobbies in order to use the substance.

Risky use of the substance is the third grouping of criteria (Criteria 8–9). This may take the form of recurrent substance use in situations in which it is physically hazardous (Criterion 8). The individual may continue substance use despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance (Criterion 9). The key issue in evaluating this criterion is not the existence of the problem, but rather the individual's failure to abstain from using the substance despite the difficulty it is causing.

Pharmacological criteria are the final grouping (Criteria 10 and 11). Tolerance (Criterion 10) is signaled by requiring a markedly increased dose of the substance to achieve the desired effect or a markedly reduced effect when the usual dose is consumed. The degree to which tolerance develops varies greatly across different individuals as well as across substances and may involve a variety of central nervous system effects. For example, tolerance to respiratory depression and tolerance to sedating and motor coordination may develop at different rates, depending on the substance. Tolerance may be difficult to determine by history alone, and laboratory tests may be helpful (e.g., high blood levels of the substance coupled with little evidence of intoxication suggest that tolerance is likely). Tolerance must also be distinguished from individual variability in the initial sensitivity to the effects of particular substances. For example, some first-time alcohol drinkers show very little evidence of intoxication with three or four drinks, whereas others of similar weight and drinking histories have slurred speech and incoordination.

Withdrawal (Criterion 11) is a syndrome that occurs when blood or tissue concentrations of a substance decline in an individual who had maintained prolonged heavy use of the substance. After developing withdrawal symptoms, the individual is likely to consume the substance to relieve the symptoms. Withdrawal symptoms vary greatly across the classes of substances, and separate criteria sets for withdrawal are provided for the drug classes. Marked and generally easily measured physiological signs of withdrawal are common with alcohol, opioids, and sedatives, hypnotics, and anxiolytics. Withdrawal signs and symptoms with stimulants (amphetamines and cocaine), as well as tobacco and cannabis, are often present but may be less apparent. Significant withdrawal has *not* been documented in humans after repeated use of phencyclidine, other hallucinogens, and inhalants; therefore, this criterion is not included for these substances. Neither tolerance nor withdrawal is necessary for a diagnosis of a substance use disorder. However, for most classes of substances, a past history of withdrawal is associated with a more severe clinical course (i.e., an earlier onset of a substance use disorder, higher levels of substance intake, and a greater number of substance-related problems).

Symptoms of tolerance and withdrawal occurring during appropriate medical treatment with prescribed medications (e.g., opioid analgesics, sedatives, stimulants) are specifically *not* counted when diagnosing a substance use disorder. The appearance of normal, expected pharmacological tolerance and withdrawal during the course of medical treatment has been known to lead to an erroneous diagnosis of "addiction" even when these were the only symptoms present. Individuals whose *only* symptoms are those that occur as a result of medical treatment (i.e., tolerance and withdrawal as part of medical care when the medications are taken as prescribed) should not receive a diagnosis solely on the basis of these symptoms. However, prescription medications can be used inappropriately, and a substance use disorder can be correctly diagnosed when there are other symptoms of compulsive, drug-seeking behavior.

## Severity and Specifiers

Substance use disorders occur in a broad range of severity, from mild to severe, with severity based on the number of symptom criteria endorsed. As a general estimate of severity, a *mild* substance use disorder is suggested by the presence of two to three symptoms, *moderate* by four to five symptoms, and *severe* by six or more symptoms. Changing severity across time is also reflected by reductions or increases in the frequency and/or dose of substance use, as assessed by the individual's own report, report of knowledgeable others, clinician's observations, and biological testing. The following course specifiers and descriptive features specifiers are also available for substance use disorders: "in early remission," "in sustained remission," "on maintenance therapy," and "in a controlled environment." Definitions of each are provided within respective criteria sets.

## Recording Procedures for Substance Use Disorders

The clinician should use the code that applies to the class of substances but record the name of the *specific substance.* For example, the clinician should record 304.10 (F13.20) moderate alprazolam use disorder (rather than moderate sedative, hypnotic, or anxiolytic use disorder) or 305.70 (F15.10) mild methamphetamine use disorder (rather than mild stimulant use disorder). For substances that do not fit into any of the classes (e.g., anabolic steroids), the appropriate code for "other substance use disorder" should be used and the specific substance indicated (e.g., 305.90 [F19.10] mild anabolic steroid use disorder). If the substance taken by the individual is unknown, the code for the class "other (or unknown)" should be used (e.g., 304.90 [F19.20] severe unknown substance use disorder). If criteria are met for more than one substance use disorder, all should be diagnosed (e.g., 304.00 [F11.20] severe heroin use disorder; 304.20 [F14.20] moderate cocaine use disorder).

The appropriate ICD-10-CM code for a substance use disorder depends on whether there is a comorbid substance-induced disorder (including intoxication and withdrawal). In the above example, the diagnostic code for moderate alprazolam use disorder, F13.20, reflects the absence of a comorbid alprazolam-induced mental disorder. Because ICD-10-CM codes for substance-induced disorders indicate both the presence (or absence) and severity of the substance use disorder, ICD-10-CM codes for substance use disorders can be used only in the absence of a substance-induced disorder. See the individual substance-specific sections for additional coding information.

Note that the word *addiction* is not applied as a diagnostic term in this classification, although it is in common usage in many countries to describe severe problems related to compulsive and habitual use of substances. The more neutral term *substance use disorder* is used to describe the wide range of the disorder, from a mild form to a severe state of chronically relapsing, compulsive drug taking. Some clinicians will choose to use the word *addiction* to describe more extreme presentations, but the word is omitted from the official DSM-5 substance use disorder diagnostic terminology because of its uncertain definition and its potentially negative connotation.

# Substance-Induced Disorders

The overall category of substance-induced disorders includes intoxication, withdrawal, and other substance/medication-induced mental disorders (e.g., substance-induced psychotic disorder, substance-induced depressive disorder).

## Substance Intoxication and Withdrawal

Criteria for substance intoxication are included within the substance-specific sections of this chapter. The essential feature is the development of a reversible substance-specific syndrome due to the recent ingestion of a substance (Criterion A). The clinically significant problematic behavioral or psychological changes associated with intoxication (e.g., belligerence, mood lability, impaired judgment) are attributable to the physiological effects of the substance on the central nervous system and develop during or shortly after use of the substance (Criterion B). The symptoms are not attributable to another medical condition and are not better explained by another mental disorder (Criterion D). Substance intoxication is common among those with a substance use disorder but also occurs frequently in individuals without a substance use disorder. This category does *not* apply to tobacco.

The most common changes in intoxication involve disturbances of perception, wakefulness, attention, thinking, judgment, psychomotor behavior, and interpersonal behavior. Short-term, or "acute," intoxications may have different signs and symptoms than

# Functional Consequences of Substance/Medication-Induced Mental Disorders

The same consequences related to the relevant independent mental disorder (e.g., suicide attempts) are likely to apply to the substance/medication-induced mental disorders, but these are likely to disappear within 1 month after abstinence. Similarly, the same functional consequences associated with the relevant substance use disorder are likely to be seen for the substance-induced mental disorders.

# Recording Procedures for Substance/Medication-Induced Mental Disorders

Coding notes and separate recording procedures for ICD-9-CM and ICD-10-CM codes for other specific substance/medication-induced mental disorders are provided in other chapters of the manual with disorders with which they share phenomenology (see the substance/medication-induced mental disorders in these chapters: "Schizophrenia Spectrum and Other Psychotic Disorders," "Bipolar and Related Disorders," "Depressive Disorders," "Anxiety Disorders," "Obsessive-Compulsive and Related Disorders," "Sleep-Wake Disorders," "Sexual Dysfunctions," and "Neurocognitive Disorders"). Generally, for ICD-9-CM, if a mental disorder is induced by a substance use disorder, a separate diagnostic code is given for the specific substance use disorder, in addition to the code for the substance/medication-induced mental disorder. For ICD-10-CM, a single code combines the substance-induced mental disorder with the substance use disorder. A separate diagnosis of the comorbid substance use disorder is not given, although the name and severity of the specific substance use disorder (when present) are used when recording the substance/medication-induced mental disorder. ICD-10-CM codes are also provided for situations in which the substance/medication-induced mental disorder is not induced by a substance use disorder (e.g., when a disorder is induced by one-time use of a substance or medication). Additional information needed to record the diagnostic name of the substance/medication-induced mental disorder is provided in the section "Recording Procedures" for each substance/medication-induced mental disorder in its respective chapter.

# Alcohol-Related Disorders

**Alcohol Use Disorder**
**Alcohol Intoxication**
**Alcohol Withdrawal**
**Other Alcohol-Induced Disorders**
**Unspecified Alcohol-Related Disorder**

# Alcohol Use Disorder

## Diagnostic Criteria

A. A problematic pattern of alcohol use leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:

1. Alcohol is often taken in larger amounts or over a longer period than was intended.
2. There is a persistent desire or unsuccessful efforts to cut down or control alcohol use.

3. A great deal of time is spent in activities necessary to obtain alcohol, use alcohol, or recover from its effects.

4. Craving, or a strong desire or urge to use alcohol.

5. Recurrent alcohol use resulting in a failure to fulfill major role obligations at work, school, or home.

6. Continued alcohol use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of alcohol.

7. Important social, occupational, or recreational activities are given up or reduced because of alcohol use.

8. Recurrent alcohol use in situations in which it is physically hazardous.

9. Alcohol use is continued despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by alcohol.

10. Tolerance, as defined by either of the following:

    a. A need for markedly increased amounts of alcohol to achieve intoxication or desired effect.

    b. A markedly diminished effect with continued use of the same amount of alcohol.

11. Withdrawal, as manifested by either of the following:

    a. The characteristic withdrawal syndrome for alcohol (refer to Criteria A and B of the criteria set for alcohol withdrawal, pp. 499–500).

    b. Alcohol (or a closely related substance, such as a benzodiazepine) is taken to relieve or avoid withdrawal symptoms.

*Specify* if:

**In early remission:** After full criteria for alcohol use disorder were previously met, none of the criteria for alcohol use disorder have been met for at least 3 months but for less than 12 months (with the exception that Criterion A4, "Craving, or a strong desire or urge to use alcohol," may be met).

**In sustained remission:** After full criteria for alcohol use disorder were previously met, none of the criteria for alcohol use disorder have been met at any time during a period of 12 months or longer (with the exception that Criterion A4, "Craving, or a strong desire or urge to use alcohol," may be met).

*Specify* if:

**In a controlled environment:** This additional specifier is used if the individual is in an environment where access to alcohol is restricted.

**Code based on current severity:** Note for ICD-10-CM codes: If an alcohol intoxication, alcohol withdrawal, or another alcohol-induced mental disorder is also present, do not use the codes below for alcohol use disorder. Instead, the comorbid alcohol use disorder is indicated in the 4th character of the alcohol-induced disorder code (see the coding note for alcohol intoxication, alcohol withdrawal, or a specific alcohol-induced mental disorder). For example, if there is comorbid alcohol intoxication and alcohol use disorder, only the alcohol intoxication code is given, with the 4th character indicating whether the comorbid alcohol use disorder is mild, moderate, or severe: F10.129 for mild alcohol use disorder with alcohol intoxication or F10.229 for a moderate or severe alcohol use disorder with alcohol intoxication.

*Specify* current severity:

**305.00 (F10.10) Mild:** Presence of 2–3 symptoms.

**303.90 (F10.20) Moderate:** Presence of 4–5 symptoms.

**303.90 (F10.20) Severe:** Presence of 6 or more symptoms.

## Specifiers

"In a controlled environment" applies as a further specifier of remission if the individual is both in remission and in a controlled environment (i.e., in early remission in a controlled environment or in sustained remission in a controlled environment). Examples of these environments are closely supervised and substance-free jails, therapeutic communities, and locked hospital units.

Severity of the disorder is based on the number of diagnostic criteria endorsed. For a given individual, changes in severity of alcohol use disorder across time are also reflected by reductions in the frequency (e.g., days of use per month) and/or dose (e.g., number of standard drinks consumed per day) of alcohol used, as assessed by the individual's self-report, report of knowledgeable others, clinician observations, and, when practical, biological testing (e.g., elevations in blood tests as described in the section "Diagnostic Markers" for this disorder).

## Diagnostic Features

Alcohol use disorder is defined by a cluster of behavioral and physical symptoms, which can include withdrawal, tolerance, and craving. Alcohol withdrawal is characterized by withdrawal symptoms that develop approximately 4–12 hours after the reduction of intake following prolonged, heavy alcohol ingestion. Because withdrawal from alcohol can be unpleasant and intense, individuals may continue to consume alcohol despite adverse consequences, often to avoid or to relieve withdrawal symptoms. Some withdrawal symptoms (e.g., sleep problems) can persist at lower intensities for months and can contribute to relapse. Once a pattern of repetitive and intense use develops, individuals with alcohol use disorder may devote substantial periods of time to obtaining and consuming alcoholic beverages.

Craving for alcohol is indicated by a strong desire to drink that makes it difficult to think of anything else and that often results in the onset of drinking. School and job performance may also suffer either from the aftereffects of drinking or from actual intoxication at school or on the job; child care or household responsibilities may be neglected; and alcohol-related absences may occur from school or work. The individual may use alcohol in physically hazardous circumstances (e.g., driving an automobile, swimming, operating machinery while intoxicated). Finally, individuals with an alcohol use disorder may continue to consume alcohol despite the knowledge that continued consumption poses significant physical (e.g., blackouts, liver disease), psychological (e.g., depression), social, or interpersonal problems (e.g., violent arguments with spouse while intoxicated, child abuse).

## Associated Features Supporting Diagnosis

Alcohol use disorder is often associated with problems similar to those associated with other substances (e.g., cannabis; cocaine; heroin; amphetamines; sedatives, hypnotics, or anxiolytics). Alcohol may be used to alleviate the unwanted effects of these other substances or to substitute for them when they are not available. Symptoms of conduct problems, depression, anxiety, and insomnia frequently accompany heavy drinking and sometimes precede it.

Repeated intake of high doses of alcohol can affect nearly every organ system, especially the gastrointestinal tract, cardiovascular system, and the central and peripheral nervous systems. Gastrointestinal effects include gastritis, stomach or duodenal ulcers, and, in about 15% of individuals who use alcohol heavily, liver cirrhosis and/or pancreatitis. There is also an increased rate of cancer of the esophagus, stomach, and other parts of the gastrointestinal tract. One of the most commonly associated conditions is low-grade hypertension. Cardiomyopathy and other myopathies are less common but occur at an in-

creased rate among those who drink very heavily. These factors, along with marked increases in levels of triglycerides and low-density lipoprotein cholesterol, contribute to an elevated risk of heart disease. Peripheral neuropathy may be evidenced by muscular weakness, paresthesias, and decreased peripheral sensation. More persistent central nervous system effects include cognitive deficits, severe memory impairment, and degenerative changes in the cerebellum. These effects are related to the direct effects of alcohol or of trauma and to vitamin deficiencies (particularly of the B vitamins, including thiamine). One devastating central nervous system effect is the relatively rare alcohol-induced persisting amnestic disorder, or Wernicke-Korsakoff syndrome, in which the ability to encode new memory is severely impaired. This condition would now be described within the chapter "Neurocognitive Disorders" and would be termed a *substance/medication-induced neurocognitive disorder.*

Alcohol use disorder is an important contributor to suicide risk during severe intoxication and in the context of a temporary alcohol-induced depressive and bipolar disorder. There is an increased rate of suicidal behavior as well as of completed suicide among individuals with the disorder.

## Prevalence

Alcohol use disorder is a common disorder. In the United States, the 12-month prevalence of alcohol use disorder is estimated to be 4.6% among 12- to 17-year-olds and 8.5% among adults age 18 years and older in the United States. Rates of the disorder are greater among adult men (12.4%) than among adult women (4.9%). Twelve-month prevalence of alcohol use disorder among adults decreases in middle age, being greatest among individuals 18- to 29-years-old (16.2%) and lowest among individuals age 65 years and older (1.5%).

Twelve-month prevalence varies markedly across race/ethnic subgroups of the U.S. population. For 12- to 17-year-olds, rates are greatest among Hispanics (6.0%) and Native Americans and Alaska Natives (5.7%) relative to whites (5.0%), African Americans (1.8%), and Asian Americans and Pacific Islanders (1.6%). In contrast, among adults, the 12-month prevalence of alcohol use disorder is clearly greater among Native Americans and Alaska Natives (12.1%) than among whites (8.9%), Hispanics (7.9%), African Americans (6.9%), and Asian Americans and Pacific Islanders (4.5%).

## Development and Course

The first episode of alcohol intoxication is likely to occur during the mid-teens. Alcohol-related problems that do not meet full criteria for a use disorder or isolated problems may occur prior to age 20 years, but the age at onset of an alcohol use disorder with two or more of the criteria clustered together peaks in the late teens or early to mid 20s. The large majority of individuals who develop alcohol-related disorders do so by their late 30s. The first evidence of withdrawal is not likely to appear until after many other aspects of an alcohol use disorder have developed. An earlier onset of alcohol use disorder is observed in adolescents with preexisting conduct problems and those with an earlier onset of intoxication.

Alcohol use disorder has a variable course that is characterized by periods of remission and relapse. A decision to stop drinking, often in response to a crisis, is likely to be followed by a period of weeks or more of abstinence, which is often followed by limited periods of controlled or nonproblematic drinking. However, once alcohol intake resumes, it is highly likely that consumption will rapidly escalate and that severe problems will once again develop.

Alcohol use disorder is often erroneously perceived as an intractable condition, perhaps based on the fact that individuals who present for treatment typically have a history of many years of severe alcohol-related problems. However, these most severe cases represent only a small proportion of individuals with this disorder, and the typical individual with the disorder has a much more promising prognosis.

Among adolescents, conduct disorder and repeated antisocial behavior often co-occur with alcohol- and with other substance-related disorders. While most individuals with alcohol use disorder develop the condition before age 40 years, perhaps 10% have later onset. Age-related physical changes in older individuals result in increased brain susceptibility to the depressant effects of alcohol; decreased rates of liver metabolism of a variety of substances, including alcohol; and decreased percentages of body water. These changes can cause older people to develop more severe intoxication and subsequent problems at lower levels of consumption. Alcohol-related problems in older people are also especially likely to be associated with other medical complications.

## Risk and Prognostic Factors

**Environmental.** Environmental risk and prognostic factors may include cultural attitudes toward drinking and intoxication, the availability of alcohol (including price), acquired personal experiences with alcohol, and stress levels. Additional potential mediators of how alcohol problems develop in predisposed individuals include heavier peer substance use, exaggerated positive expectations of the effects of alcohol, and suboptimal ways of coping with stress.

**Genetic and physiological.** Alcohol use disorder runs in families, with 40%–60% of the variance of risk explained by genetic influences. The rate of this condition is three to four times higher in close relatives of individuals with alcohol use disorder, with values highest for individuals with a greater number of affected relatives, closer genetic relationships to the affected person, and higher severity of the alcohol-related problems in those relatives. A significantly higher rate of alcohol use disorders exists in the monozygotic twin than in the dizygotic twin of an individual with the condition. A three- to fourfold increase in risk has been observed in children of individuals with alcohol use disorder, even when these children were given up for adoption at birth and raised by adoptive parents who did not have the disorder.

Recent advances in our understanding of genes that operate through intermediate characteristics (or phenotypes) to affect the risk of alcohol use disorder can help to identify individuals who might be at particularly low or high risk for alcohol use disorder. Among the low-risk phenotypes are the acute alcohol-related skin flush (seen most prominently in Asians). High vulnerability is associated with preexisting schizophrenia or bipolar disorder, as well as impulsivity (producing enhanced rates of all substance use disorders and gambling disorder), and a high risk specifically for alcohol use disorder is associated with a low level of response (low sensitivity) to alcohol. A number of gene variations may account for low response to alcohol or modulate the dopamine reward systems; it is important to note, however, that any one gene variation is likely to explain only 1%–2% of the risk for these disorders.

**Course modifiers.** In general, high levels of impulsivity are associated with an earlier onset and more severe alcohol use disorder.

## Culture-Related Diagnostic Issues

In most cultures, alcohol is the most frequently used intoxicating substance and contributes to considerable morbidity and mortality. An estimated 3.8% of all global deaths and 4.6% of global disability-adjusted life-years are attributable to alcohol. In the United States, 80% of adults (age 18 years and older) have consumed alcohol at some time in their lives, and 65% are current drinkers (last 12 months). An estimated 3.6% of the world population (15–64 years old) has a current (12-month) alcohol use disorder, with a lower prevalence (1.1%) found in the African region, a higher rate (5.2%) found in the American region (North, South, and Central America and the Caribbean), and the highest rate (10.9%) found in the Eastern Europe region.

Polymorphisms of genes for the alcohol-metabolizing enzymes alcohol dehydroge-nase and aldehyde dehydrogenase are most often seen in Asians and affect the response to alcohol. When consuming alcohol, individuals with these gene variations can experience a flushed face and palpitations, reactions that can be so severe as to limit or preclude future alcohol consumption and diminish the risk for alcohol use disorder. These gene variations are seen in as many as 40% of Japanese, Chinese, Korean, and related groups worldwide and are related to lower risks for the disorder.

Despite small variations regarding individual criterion items, the diagnostic criteria perform equally well across most race/ethnicity groups.

## Gender-Related Diagnostic Issues

Males have higher rates of drinking and related disorders than females. However, because females generally weigh less than males, have more fat and less water in their bodies, and metabolize less alcohol in their esophagus and stomach, they are likely to develop higher blood alcohol levels per drink than males. Females who drink heavily may also be more vulnerable than males to some of the physical consequences associated with alcohol, in-cluding liver disease.

## Diagnostic Markers

Individuals whose heavier drinking places them at elevated risk for alcohol use disorder can be identified both through standardized questionnaires and by elevations in blood test results likely to be seen with regular heavier drinking. These measures do not establish a diagnosis of an alcohol-related disorder but can be useful in highlighting individuals for whom more information should be gathered. The most direct test available to measure al-cohol consumption cross-sectionally is *blood alcohol concentration,* which can also be used to judge tolerance to alcohol. For example, an individual with a concentration of 150 mg of ethanol per deciliter (dL) of blood who does not show signs of intoxication can be pre-sumed to have acquired at least some degree of tolerance to alcohol. At 200 mg/dL, most nontolerant individuals demonstrate severe intoxication.

Regarding laboratory tests, one sensitive laboratory indicator of heavy drinking is a modest elevation or high-normal levels (>35 units) of gamma-glutamyltransferase (GGT). This may be the only laboratory finding. At least 70% of individuals with a high GGT level are persistent heavy drinkers (i.e., consuming eight or more drinks daily on a regular basis). A second test with comparable or even higher levels of sensitivity and specificity is carbo-hydrate-deficient transferrin (CDT), with levels of 20 units or higher useful in identifying in-dividuals who regularly consume eight or more drinks daily. Since both GGT and CDT levels return toward normal within days to weeks of stopping drinking, both state markers may be useful in monitoring abstinence, especially when the clinician observes increases, rather than decreases, in these values over time—a finding indicating that the person is likely to have returned to heavy drinking. The combination of tests for CDT and GGT may have even higher levels of sensitivity and specificity than either test used alone. Additional useful tests include the mean corpuscular volume (MCV), which may be elevated to high-normal values in individuals who drink heavily—a change that is due to the direct toxic ef-fects of alcohol on erythropoiesis. Although the MCV can be used to help identify those who drink heavily, it is a poor method of monitoring abstinence because of the long half-life of red blood cells. Liver function tests (e.g., alanine aminotransferase [ALT] and alkaline phos-phatase) can reveal liver injury that is a consequence of heavy drinking. Other potential markers of heavy drinking that are more nonspecific for alcohol but can help the clinician think of the possible effects of alcohol include elevations in blood levels or lipids (e.g., tri-glycerides and high-density lipoprotein cholesterol) and high-normal levels of uric acid.

Additional diagnostic markers relate to signs and symptoms that reflect the consequences often associated with persistent heavy drinking. For example, dyspepsia, nausea, and bloat-

ing can accompany gastritis, and hepatomegaly, esophageal varices, and hemorrhoids may reflect alcohol-induced changes in the liver. Other physical signs of heavy drinking include tremor, unsteady gait, insomnia, and erectile dysfunction. Males with chronic alcohol use disorder may exhibit decreased testicular size and feminizing effects associated with reduced testosterone levels. Repeated heavy drinking in females is associated with menstrual irregularities and, during pregnancy, spontaneous abortion and fetal alcohol syndrome. Individuals with preexisting histories of epilepsy or severe head trauma are more likely to develop alcohol-related seizures. Alcohol withdrawal may be associated with nausea, vomiting, gastritis, hematemesis, dry mouth, puffy blotchy complexion, and mild peripheral edema.

## Functional Consequences of Alcohol Use Disorder

The diagnostic features of alcohol use disorder highlight major areas of life functioning likely to be impaired. These include driving and operating machinery, school and work, interpersonal relationships and communication, and health. Alcohol-related disorders contribute to absenteeism from work, job-related accidents, and low employee productivity. Rates are elevated in homeless individuals, perhaps reflecting a downward spiral in social and occupational functioning, although most individuals with alcohol use disorder continue to live with their families and function within their jobs.

Alcohol use disorder is associated with a significant increase in the risk of accidents, violence, and suicide. It is estimated that one in five intensive care unit admissions in some urban hospitals is related to alcohol and that 40% of individuals in the United States experience an alcohol-related adverse event at some time in their lives, with alcohol accounting for up to 55% of fatal driving events. Severe alcohol use disorder, especially in individuals with antisocial personality disorder, is associated with the commission of criminal acts, including homicide. Severe problematic alcohol use also contributes to disinhibition and feelings of sadness and irritability, which contribute to suicide attempts and completed suicides.

Unanticipated alcohol withdrawal in hospitalized individuals for whom a diagnosis of alcohol use disorder has been overlooked can add to the risks and costs of hospitalization and to time spent in the hospital.

## Differential Diagnosis

**Nonpathological use of alcohol.**   The key element of alcohol use disorder is the use of heavy doses of alcohol with resulting repeated and significant distress or impaired functioning. While most drinkers sometimes consume enough alcohol to feel intoxicated, only a minority (less than 20%) ever develop alcohol use disorder. Therefore, drinking, even daily, in low doses and occasional intoxication do not by themselves make this diagnosis.

**Sedative, hypnotic, or anxiolytic use disorder.**   The signs and symptoms of alcohol use disorder are similar to those seen in sedative, hypnotic, or anxiolytic use disorder. The two must be distinguished, however, because the course may be different, especially in relation to medical problems.

**Conduct disorder in childhood and adult antisocial personality disorder.**   Alcohol use disorder, along with other substance use disorders, is seen in the majority of individuals with antisocial personality and preexisting conduct disorder. Because these diagnoses are associated with an early onset of alcohol use disorder as well as a worse prognosis, it is important to establish both conditions.

## Comorbidity

Bipolar disorders, schizophrenia, and antisocial personality disorder are associated with a markedly increased rate of alcohol use disorder, and several anxiety and depressive disorders

may relate to alcohol use disorder as well. At least a part of the reported association between depression and moderate to severe alcohol use disorder may be attributable to temporary, alcohol-induced comorbid depressive symptoms resulting from the acute effects of intoxication or withdrawal. Severe, repeated alcohol intoxication may also suppress immune mechanisms and predispose individuals to infections and increase the risk for cancers.

# Alcohol Intoxication

## Diagnostic Criteria

A.  Recent ingestion of alcohol.

B.  Clinically significant problematic behavioral or psychological changes (e.g., inappropriate sexual or aggressive behavior, mood lability, impaired judgment) that developed during, or shortly after, alcohol ingestion.

C.  One (or more) of the following signs or symptoms developing during, or shortly after, alcohol use:

1.  Slurred speech.
2.  Incoordination.
3.  Unsteady gait.
4.  Nystagmus.
5.  Impairment in attention or memory.
6.  Stupor or coma.

D.  The signs or symptoms are not attributable to another medical condition and are not better explained by another mental disorder, including intoxication with another substance.

**Coding note:** The ICD-9-CM code is **303.00.** The ICD-10-CM code depends on whether there is a comorbid alcohol use disorder. If a mild alcohol use disorder is comorbid, the ICD-10-CM code is **F10.129,** and if a moderate or severe alcohol use disorder is comorbid, the ICD-10-CM code is **F10.229.** If there is no comorbid alcohol use disorder, then the ICD-10-CM code is **F10.929.**

## Diagnostic Features

The essential feature of alcohol intoxication is the presence of clinically significant problematic behavioral or psychological changes (e.g., inappropriate sexual or aggressive behavior, mood lability, impaired judgment, impaired social or occupational functioning) that develop during, or shortly after, alcohol ingestion (Criterion B). These changes are accompanied by evidence of impaired functioning and judgment and, if intoxication is intense, can result in a life-threatening coma. The symptoms must not be attributable to another medical condition (e.g., diabetic ketoacidosis), are not a reflection of conditions such as delirium, and are not related to intoxication with other depressant drugs (e.g., benzodiazepines) (Criterion D). The levels of incoordination can interfere with driving abilities and performance of usual activities to the point of causing accidents. Evidence of alcohol use can be obtained by smelling alcohol on the individual's breath, eliciting a history from the individual or another observer, and, when needed, having the individual provide breath, blood, or urine samples for toxicology analyses.

## Associated Features Supporting Diagnosis

Alcohol intoxication is sometimes associated with amnesia for the events that occurred during the course of the intoxication ("blackouts"). This phenomenon may be related to the presence of a high blood alcohol level and, perhaps, to the rapidity with which this level is reached. During even mild alcohol intoxication, different symptoms are likely to be

# Opioid Use Disorder

## Diagnostic Criteria

A.  A problematic pattern of opioid use leading to clinically significant impairment or distress, as manifested by at least two of the following, occurring within a 12-month period:

1.  Opioids are often taken in larger amounts or over a longer period than was intended.
2.  There is a persistent desire or unsuccessful efforts to cut down or control opioid use.
3.  A great deal of time is spent in activities necessary to obtain the opioid, use the opioid, or recover from its effects.
4.  Craving, or a strong desire or urge to use opioids.
5.  Recurrent opioid use resulting in a failure to fulfill major role obligations at work, school, or home.
6.  Continued opioid use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of opioids.
7.  Important social, occupational, or recreational activities are given up or reduced because of opioid use.
8.  Recurrent opioid use in situations in which it is physically hazardous.
9.  Continued opioid use despite knowledge of having a persistent or recurrent physical or psychological problem that is likely to have been caused or exacerbated by the substance.
10. Tolerance, as defined by either of the following:

    a.  A need for markedly increased amounts of opioids to achieve intoxication or desired effect.
    b.  A markedly diminished effect with continued use of the same amount of an opioid.

    **Note:** This criterion is not considered to be met for those taking opioids solely under appropriate medical supervision.

11. Withdrawal, as manifested by either of the following:

    a.  The characteristic opioid withdrawal syndrome (refer to Criteria A and B of the criteria set for opioid withdrawal, pp. 547–548).
    b.  Opioids (or a closely related substance) are taken to relieve or avoid withdrawal symptoms.

    **Note:** This criterion is not considered to be met for those individuals taking opioids solely under appropriate medical supervision.

*Specify* if:

**In early remission:** After full criteria for opioid use disorder were previously met, none of the criteria for opioid use disorder have been met for at least 3 months but for less than 12 months (with the exception that Criterion A4, "Craving, or a strong desire or urge to use opioids," may be met).

**In sustained remission:** After full criteria for opioid use disorder were previously met, none of the criteria for opioid use disorder have been met at any time during a period of 12 months or longer (with the exception that Criterion A4, "Craving, or a strong desire or urge to use opioids," may be met).

*Specify* if:

**On maintenance therapy:** This additional specifier is used if the individual is taking a prescribed agonist medication such as methadone or buprenorphine and none of the criteria for opioid use disorder have been met for that class of medication (except tolerance to, or withdrawal from, the agonist). This category also applies to those individ-

uals being maintained on a partial agonist, an agonist/antagonist, or a full antagonist such as oral naltrexone or depot naltrexone.

**In a controlled environment:** This additional specifier is used if the individual is in an environment where access to opioids is restricted.

**Coding based on current severity:** Note for ICD-10-CM codes: If an opioid intoxication, opioid withdrawal, or another opioid-induced mental disorder is also present, do not use the codes below for opioid use disorder. Instead, the comorbid opioid use disorder is indicated in the 4th character of the opioid-induced disorder code (see the coding note for opioid intoxication, opioid withdrawal, or a specific opioid-induced mental disorder). For example, if there is comorbid opioid-induced depressive disorder and opioid use disorder, only the opioid-induced depressive disorder code is given, with the 4th character indicating whether the comorbid opioid use disorder is mild, moderate, or severe: F11.14 for mild opioid use disorder with opioid-induced depressive disorder or F11.24 for a moderate or severe opioid use disorder with opioid-induced depressive disorder.

*Specify* current severity:

**305.50 (F11.10) Mild:** Presence of 2–3 symptoms.
**304.00 (F11.20) Moderate:** Presence of 4–5 symptoms.
**304.00 (F11.20) Severe:** Presence of 6 or more symptoms.

## Specifiers

The "on maintenance therapy" specifier applies as a further specifier of remission if the individual is both in remission and receiving maintenance therapy. "In a controlled environment" applies as a further specifier of remission if the individual is both in remission and in a controlled environment (i.e., in early remission in a controlled environment or in sustained remission in a controlled environment). Examples of these environments are closely supervised and substance-free jails, therapeutic communities, and locked hospital units.

Changing severity across time in an individual is also reflected by reductions in the frequency (e.g., days of use per month) and/or dose (e.g., injections or number of pills) of an opioid, as assessed by the individual's self-report, report of knowledgeable others, clinician's observations, and biological testing.

## Diagnostic Features

Opioid use disorder includes signs and symptoms that reflect compulsive, prolonged self-administration of opioid substances that are used for no legitimate medical purpose or, if another medical condition is present that requires opioid treatment, that are used in doses greatly in excess of the amount needed for that medical condition. (For example, an individual prescribed analgesic opioids for pain relief at adequate dosing will use significantly more than prescribed and not only because of persistent pain.) Individuals with opioid use disorder tend to develop such regular patterns of compulsive drug use that daily activities are planned around obtaining and administering opioids. Opioids are usually purchased on the illegal market but may also be obtained from physicians by falsifying or exaggerating general medical problems or by receiving simultaneous prescriptions from several physicians. Health care professionals with opioid use disorder will often obtain opioids by writing prescriptions for themselves or by diverting opioids that have been prescribed for patients or from pharmacy supplies. Most individuals with opioid use disorder have significant levels of tolerance and will experience withdrawal on abrupt discontinuation of opioid substances. Individuals with opioid use disorder often develop conditioned responses to drug-related stimuli (e.g., craving on seeing any heroin powder–like substance)—a phenomenon that occurs with most drugs that cause intense psychological changes. These responses probably contribute to relapse, are difficult to extinguish, and typically persist long after detoxification is completed.

## Associated Features Supporting Diagnosis

Opioid use disorder can be associated with a history of drug-related crimes (e.g., posses-sion or distribution of drugs, forgery, burglary, robbery, larceny, receiving stolen goods). Among health care professionals and individuals who have ready access to controlled substances, there is often a different pattern of illegal activities involving problems with state licensing boards, professional staffs of hospitals, or other administrative agencies. Marital difficulties (including divorce), unemployment, and irregular employment are of-ten associated with opioid use disorder at all socioeconomic levels.

## Prevalence

The 12-month prevalence of opioid use disorder is approximately 0.37% among adults age 18 years and older in the community population. This may be an underestimate because of the large number of incarcerated individuals with opioid use disorders. Rates are higher in males than in females (0.49% vs. 0.26%), with the male-to-female ratio typically being 1.5:1 for opioids other than heroin (i.e., available by prescription) and 3:1 for heroin. Female ad-olescents may have a higher likelihood of developing opioid use disorders. The preva-lence decreases with age, with the prevalence highest (0.82%) among adults age 29 years or younger, and decreasing to 0.09% among adults age 65 years and older. Among adults, the prevalence of opioid use disorder is lower among African Americans at 0.18% and over-represented among Native Americans at 1.25%. It is close to average among whites (0.38%), Asian or Pacific Islanders (0.35%), and Hispanics (0.39%).

Among individuals in the United States ages 12–17 years, the overall 12-month prev-alence of opioid use disorder in the community population is approximately 1.0%, but the prevalence of heroin use disorder is less than 0.1%. By contrast, analgesic use disorder is prevalent in about 1.0% of those ages 12–17 years, speaking to the importance of opioid an-algesics as a group of substances with significant health consequences.

The 12-month prevalence of problem opioid use in European countries in the commu-nity population ages 15–64 years is between 0.1% and 0.8%. The average prevalence of problem opioid use in the European Union and Norway is between 0.36% and 0.44%.

## Development and Course

Opioid use disorder can begin at any age, but problems associated with opioid use are most commonly first observed in the late teens or early 20s. Once opioid use disorder develops, it usually continues over a period of many years, even though brief periods of abstinence are frequent. In treated populations, relapse following abstinence is common. Even though relapses do occur, and while some long-term mortality rates may be as high as 2% per year, about 20%–30% of individuals with opioid use disorder achieve long-term abstinence. An exception concerns that of military service personnel who became depen-dent on opioids in Vietnam; over 90% of this population who had been dependent on opi-oids during deployment in Vietnam achieved abstinence after they returned, but they experienced increased rates of alcohol or amphetamine use disorder as well as increased suicidality.

Increasing age is associated with a decrease in prevalence as a result of early mortality and the remission of symptoms after age 40 years (i.e., "maturing out"). However, many individuals continue have presentations that meet opioid use disorder criteria for decades.

## Risk and Prognostic Factors

**Genetic and physiological.**    The risk for opiate use disorder can be related to individual, family, peer, and social environmental factors, but within these domains, genetic factors play a particularly important role both directly and indirectly. For instance, impulsivity and novelty seeking are individual temperaments that relate to the propensity to develop

a substance use disorder but may themselves be genetically determined. Peer factors may relate to genetic predisposition in terms of how an individual selects his or her environment.

## Culture-Related Diagnostic Issues

Despite small variations regarding individual criterion items, opioid use disorder diagnostic criteria perform equally well across most race/ethnicity groups. Individuals from ethnic minority populations living in economically deprived areas have been overrepresented among individuals with opioid use disorder. However, over time, opioid use disorder is seen more often among white middle-class individuals, especially females, suggesting that differences in use reflect the availability of opioid drugs and that other social factors may impact prevalence. Medical personnel who have ready access to opioids may be at increased risk for opioid use disorder.

## Diagnostic Markers

Routine urine toxicology test results are often positive for opioid drugs in individuals with opioid use disorder. Urine test results remain positive for most opioids (e.g., heroin, morphine, codeine, oxycodone, propoxyphene) for 12–36 hours after administration. Fentanyl is not detected by standard urine tests but can be identified by more specialized procedures for several days. Methadone, buprenorphine (or buprenorphine/naloxone combination), and LAAM (L-alpha-acetylmethadol) have to be specifically tested for and will not cause a positive result on routine tests for opiates. They can be detected for several days up to more than 1 week. Laboratory evidence of the presence of other substances (e.g., cocaine, marijuana, alcohol, amphetamines, benzodiazepines) is common. Screening test results for hepatitis A, B, and C virus are positive in as many as 80%–90% of injection opioid users, either for hepatitis antigen (signifying active infection) or for hepatitis antibody (signifying past infection). HIV is prevalent in injection opioid users as well. Mildly elevated liver function test results are common, either as a result of resolving hepatitis or from toxic injury to the liver due to contaminants that have been mixed with the injected opioid. Subtle changes in cortisol secretion patterns and body temperature regulation have been observed for up to 6 months following opioid detoxification.

## Suicide Risk

Similar to the risk generally observed for all substance use disorders, opioid use disorder is associated with a heightened risk for suicide attempts and completed suicides. Particularly notable are both accidental and deliberate opioid overdoses. Some suicide risk factors overlap with risk factors for an opioid use disorder. In addition, repeated opioid intoxication or withdrawal may be associated with severe depressions that, although temporary, can be intense enough to lead to suicide attempts and completed suicides. Available data suggest that nonfatal accidental opioid overdose (which is common) and attempted suicide are distinct clinically significant problems that should not be mistaken for each other.

## Functional Consequences of Opioid Use Disorder

Opioid use is associated with a lack of mucous membrane secretions, causing dry mouth and nose. Slowing of gastrointestinal activity and a decrease in gut motility can produce severe constipation. Visual acuity may be impaired as a result of pupillary constriction with acute administration. In individuals who inject opioids, sclerosed veins ("tracks") and puncture marks on the lower portions of the upper extremities are common. Veins sometimes become so severely sclerosed that peripheral edema develops, and individuals switch to injecting in veins in the legs, neck, or groin. When these veins become unusable, individuals often inject directly into their subcutaneous tissue ("skin-popping"), resulting

in cellulitis, abscesses, and circular-appearing scars from healed skin lesions. Tetanus and *Clostridium botulinum* infections are relatively rare but extremely serious consequences of injecting opioids, especially with contaminated needles. Infections may also occur in other organs and include bacterial endocarditis, hepatitis, and HIV infection. Hepatitis C infections, for example, may occur in up to 90% of persons who inject opioids. In addition, the prevalence of HIV infection can be high among individuals who inject drugs, a large proportion of whom are individuals with opioid use disorder. HIV infection rates have been reported to be as high as 60% among heroin users with opioid use disorder in some areas of the United States or the Russian Federation. However, the incidence may also be 10% or less in other areas, especially those where access to clean injection material and paraphernalia is facilitated.

Tuberculosis is a particularly serious problem among individuals who use drugs intravenously, especially those who are dependent on heroin; infection is usually asymptomatic and evident only by the presence of a positive tuberculin skin test. However, many cases of active tuberculosis have been found, especially among those who are infected with HIV. These individuals often have a newly acquired infection but also are likely to experience reactivation of a prior infection because of impaired immune function.

Individuals who sniff heroin or other opioids into the nose ("snorting") often develop irritation of the nasal mucosa, sometimes accompanied by perforation of the nasal septum. Difficulties in sexual functioning are common. Males often experience erectile dysfunction during intoxication or chronic use. Females commonly have disturbances of reproductive function and irregular menses.

In relation to infections such as cellulitis, hepatitis, HIV infection, tuberculosis, and endocarditis, opioid use disorder is associated with a mortality rate as high as 1.5%–2% per year. Death most often results from overdose, accidents, injuries, AIDS, or other general medical complications. Accidents and injuries due to violence that is associated with buying or selling drugs are common. In some areas, violence accounts for more opioid-related deaths than overdose or HIV infection. Physiological dependence on opioids may occur in about half of the infants born to females with opioid use disorder; this can produce a severe withdrawal syndrome requiring medical treatment. Although low birth weight is also seen in children of mothers with opioid use disorder, it is usually not marked and is generally not associated with serious adverse consequences.

## Differential Diagnosis

**Opioid-induced mental disorders.**   Opioid-induced disorders occur frequently in individuals with opioid use disorder. Opioid-induced disorders may be characterized by symptoms (e.g., depressed mood) that resemble primary mental disorders (e.g., persistent depressive disorder [dysthymia] vs. opioid-induced depressive disorder, with depressive features, with onset during intoxication). Opioids are less likely to produce symptoms of mental disturbance than are most other drugs of abuse. Opioid intoxication and opioid withdrawal are distinguished from the other opioid-induced disorders (e.g., opioid-induced depressive disorder, with onset during intoxication) because the symptoms in these latter disorders predominate the clinical presentation and are severe enough to warrant independent clinical attention.

**Other substance intoxication.**   Alcohol intoxication and sedative, hypnotic, or anxiolytic intoxication can cause a clinical picture that resembles that for opioid intoxication. A diagnosis of alcohol or sedative, hypnotic, or anxiolytic intoxication can usually be made based on the absence of pupillary constriction or the lack of a response to naloxone challenge. In some cases, intoxication may be due both to opioids and to alcohol or other sedatives. In these cases, the naloxone challenge will not reverse all of the sedative effects.

**Other withdrawal disorders.**   The anxiety and restlessness associated with opioid withdrawal resemble symptoms seen in sedative-hypnotic withdrawal. However, opioid withdrawal is also accompanied by rhinorrhea, lacrimation, and pupillary dilation, which

are not seen in sedative-type withdrawal. Dilated pupils are also seen in hallucinogen intoxication and stimulant intoxication. However, other signs or symptoms of opioid withdrawal, such as nausea, vomiting, diarrhea, abdominal cramps, rhinorrhea, or lacrimation, are not present.

## Comorbidity

The most common medical conditions associated with opioid use disorder are viral (e.g., HIV, hepatitis C virus) and bacterial infections, particularly among users of opioids by injection. These infections are less common in opioid use disorder with prescription opioids. Opioid use disorder is often associated with other substance use disorders, especially those involving tobacco, alcohol, cannabis, stimulants, and benzodiazepines, which are often taken to reduce symptoms of opioid withdrawal or craving for opioids, or to enhance the effects of administered opioids. Individuals with opioid use disorder are at risk for the development of mild to moderate depression that meets symptomatic and duration criteria for persistent depressive disorder (dysthymia) or, in some cases, for major depressive disorder. These symptoms may represent an opioid-induced depressive disorder or an exacerbation of a preexisting primary depressive disorder. Periods of depression are especially common during chronic intoxication or in association with physical or psychosocial stressors that are related to the opioid use disorder. Insomnia is common, especially during withdrawal. Antisocial personality disorder is much more common in individuals with opioid use disorder than in the general population. Posttraumatic stress disorder is also seen with increased frequency. A history of conduct disorder in childhood or adolescence has been identified as a significant risk factor for substance-related disorders, especially opioid use disorder.

# Opioid Intoxication

## Diagnostic Criteria

A. Recent use of an opioid.

B. Clinically significant problematic behavioral or psychological changes (e.g., initial euphoria followed by apathy, dysphoria, psychomotor agitation or retardation, impaired judgment) that developed during, or shortly after, opioid use.

C. Pupillary constriction (or pupillary dilation due to anoxia from severe overdose) and one (or more) of the following signs or symptoms developing during, or shortly after, opioid use:

   1. Drowsiness or coma.
   2. Slurred speech.
   3. Impairment in attention or memory.

D. The signs or symptoms are not attributable to another medical condition and are not better explained by another mental disorder, including intoxication with another substance.

*Specify* if:

   **With perceptual disturbances:** This specifier may be noted in the rare instance in which hallucinations with intact reality testing or auditory, visual, or tactile illusions occur in the absence of a delirium.

**Coding note:** The ICD-9-CM code is **292.89.** The ICD-10-CM code depends on whether or not there is a comorbid opioid use disorder and whether or not there are perceptual disturbances.

   **For opioid intoxication without perceptual disturbances:** If a mild opioid use disorder is comorbid, the ICD-10-CM code is **F11.129,** and if a moderate or severe opioid

**Other mental disorders.**   A diagnosis of major or mild vascular NCD is inappropriate if the symptoms can be entirely attributed to delirium, although delirium may sometimes be superimposed on a preexisting major or mild vascular NCD, in which case both diagnoses can be made. If the criteria for major depressive disorder are met and the cognitive impairment is temporally related to the likely onset of the depression, major or mild vascular NCD should not be diagnosed. However, if the NCD preceded the development of the depression, or the severity of the cognitive impairment is out of proportion to the severity of the depression, both should be diagnosed.

## Comorbidity

Major or mild NCD due to Alzheimer's disease commonly co-occurs with major or mild vascular NCD, in which case both diagnoses should be made. Major or mild vascular NCD and depression frequently co-occur.

# Major or Mild Neurocognitive Disorder Due to Traumatic Brain Injury

## Diagnostic Criteria

A. The criteria are met for major or mild neurocognitive disorder.
B. There is evidence of a traumatic brain injury—that is, an impact to the head or other mechanisms of rapid movement or displacement of the brain within the skull, with one or more of the following:
   1. Loss of consciousness.
   2. Posttraumatic amnesia.
   3. Disorientation and confusion.
   4. Neurological signs (e.g., neuroimaging demonstrating injury; a new onset of seizures; a marked worsening of a preexisting seizure disorder; visual field cuts; anosmia; hemiparesis).
C. The neurocognitive disorder presents immediately after the occurrence of the traumatic brain injury or immediately after recovery of consciousness and persists past the acute post-injury period.

**Coding note:** For major neurocognitive disorder due to traumatic brain injury, with behavioral disturbance: For ICD-9-CM, first code **907.0** late effect of intracranial injury without skull fracture, followed by **294.11** major neurocognitive disorder due to traumatic brain injury, with behavioral disturbance. For ICD-10-CM, first code **S06.2X9S** diffuse traumatic brain injury with loss of consciousness of unspecified duration, sequela; followed by **F02.81** major neurocognitive disorder due to traumatic brain injury, with behavioral disturbance.

For major neurocognitive disorder due to traumatic brain injury, without behavioral disturbance: For ICD-9-CM, first code **907.0** late effect of intracranial injury without skull fracture, followed by **294.10** major neurocognitive disorder due to traumatic brain injury, without behavioral disturbance. For ICD-10-CM, first code **S06.2X9S** diffuse traumatic brain injury with loss of consciousness of unspecified duration, sequela; followed by **F02.80** major neurocognitive disorder due to traumatic brain injury, without behavioral disturbance.

For mild neurocognitive disorder due to traumatic brain injury, code **331.83 (G31.84).** (**Note:** Do *not* use the additional code for traumatic brain injury. Behavioral disturbance cannot be coded but should still be indicated in writing.)

## Specifiers

Rate the severity of the neurocognitive disorder (NCD), not the underlying traumatic brain injury (see the section "Development and Course" for this disorder).

## Diagnostic Features

Major or mild NCD due to traumatic brain injury (TBI) is caused by an impact to the head, or other mechanisms of rapid movement or displacement of the brain within the skull, as can happen with blast injuries. *Traumatic brain injury* is defined as brain trauma with specific characteristics that include at least one of the following: loss of consciousness, posttraumatic amnesia, disorientation and confusion, or, in more severe cases, neurological signs (e.g., positive neuroimaging, a new onset of seizures or a marked worsening of a preexisting seizure disorder, visual field cuts, anosmia, hemiparesis) (Criterion B). To be attributable to TBI, the NCD must present either immediately after the brain injury occurs or immediately after the individual recovers consciousness after the injury and persist past the acute post-injury period (Criterion C).

The cognitive presentation is variable. Difficulties in the domains of complex attention, executive ability, learning, and memory are common as well as slowing in speed of information processing and disturbances in social cognition. In more severe TBI in which there is brain contusion, intracranial hemorrhage, or penetrating injury, there may be additional neurocognitive deficits, such as aphasia, neglect, and constructional dyspraxia.

## Associated Features Supporting Diagnosis

Major or mild NCD due to TBI may be accompanied by disturbances in emotional function (e.g., irritability, easy frustration, tension and anxiety, affective lability); personality changes (e.g., disinhibition, apathy, suspiciousness, aggression); physical disturbances (e.g., headache, fatigue, sleep disorders, vertigo or dizziness, tinnitus or hyperacusis, photosensitivity, anosmia, reduced tolerance to psychotropic medications); and, particularly in more severe TBI, neurological symptoms and signs (e.g., seizures, hemiparesis, visual disturbances, cranial nerve deficits) and evidence of orthopedic injuries.

## Prevalence

In the United States, 1.7 million TBIs occur annually, resulting in 1.4 million emergency department visits, 275,000 hospitalizations, and 52,000 deaths. About 2% of the population lives with TBI-associated disability. Males account for 59% of TBIs in the United States. The most common etiologies of TBI in the United States are falls, vehicular accidents, and being struck on the head. Collisions and blows to the head that occur in the course of contact sports are increasingly recognized as sources of mild TBI, with a concern that repeated mild TBI may have cumulatively persisting sequelae.

## Development and Course

The severity of a TBI is rated at the time of injury/initial assessment as mild, moderate, or severe according to the thresholds in Table 2.

The severity rating of the TBI itself does not necessarily correspond to the severity of the resulting NCD. The course of recovery from TBI is variable, depending not only on the specifics of the injury but also on cofactors, such as age, prior history of brain damage, or substance abuse, that may favor or impede recovery.

Neurocognitive Disorders

**TABLE 2   Severity ratings for traumatic brain injury**

| Injury characteristic | Mild TBI | Moderate TBI | Severe TBI |
|---|---|---|---|
| Loss of consciousness | <30 min | 30 minutes–24 hours | >24 hours |
| Posttraumatic amnesia | <24 hours | 24 hours–7 days | >7 days |
| Disorientation and confusion at initial assessment (Glasgow Coma Scale Score) | 13–15 (not below 13 at 30 minutes) | 9–12 | 3–8 |

Neurobehavioral symptoms tend to be most severe in the immediate aftermath of the TBI. Except in the case of severe TBI, the typical course is that of complete or substantial improvement in associated neurocognitive, neurological, and psychiatric symptoms and signs. Neurocognitive symptoms associated with mild TBI tend to resolve within days to weeks after the injury with complete resolution typical by 3 months. Other symptoms that may potentially co-occur with the neurological symptoms (e.g., depression, irritability, fatigue, headache, photosensitivity, sleep disturbance) also tend to resolve in the weeks following mild TBI. Substantial subsequent deterioration in these areas should trigger consideration of additional diagnoses. However, repeated mild TBI may be associated with persisting neurocognitive disturbance.

With moderate and severe TBI, in addition to persistence of neurocognitive deficits, there may be associated neurophysiological, emotional, and behavioral complications. These include seizures (particularly in the first year), photosensitivity, hyperacusis, irritability, aggression, depression, sleep disturbance, fatigue, apathy, inability to resume occupational and social functioning at pre-injury level, and deterioration in interpersonal relationships. Moderate and severe TBI have been associated with increased risk of depression, aggression, and possibly neurodegenerative diseases such as Alzheimer's disease.

The features of persisting major or mild NCD due to TBI will vary by age, specifics of the injury, and cofactors. Persisting TBI-related impairment in an infant or child may be reflected in delays in reaching developmental milestones (e.g., language acquisition), worse academic performance, and possibly impaired social development. Among older teenagers and adults, persisting symptoms may include various neurocognitive deficits, irritability, hypersensitivity to light and sound, easy fatigability, and mood changes, including depression, anxiety, hostility, or apathy. In older individuals with depleted cognitive reserve, mild TBI is more likely to result in incomplete recoveries.

## Risk and Prognostic Factors

**Risk factors for traumatic brain injury.**   Traumatic brain injury rates vary by age, with the highest prevalence among individuals younger than 4 years, older adolescents, and individuals older than 65 years. Falls are the most common cause of TBI, with motor vehicle accidents being second. Sports concussions are frequent causes of TBI in older children, teenagers, and young adults.

**Risk factors for neurocognitive disorder after traumatic brain injury.**   Repeated concussions can lead to persistent NCD and neuropathological evidence of traumatic encephalopathy. Co-occurring intoxication with a substance may increase the severity of a TBI from a motor vehicle accident, but whether intoxication at the time of injury worsens neurocognitive outcome is unknown.

**Course modifiers.**   Mild TBI generally resolves within a few weeks to months, although resolution may be delayed or incomplete in the context of repeated TBI. Worse outcome from

# EXHIBIT B

# Reading Law:
## *The Interpretation of Legal Texts*



ANTONIN SCALIA
BRYAN A. GARNER

*Foreword by Frank H. Easterbrook*

### 15. Presumption of Nonexclusive "Include"

**The verb *to include* introduces examples, not an exhaustive list.**

In normal English usage, if a group "consists of " or "comprises" 300 lawyers, it contains precisely that number. If it "includes" 300 lawyers, there may well be thousands of other members from all walks of life as well. That is, the word *include* does not ordinarily introduce an exhaustive list, while *comprise*—with an exception that we will discuss shortly—ordinarily does. That is the rule both in good English usage[1] and in textualist decision-making.[2] Some jurisdictions have even codified a rule about *include*.[3]

Often the phrase that appears is *including but not limited to*— or either of two variants, *including without limitation* and *including without limiting the generality of the foregoing*. These cautious phrases are intended to defeat the negative-implication canon (§ 10): "Even though the word *including* itself means that the list is merely exemplary and not exhaustive, the courts have not invariably so held. So the longer, more explicit variations are necessary in the eyes of many drafters."[4] Even so, the commonness of these belts-and-suspenders phrases does not lessen the exemplariness of *include*.

In one particular legal specialty—intellectual-property law— *comprise* is held to be synonymous with *include*. Specifically, *comprise* introduces a nonexhaustive list in the field of patent-claim drafting.[5] But this is a narrow, anomalous exception.

# EXHIBIT C

BOARD DATE: 6 February 2018
DOCKET NUMBER: AR20170015770
BOARD DETERMINATION/RECOMMENDATION:
The evidence presented does not demonstrate the existence of a probable error
or injustice. Therefore, the Board determined that the overall merits of this case
are insufficient as a basis to amend the decision of the ABCMR set forth in
Docket Numbers AC93-13741, on 2 February 1994, and AR20130013383, on
20 March 2014.

I certify that herein is recorded the true and complete record of the proceedings
of the Army Board for Correction of Military Records in this case.

                      BOARD DATE:  6 February 2018

                      DOCKET NUMBER:  AR20170015770

BOARD VOTE:

Mbr 1    Mbr 2    Mbr 3

  :        :        :        GRANT FULL RELIEF

  :        :        :        GRANT PARTIAL RELIEF

  :        :        :        GRANT FORMAL HEARING

  X        X        X        DENY APPLICATION

2 Enclosures
1.  Board Determination/Recommendation
2.  Evidence and Consideration

                      BOARD DATE:  6 February 2018

                      DOCKET NUMBER:  AR20170015770

THE BOARD CONSIDERED THE FOLLOWING EVIDENCE:

1.  Application for correction of military records (with supporting documents provided, if
any).

2.  Military Personnel Records and advisory opinions (if any).

THE APPLICANT'S REQUEST, STATEMENT, AND EVIDENCE:

1.  The applicant requests reconsideration of his earlier request for an upgrade of his under
other than honorable conditions discharge to general under honorable conditions.  He also
requests personal appearance before the Board.

2.  The applicant states for the reasons set forth in the materials provided by his counsel;
the applicant asserts his discharge was unjust and in error.

a. He contends no consideration was given to the fact he was suffering from undiagnosed and untreated post-traumatic stress disorder (PTSD); his condition led to the misconduct that resulted in his discharge. He did not realize he was suffering from PTSD, and that his Vietnam service was its cause, until he began seeing a therapist in 2015.

b. He provides a personal statement:

(1) The applicant describes his personal history; he speaks about his family and some of his experiences growing up.

(2) He details his military history and states he saw "dead bodies stacked up the day [he] arrived." The base where he was stationed endured almost daily mortar and rocket attacks, and he witnessed his fellow Soldiers dying. He notes the fact his brother was also serving in Vietnam at the same time did not help, and claims his brother also suffered a mental breakdown due to his Vietnam service, for which now he receives a 100 percent service-connected disability.

(3) The applicant states, after about a month of intense pressure, he began to suffer such PTSD symptoms as headaches, nightmares, and sleeplessness; illegal drugs were cheap and readily available, so he used them to find refuge. In late March 1969, he was medically evacuated to Japan because of an infectious hepatitis diagnosis. His headaches continued during treatment and his addiction grew worse; he never received any treatment for his addiction, nor were his PTSD symptoms addressed. He departed in an absent without leave (AWOL) status while in Japan and, on his return, accepted nonjudicial punishment (NJP) under the provisions of Article 15, Uniform Code of Military Justice (UCMJ).

(4) In June 1969, he was medically evacuated to Fort Dix, NJ, and went AWOL again to look for drugs; he was arrested and convicted for attempted robbery in New York City. In March 1970, a summary court-martial at Fort Dix convicted him for being AWOL from 6 December 1969 to 3 March 1970; he was subsequently administratively separated due to his civilian conviction.

(5) Over the next 40 years, he was not strong enough to shake his addiction; he continued to commit crimes that were driven by his need for drugs. He spent 34 years in prison; most recently he was serving a 25-year-to-life prison term. He was released on parole in 2013 after serving the minimum sentence. He describes, after his release, how he lived in non-profit housing, moved to transitional housing, and then was hired by the non-profit organization to manage one of the residences.

(6) The applicant speaks of his relationship with his daughter, his grandchildren, and his daughter's mother.

(7) He states he previously requested relief from the Board, but, at that time, he did not have professional help; his request was submitted before he started therapy and received a PTSD diagnosis. He contends the reason he is submitting his current application is because a change in his character of service would be a recognition of the impact a horrible war had on a "19-year-old kid, suffering from a condition that was not recognized until many years later" and played a significant role in the way his life turned out.

c. He defers the remainder of his arguments and evidence to counsel.


COUNSEL'S REQUEST, STATEMENT, AND EVIDENCE:

1. Counsel requests:
    a. Prior to a decision being made, and in accordance with the below listed citations, counsel requests all regulations; case summaries, staff briefs or memoranda; advisory opinions from any source; military or civilian investigation reports; and any other documents being considered in the applicant's discharge review. The references are as follows:

* Department of Defense Instruction (DODI) 1332.28 (Discharge Review Board Procedures and Standards), paragraph E3.2.9.4.1 (Availability of Records and Documents)
* Freedom of Information Action (Title 5, U.S. Code, section 552)

* the Privacy Act, (Title 5, U.S. Code, section 552a)

(DODI 1332.28 does not apply to the Army Board for Correction of Military Records (ABCMR); only to DRBs, (e.g., the Army Discharge Review Board (ADRB)). The applicable legal reference for the ABCMR is Title 10, U.S. Code, section 1556 (Ex Parte Communications Prohibited))

(E3.2.9.4.1. states, "in any case heard on request of an applicant, the DRB shall provide the applicant, at a reasonable time before initiating the decision process, a notice of the availability of all regulations and documents to be considered in the discharge review, except for documents in the official personnel or medical records and any documents submitted by the applicant. The DRB shall notify the applicant of the right to examine such documents or to be provided with copies of the documents upon request; of the date by which such requests must be received; and of the opportunity to respond within a reasonable period of time to be set by the DRB.")

(Title 10, U.S. Code, section 1556, requires the ABCMR to provide a copy of all correspondence and communications (including summaries of verbal communications) between the Board (or staff) and an entity or person outside the ABCMR. Such communications can include advisory opinions and investigative reports. Among the exceptions are any records already provided to or known by the applicant, any classified information, and/or communications of a purely administrative nature.)

    b.  In effect, because the applicant has been diagnosed with PTSD due to his combat service, counsel requests a physician, clinical psychologist, or psychiatrist be included as a member of the board that reviews his application for relief. Counsel references Title 10, U.S. Code, section 1553(d)(1), as the basis of his request.

(Title 10, U.S. Code, section 1552 (Correction of Military Records, Claims Incident Thereto) is the provision of Federal law governing the ABCMR. Title 10, U.S. Code, section 1553 (Review of Discharge or Dismissal) applies only to the ADRB. Subparagraph d(1) of section 1553 requires a physician, clinical psychologist, or psychiatrist to be included as members of the ADRB when cases are being considered for former Soldiers who, while serving on active duty, were deployed and subsequently diagnosed by a physician, clinical psychologist, or psychiatrist as experiencing PTSD or traumatic brain injury (TBI) as a consequence of that deployment.)

2.  Counsel states:

    a.  The applicant's story is one of a promising young man whose life, at age 19, was derailed by the horrors he experienced while serving in Vietnam; only now, after nearly half a century, is he beginning his recovery.

        (1)  He joined the Army in March 1968 and was assigned to Vietnam after completing basic and military occupational specialty (MOS) training. Almost immediately he was exposed to intense mortar and rocket fire; he saw his buddies wounded or killed.

        (2)  He began to suffer from what is now known as PTSD, and he sought refuge from his nightmares in cheap, plentiful, and easily available heroin. His heroin use began a downward spiral that led to serious illness and a civilian conviction, which resulted in his March 1971 under other than honorable conditions discharge.

        (3)  After his discharge, he descended into a life of addiction-fueled crime and was incarcerated numerous times. He began to seek treatment shortly after his release on parole in 2013 and, for the first time, learned about his Vietnam-related PTSD, as well as its effects on his behavior. Since his release, he has been employed as a house manager for homeless Veterans and has served as a peer-to-peer counselor and motivational speaker.

        (4)  Counsel contends this is not about fault. PTSD was not understood until many years after the applicant's return from Vietnam. Counsel notes the applicant takes responsibility for his conduct, but this is about the tragedy resulting from the needless loss of so many years. Had the Army diagnosed and properly treated the applicant while he was still on active duty, the treatment could have restored him as an effective Soldier and productive member of his community. The applicant is, in a very real sense, a casualty of war.

    b.   Facts:

       (1)   The applicant was drafted into the Army at age 18; his pre-Vietnam service was unremarkable. As stated above, his exposure to combat and the resulting PTSD caused him to self-medicate with heroin; he ultimately was discharged under other than honorable conditions.

       (2)   This petition seeks reconsideration of previous ABCMR decisions, and is based primarily on newly discovered evidence showing the applicant suffered from undiagnosed PTSD, and that there was, and continues to be, a direct causal connection between his PTSD and his drug use.

       (3)   Counsel includes what he asserts to be a "most revealing" report, dated 24 April 1969, wherein Major HJS, Medical Corps, details the applicant's late March 1969 hospitalization in Vietnam; this was not included with the applicant's earlier petitions. Although PTSD was not yet recognized, the report contains unmistakable proof that the applicant suffered from this disorder. Counsel enumerates symptoms he contends clearly show PTSD symptoms.

       (4)   Also not previously considered is an update to the applicant's life following his 2013 release from prison. He has been in regular PTSD treatment with the Department of Veterans Affairs (VA) and has successfully completed a rigorous 2-year outpatient drug rehabilitation program. Following his release, the applicant lived in non-profit Veterans' housing, where he was an "exemplary resident." The non-profit organization hired him as a full-time manager for one of the residences and he continues his employment in that position. In addition, the applicant regularly volunteers to speak to youth groups and at-risk students.

    c.   Argument and conclusion.

       (1)   The previous decisions by the Board should be reconsidered due to the newly discovered evidence showing a direct causal link between the PTSD and his drug use. The applicant's PTSD entitles him to both special and liberal consideration (citing the September 2014 guidance from the former Secretary of Defense).

       (2)   In addition, his earlier petitions were prepared without professional help; because of this, the Board was not apprised of key evidence.

       (3)   The Board should also consider the applicant's exemplary behavior since his release from prison in 2013.

       (4)   In conclusion, the applicant is truly a casualty of war; had he been properly diagnosed and treated, his life would have taken a very different trajectory. The applicant now understands the impact of PTSD and continues to work on his recovery.

3.   Counsel provides:

* DD Form 214 (Armed Forces of the United States Report of Transfer or Discharge) for the period ending 11 March 1968
* ABCMR Docket Number AR20130013383 Record of Proceedings (ROP) and associated documents
* Vet Center Treatment Summary Update, dated 24 April 2017
* Columbia University School of Nursing letter, dated 23 January 2017
* Standard Form (SF) 502, dated 31 March 1969
* four letters of support, dated between 1 December 2016 and 25 January 2017
* New York State Corrections and Community Service letter, dated 2 May 2017

CONSIDERATION OF EVIDENCE:

1.   Incorporated herein by reference are military records which were summarized in the previous consideration of the applicant's case by the ABCMR in Docket Numbers AC93-13741, on 2 February 1994, and AR20130013383, on 20 March 2014.

2.   The applicant submitted his initial petition on 11 July 1993, and a request for reconsideration on 15 July 2013. His current request provides new evidence and arguments; as

such, his request warrants consideration by the Board.

3.  The applicant was inducted into the Army of the United States on 11 March1968.  He held MOS 94B (Cook).

4.  He served in Vietnam from 5 March 1969 to 17 June 1969.  While in Vietnam, he was medically evacuated to Japan because he had contracted hepatitis.

5.  While assigned in Japan for medical treatment, he accepted NJP due to having been AWOL from 30 April to 1 May 1969.

6.  He was transferred to Fort Dix, NJ and, while there, was convicted by a summary court-martial on 19 March 1970 for one specification of AWOL from 6 December 1969 to 3 March 1970. 7.  On 5 April 1970, he was arrested in New York City for robbery and possession of a dangerous weapon.  On 23 April 1970, he was sentenced to 1 year in a correctional institute, effective 30 September 1970.

8.  A letter, dated 12 November 1970, sent by the City of New York, Department of Correction, advised the applicant's commander that the applicant had been convicted of attempted robbery, 3rd degree and the court sentenced him to serve a prison sentence.  He was scheduled for release on 19 February 1971.

9.  On 5 January 1971, the applicant's Fort Dix commander notified the applicant in writing he was being considered for separation under the provisions of Army Regulation (AR) 635-206 (Personnel Separations — Discharge — Misconduct (Fraudulent Entry, Conviction by Civil Court, and Absence Without Leave or Desertion)) based on his civil court conviction.

10.  The applicant acknowledged receipt of the notification on 8 January 1971 and submitted the following:

        a.  He indicated he:

* waived consideration of his case before a board of officers
* would not submit statements on his own behalf
* was currently being held in civil confinement
* did not intend to appeal his civil conviction

        b.  He understood he could encounter substantial prejudice in civilian life in the event an undesirable or general discharge under honorable conditions were issued, and that an undesirable discharge could make him ineligible for many or all benefits available to Veterans under Federal and/or State law.

11.  On 25 February 1971, the separation authority approved the commander's recommendation for discharge and directed the applicant be furnished an Undesirable Discharge Certificate (with an under other than honorable conditions character of service).  The applicant was discharged accordingly on 16 March 1971.

12.  His DD Form 214 shows he completed 1 year, 9 months, and 16 days of net active creditable service, with 446 days of lost time.  He was awarded or authorized the National Defense Service Medal and the Vietnam Service Medal. The authority for separation was AR 635-206 and his character of service was under other than honorable conditions.

13.  The ADRB denied his requests for an upgrade of his character of service first on 4 June 1974 and again on 27 December 1985.

14.  The ABCMR denied his character of service upgrade requests on 2 February 1994 and 20 March 2014.

15.  The applicant and counsel provide:

        a.  Two letters of support, one undated and the other dated 1 December 2016, which affirm the applicant has exceptional communication and managerial skills, and has proven himself to be an upstanding, law-abiding citizen who attends weekly Bible study and local Christian meetings.  The applicant has demonstrated he wishes to make the most of life by working, learning, caring for the needs of his elderly parents, and participating in

meaningful relationships.

b.  Letter, dated 15 December 2016, showing the signatures of persons identified as primary counselor and program coordinator, states, in effect, the applicant successfully completed an outpatient drug and alcohol rehabilitation program, and his case was favorably closed on 11 January 2016.

c.  Letter, dated 25 January 2017, that essentially states the applicant volunteered at his local community college to speak to college student in an approved education series dealing with alcohol and substance abuse.  The class in which he participated is a community service open to young adults.

d.  Letter, dated 2 May 2017, from a probation officer, New York State Corrections and Community Supervision, who states the applicant was paroled on 11 June 2013 with a maximum expiration of "life."  He reports as directed on a monthly basis, has tested negative for drug use, and completed a drug and alcohol treatment program.

16.  On 8 November 2017, an Army Review Boards Agency (ARBA) psychologist provided a medical advisory opinion.

a.  The Case Management Division (CMD), ARBA, requested a review of the applicant's case to determine if his medical conditions were considered during separation processing.

b.  A brief summary was provided of the applicant's military service.

c.  Following a review of all available medical records, the ARBA psychologist determined the following:
       (1)  The available record did not reasonably support the presence of PTSD or other behavioral health condition warranting separation through medical channels.  However, in applying the policy of liberal consideration, the ARBA psychologist noted the applicant's post-service diagnosis for PTSD from the time of his Vietnam service and onwards.  There is also evidence he sustained a TBI but his records show he never reached a point, during his active service, where he failed medical retention standards for either behavioral health or TBI-related conditions.

       (2)  Both PTSD and TBI are presumed to have been present at the time he committed the misconduct that ultimately led to his adverse discharge.  His medical conditions would mitigate his periods of AWOL, but not the offenses of robbery and the possession of a dangerous weapon.  Robbery is the type of serious crime that PTSD does not mitigate.

17.  On 14 November 2017, CMD provided counsel and the applicant a copy of the ARBA medical advisory for review and comment.  On 12 December 2017, counsel submitted the following in response:

a.  The brief summary in the advisory misstated the applicant's military service.  In addition, the advisory opinion notes the applicant's earlier petitions did not include any medical reports of psychological symptoms, a fact counsel had already addressed.

       (1)  Counsel went on to contend the ARBA psychologist was incorrect in stating neither the applicant nor counsel had established when the applicant's PTSD began; clearly it started while the applicant was in Vietnam, and counsel cited two substantiating reports.

       (2)  Counsel then acknowledged the advisory opinion had conceded liberal consideration should be given for PTSD.  Additionally, the advisory opinion indicated that TBI and PTSD were presumed to have been incurred during the applicant's active service, and present when he committed the misconduct that led to his adverse discharge.

b.  Counsel asserts, if the applicant's Vietnam and post-Vietnam experience had occurred today, the outcome would likely have been dramatically different.  The horrors of war and easy access to drugs transformed the applicant into a drug addict who spent nearly half of his life in prison.

c.  The applicant accepts responsibility for his conduct and is doing his best to

atone for what he had done.
REFERENCES:

1.  AR 635-206, in effect at that time, set forth the basic authority for the separation of
enlisted personnel for misconduct.  Section VI of the regulation provided for the separation
of personnel for conviction by civil court, where the action taken against a Soldier was
tantamount to a finding of guilty for an offense under the UCMJ for which the maximum
punishment was either death or confinement in excess of 1 year.  An undesirable discharge
with an under other than honorable conditions character of service was normally considered
appropriate.

2.  New York Penal Law 160.05 defines robbery in the third degree as forcibly stealing
property.  Because this offense is categorized as a "Class D Felony" (indicating a violent
crime), the available sentence is up to 7 years in prison.

3.  The Manual for Courts-Martial, in effect at the time, showed the maximum punishment for
the offense of robbery was a dishonorable discharge and 10 years confinement at hard labor.

4.  AR 635-200 (Personnel Separations — Enlisted Personnel), in effect at the time, provided
policy and procedures for the separation of enlisted personnel.

     a.  Paragraph 1-9d stated an honorable discharge was a separation with honor, and
would be conditioned upon proper military behavior and proficient performance of duty.  Due
consideration was to be given to the Soldier's age, length of service, grade, and general
aptitude.  Where there had been disciplinary infractions, the extent would be considered, as
well as the seriousness of the offense(s).  The governing factor was to be the pattern of
behavior, not isolated instances.  Additionally, an authorized commander could character the
Soldier's service as honorable when following were considered:

* conduct ratings of at least "Good"; efficiency ratings of a minimum of "Fair"
* no general court-martial convictions; not more than one special court-martial conviction;
careful consideration was to be given to the nature of the offense(s), the sentence adjudged,
and character of the remainder of the Soldier's service

     b.  Paragraph 1-9e stated a general discharge was a separation from the Army under
honorable conditions.  When authorized, it was issued to a Soldier whose military record was
satisfactory but not sufficiently meritorious to warrant an honorable discharge.
5.  PTSD is unique among psychiatric diagnoses because of the great importance placed upon
the etiological agent, the traumatic stressor.  In fact, one cannot make a PTSD diagnosis
unless the patient has actually met the "stressor criterion," which means he or she has been
exposed to an event that is considered traumatic.

     a.  Clinical experience with the PTSD diagnosis has shown there are individual
differences regarding the capacity to cope with catastrophic stress.  Therefore, while most
people exposed to traumatic events do not develop PTSD, others go on to develop the full-
blown syndrome.  Such observations have prompted the recognition that trauma, like pain, is
not an external phenomenon that can be completely objectified.

     b.  Like pain, the traumatic experience is filtered through cognitive and emotional
processes before it can be appraised as an extreme threat.  Because of individual differences
in this appraisal process, different people appear to have different trauma thresholds, some
more protected from, and some more vulnerable to developing clinical symptoms after exposure
to extremely stressful situations.

6.  The Fifth Revision of DSM-5 was released in May 2013.  This updated edition included
changes to the diagnostic criteria for PTSD and acute stress disorder.  The PTSD diagnostic
criteria were revised to take into account things that have been learned from scientific
research and clinical experience.  The revised diagnostic criteria for PTSD include a history
of exposure to a traumatic event that meets specific stipulations and symptoms from each of
four symptom clusters:  intrusion, avoidance, negative alterations in cognitions and mood,
and alterations in arousal and reactivity.  The sixth criterion concerns duration of
symptoms; the seventh assesses functioning; and the eighth criterion clarifies symptoms as
not attributable to a substance or co-occurring medical condition.

     a.  Criterion A, stressor:  The person was exposed to: death, threatened death,

actual or threatened serious injury, or actual or threatened sexual violence, as follows: (one required)

        (1)  Direct exposure.

        (2)  Witnessing, in person.

        (3)  Indirectly, by learning that a close relative or close friend was exposed to trauma.  If the event involved actual or threatened death, it must have been violent or accidental.

        (4)  Repeated or extreme indirect exposure to aversive details of the event(s), usually in the course of professional duties (e.g., first responders, collecting body parts; professionals repeatedly exposed to details of child abuse). This does not include indirect non-professional exposure through electronic media, television, movies, or pictures.

    b.  Criterion B, intrusion symptoms:  The traumatic event is persistently re-experienced in the following way(s): (one required)

* Recurrent, involuntary, and intrusive memories
* Traumatic nightmares
* Dissociative reactions (e.g., flashbacks) which may occur on a continuum from brief episodes to complete loss of consciousness
* Intense or prolonged distress after exposure to traumatic reminders
* Marked physiologic reactivity after exposure to trauma-related stimuli

    c.  Criterion C, avoidance:  Persistent effortful avoidance of distressing trauma-related stimuli after the event: (one required)

* Trauma-related thoughts or feelings
* Trauma-related external reminders (e.g., people, places, conversations, activities, objects, or situations)

    d.  Criterion D, negative alterations in cognitions and mood:  Negative alterations in cognitions and mood that began or worsened after the traumatic event: (two required)

* Inability to recall key features of the traumatic event (usually dissociative amnesia; not due to head injury, alcohol, or drugs)
* Persistent (and often distorted) negative beliefs and expectations about oneself or the world (e.g., "I am bad," "The world is completely dangerous")
* Persistent distorted blame of self or others for causing the traumatic event or for resulting consequences
* Persistent negative trauma-related emotions (e.g., fear, horror, anger, guilt, or shame)
* Markedly diminished interest in (pre-traumatic) significant activities
* Feeling alienated from others (e.g., detachment or estrangement)
* Constricted affect: persistent inability to experience positive emotions

    e.  Criterion E, alterations in arousal and reactivity:  Trauma-related alterations in arousal and reactivity that began or worsened after the traumatic event: (two required)

* Irritable or aggressive behavior
* Self-destructive or reckless behavior
* Hypervigilance
* Exaggerated startle response
* Problems in concentration
* Sleep disturbance

    f.  Criterion F, duration:  Persistence of symptoms (in Criteria B, C, D, and E) for more than one month.

    g.  Criterion G, functional significance:  Significant symptom-related distress or functional impairment (e.g., social, occupational).

    h.  Criterion H, exclusion:  Disturbance is not due to medication, substance.

7. On 3 September 2014, the Secretary of Defense directed the Service Discharge Review Boards (DRBs) and Service Boards for Correction of Military/Naval Records (BCM/NRs) to carefully consider applications from former service members administratively discharged under other than honorable conditions, and who had since been diagnosed with PTSD by a competent mental health professional. The Boards were to determine if it would be appropriate to upgrade the characterization of an applicant's service, due to revised PTSD criteria, detailed medical considerations, and mitigating factors.

8. BCM/NRs are not courts, nor are they investigative agencies. Therefore, the determinations should be based upon a thorough review of the available military records and the evidence provided by each applicant on a case-by-case basis. When determining if PTSD, or other behavioral health issue(s), was the causative factor for misconduct, and whether an upgrade is warranted, the following factors should be carefully considered:

* was it reasonable to determine that PTSD or other behavioral health conditions existed at the time of discharge?
* did the record contain documentation of the occurrence of a traumatic event during the period of service?
* did the military record contain documentation of a diagnosis of PTSD or other behavioral health symptoms?
* did the applicant provide documentation of a diagnosis of PTSD or behavioral health symptoms rendered by a competent mental health professional representing a civilian healthcare provider?
* was the applicant's condition determined to have existed prior to military service?
* was the applicant's condition determined to have been incurred during, or aggravated by military service?
* did mitigating factors exist in the applicant's case?
* did the applicant have a history of misconduct prior to the occurrence of the traumatic event?
* was the applicant/FSM's misconduct premeditated?
* how serious was the misconduct?

9. Although the Department of Defense acknowledges that some Soldiers who were administratively discharged under other than honorable conditions may have had an undiagnosed condition of PTSD, or other behavioral health condition, at the time of their discharge, it is presumed that they were properly discharged based upon the evidence that was available at the time.

    a. Conditions documented in the record that can be reasonably determined to have existed at the time of discharge will be considered to have been present at separation. In cases in which PTSD or other behavioral health conditions may be reasonably determined to have existed at the time of discharge, those conditions will be considered potential mitigating factors in the misconduct that caused the under other than honorable conditions characterization of service.

    b. Corrections Boards must exercise caution in weighing evidence of mitigation in cases in which serious misconduct precipitated a discharge with a characterization of service of under other than honorable conditions. Potentially mitigating evidence of the existence of undiagnosed combat-related PTSD or other behavioral health conditions as a causative factor in the misconduct resulting in discharge will be carefully weighed against the severity of the misconduct. PTSD is not a likely cause of premeditated misconduct.

    c. Corrections Boards will also exercise caution in weighing evidence of mitigation in all cases of misconduct by carefully considering the likely causal relationship of symptoms to the misconduct.

10. On 25 August 2017, the Office of the Undersecretary of Defense for Personnel and Readiness issued clarifying guidance for the Secretary of Defense's Directive to DRBs and BCM/NRs when considering requests by Veterans for modification of their discharges due in whole, or in part, to: mental health conditions, including PTSD; TBI; sexual assault; sexual harassment. Boards were directed to give liberal consideration to Veterans petitioning for discharge relief when the application for relief was based in whole or in part on those conditions or experiences. The guidance further described evidence sources and criteria, and required Boards to consider the conditions or experiences presented in evidence as potential mitigation for that misconduct which led to the discharge.

11.  AR 15-185 (Army Board for Correction of Military Records (ABCMR)) prescribes the policies and procedures for correction of military records by the Secretary of the Army, acting through the ABCMR.

    a.  Paragraph 2-9 contains guidance on the burden of proof.  It states the ABCMR begins its consideration of each case with the presumption of administrative regularity, which is that what the Army did was correct.  The applicant has the burden of proving an error or injustice by a preponderance of the evidence.

    b.  The ABCMR may, in its discretion, hold a hearing or request additional evidence or opinions.  It states further, in paragraph 2-11, that applicants do not have a right to a hearing before the ABCMR.  The Director or the ABCMR may grant a formal hearing whenever justice requires.

DISCUSSION:

1.  By regulation, an applicant is not entitled to a hearing before the Board.  Hearings may be authorized by a panel of the Board or by the Director of the ABCMR.  In this case, the evidence of record, including independent evidence he provided, is sufficient to render a fair and equitable decision at this time.

2.  Counsel makes two requests that cite legal and regulatory guidance not relevant to the ABCMR.

    a.  Concerning counsel's request for all regulations; case summaries, staff briefs, or memoranda; advisory opinions from any source; military or civilian investigation reports; and any other documents being considered in the applicant's discharge review (per DODI 1332.28):

* ABCMR is governed by Title 10, U.S. Code, section 1556, which requires the Board to provide copies of all correspondence and communications (including summaries of verbal communications) between the Board (or staff) and outside entities or persons
* although this case required a medical advisory opinion, the opinion was rendered by a psychologist assigned to ARBA (the higher headquarters of the ABCMR)
* as required, a copy of the advisory opinion was provided to the applicant and counsel for review and comment
* all other references and regulations associated with this ROP were either previously cited or were available to the applicant and/or counsel at the time they were in effect
* no staff briefs or case summaries were prepared as part of the preparation required for the ABCMR to review this case

    b.  As to counsel's request to have a physician, clinical psychologist, or psychiatrist be included as a member of the board, this requirement, by law, exclusively applies to the ADRB.  Although the Board's membership does not include the aforementioned medical and/or behavioral health professionals, it has been provided the above-mentioned medical advisory opinion, which serves as additional evidence for the Board's consideration.

3.  The applicant was convicted in a civil court of a violent crime (i.e., attempted robbery in the third degree, a Class D violent felony under New York State law).  Because he was convicted of an offense that, under the UCMJ, had a maximum punishment in excess of 1 year, the applicant's chain of command initiated separation action under AR 635-206.  The evidence of record appears to show all requirements of law and regulation were met and the rights of the applicant were fully protected throughout the separation process.  In addition, the characterization of service he received appears to have been commensurate with the reason for his discharge.

4.  Counsel argues, in effect, the applicant's character of service should be upgraded due to his PTSD and TBI diagnoses.  He references DOD guidance, specifically asserting the Board is empowered to apply liberal consideration when reaching its determination.

    a.  An ARBA psychologist reviewed the applicant's available medical records and found, although he can be presumed to have had undiagnosed PTSD and TBI during his active service, these conditions were only partially mitigating in that a causal connection can be drawn with the applicant's periods of AWOL.

        b.  The basis for his adverse separation, however, were not his AWOLs, but rather his
civil conviction for a violent form of attempted robbery.

        c.  While the Board is has been asked to apply liberal consideration in cases like
this, the Board is also charged with assessing the seriousness of the misconduct.  The ARBA
psychologist noted robbery is the type of serious crime not mitigated by PTSD.

5.  Counsel further asks the Board to consider the applicant's post-service contributions,
specifically how, after his release from prison, he has turned his life around.

//NOTHING FOLLOWS//
ABCMR Record of Proceedings (cont)      AR20170015770


2

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS


ABCMR Record of Proceedings (cont)      AR20170015770


2

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS


Enclosure 2

# EXHIBIT D

```
                  BOARD DATE:  17 August 2017

                  DOCKET NUMBER:  AR20160000200


BOARD VOTE:

_____  _____  _____  GRANT FULL RELIEF

___x_____  __x_____  __x_____  GRANT PARTIAL RELIEF

_____  _____  _____  GRANT FORMAL HEARING

_____  _____  _____  DENY APPLICATION


2 Enclosures
1.  Board Determination/Recommendation
2.  Evidence and Consideration



                  BOARD DATE:  17 August 2017

                  DOCKET NUMBER:  AR20160000200


BOARD DETERMINATION/RECOMMENDATION:

1.  The Board determined the evidence presented is sufficient to warrant amendment of the
ABCMR's decision in Docket Number AR2000041727, dated 12 September 2000.  As a result, the
Board recommends that all Department of the Army records of the individual concerned be
corrected by reissuing his DD Form 214 to show the character of his service as general under
honorable conditions.

2.  The Board further determined the evidence presented is insufficient to warrant a portion
of the requested relief.  As a result, the Board recommends denial of so much of the
application that pertains to upgrading his character of service to fully honorable.


                      _____x_____
                              CHAIRPERSON

I certify that herein is recorded the true and complete record of the proceedings of the Army
Board for Correction of Military Records in this case.



                  BOARD DATE:  17 August 2017

                  DOCKET NUMBER:  AR20160000200


THE BOARD CONSIDERED THE FOLLOWING EVIDENCE:

1.  Application for correction of military records (with supporting documents provided, if
any).

2.  Military Personnel Records and advisory opinions (if any).

THE APPLICANT'S REQUEST, STATEMENT, AND EVIDENCE:
```

1. The applicant requests reconsideration of an earlier request to upgrade his discharge under other than honorable conditions (UOTHC) to honorable.

2. The applicant states:

   a. Post-traumatic stress disorder (PTSD) affected his mental health and caused him to be absent without leave (AWOL).

   b. On 3 September 2014, the Secretary of Defense issued a memorandum providing guidance to the Military Department Boards for Correction of Military/Naval Records regarding discharge upgrades by veterans claiming PTSD.

3. The applicant provides numerous civilian mental health records, dated June 1984 to June 1987.

CONSIDERATION OF EVIDENCE:

1. Incorporated herein by reference are military records which were summarized in the previous consideration of the applicant's case by the Army Board for Correction of Military Records (ABCMR) in Docket Number AR2000041727 on 12 September 2000.

2. The medical records provided by the applicant are new evidence that was not previously considered by the Board and warrants consideration at this time.

3. The applicant enlisted in the Regular Army on 17 February 1983 for a period of 4 years. He completed his training and was awarded military occupational specialty 62J (general construction equipment operator).

4. He was AWOL from 17 September 1983 to 16 November 1983. On 18 November 1983, charges were preferred against him for the AWOL period.

5. On 18 November 1983, he consulted with counsel and voluntarily requested discharge for the good of the service in lieu of trial by court-martial under the provisions of Army Regulation 635-200 (Personnel Separations — Enlisted Personnel), chapter 10. He acknowledged that by submitting his request for discharge, he was guilty of a charge against him that authorized the imposition of a bad conduct or dishonorable discharge. He indicated he understood he might be discharged under conditions other than honorable and given a discharge UOTHC, he might be ineligible for many or all benefits administered by the Veterans Administration, he might be deprived of many or all Army benefits, and he might be ineligible for many or all benefits as a veteran under both Federal and State laws. He acknowledged he might expect to encounter substantial prejudice in civilian life because of a discharge UOTHC. He elected not to make a statement in his own behalf.

6. On 31 January 1984, the separation authority approved his voluntary request for discharge and directed the issuance of a discharge UOTHC.

7. On 17 February 1984, he was discharged for the good of the service in lieu of trial by court-martial under the provisions of Army Regulation 635-200, chapter 10. He completed 10 months and 2 days of creditable active service during this period with 60 days of lost time. His service was characterized as UOTHC.

8. There is no evidence of record showing he was diagnosed with PTSD or any behavioral or mental health condition prior to or subsequent to his discharge.

9. He provided:

   a. A psychiatric intake from the Southeastern Regional Mental Health Center of Lumberton, North Carolina, dated 5 June 1984, documenting the applicant was actively psychotic with paranoia and strange behaviors. According to the intake, the applicant's mother reported the applicant had his first psychotic break during basic training and was hospitalized for this. His mother states she saw the applicant's military medical records when he came home while AWOL and saw the diagnosis of schizophrenia.

   b. A diagnostic report from the North Carolina Division of Mental Health/Mental Retardation and Substance abuse Services, dated 16 July 1984, showing he was diagnosed with

chronic undifferentiated schizophrenia.

    c. A termination summary from the North Carolina Division of Mental Health/Mental Retardation, dated 1 May 1986, showing he was diagnosed with schizophrenic disorder, undifferentiated, unspecified.

10. On 27 February 1987, the Army Discharge Review Board denied his request for a discharge upgrade.

11. On 12 September 2000, the ABCMR denied his request for a general discharge.

12. An advisory opinion was rendered by the Army Review Boards Agency Psychiatrist, dated 25 May 2017, wherein she stated:

    a. The applicant's military personnel records are void of any information regarding his behavioral health. His mother reported to his healthcare providers that the applicant developed psychotic symptoms during basic training and was hospitalized. The mother stated she saw military medical records diagnosing the applicant was schizophrenia. This documentation, however, is not present in the applicant's military personnel records. No military medical records are available for review.

    b. There is no evidence in the applicant's military records that he failed to meet retention standards.

    c. In conclusion, review of the military personnel record indicates no evidence of any behavior health condition, to include schizophrenia. A review of the civilian medical records, however, indicates indisputably that the applicant was diagnose with schizophrenia four months after being discharged from the Army. Given the proximity of his date of diagnosis to his date of discharge, it is almost certain the applicant was psychotic and suffering from the effects of schizophrenia while serving on active duty. The fact he was AWOL with no obvious explanation further supports this contention. Psychotic individuals are prone to illogical thinking and impulsive behaviors. Additionally, oftentimes these individuals have paranoid delusions regarding governmental organizations such as the military. The combination of these paranoid delusions, irrational thinking and impulsivity could quiet easily result in the psychotic individual taking flight (i.e., being AWOL) in order to protect himself.

    d. The available records do support a boardable diagnosis at the time of his discharge — chronic undifferentiated schizophrenia.

    e. There is no evidence in the applicant's military records that he failed to meet retention standards.

    f. His diagnosis of chronic undifferentiated schizophrenia is a mitigating factor in his misconduct. Schizophrenia can lead to impulsive, irrational, paranoid thinking which can result in the affect individual fleeing in order to protect himself.
As such, there is a nexus between the applicant's schizophrenia and the misconduct of being AWOL.

13. A copy of the advisory opinion was provided to the applicant for comment and/or rebuttal. He responded and stated he doesn't have any Department of Veterans Affairs medical records because his family didn't know he qualified for such support with a discharge UOTHC. Therefore, his mother used the public mental health system. He was admitted at the first available appointment. He is not sure what happened to his military medical treatment records. The copy they sent him didn't have anything in his records about seeing doctors about mental behavior even though his mother received a call stating he might be medically discharged. He was treated with shots in his eye at the Fort Leonard Wood medical treatment facility and that wasn't in the copy of medical records sent to him.

REFERENCES:

1. Army Regulation 635-200 sets forth the basic authority for separation of enlisted personnel.

    a. Paragraph 3-7a provides that an honorable discharge is a separation with honor

and entitles the recipient to benefits provided by law.  The honorable characterization is appropriate when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for Army personnel or is otherwise so meritorious that any other characterization would be clearly inappropriate.

    b.  Paragraph 3–7b provides that a general discharge is a separation from the Army under honorable conditions.  When authorized, it is issued to a Soldier whose military record is satisfactory, but not sufficiently meritorious to warrant an honorable discharge.

    c.  Chapter 10 provides that a member who has committed an offense or offenses for which the authorized punishment includes a punitive discharge may submit a request for discharge for the good of the service in lieu of trial by court-martial.  The request may be submitted at any time after charges have been preferred and must include the individual's admission of guilt.  Although an honorable or general discharge is authorized, a discharge UOTHC is normally considered appropriate.

2.  The Diagnostic and Statistical Manual of Mental Disorders (DSM), chapter 7, addresses trauma and stress or related disorders.  The DSM is published by the American Psychiatric Association (APA) and provides standard criteria and common language for classification of mental disorders.  In 1980, the APA added PTSD to the third edition of its DSM nosologic classification scheme.  Although controversial when first introduced, the PTSD diagnosis has filled an important gap in psychiatric theory and practice.  From a historical perspective, the significant change ushered in by the PTSD concept was the stipulation that the etiological agent was outside the individual (i.e., a traumatic event) rather than an inherent individual weakness (i.e., a traumatic neurosis).  The key to understanding the scientific basis and clinical expression of PTSD is the concept of "trauma."

3.  PTSD is unique among psychiatric diagnoses because of the great importance placed upon the etiological agent, the traumatic stressor.  In fact, one cannot make a PTSD diagnosis unless the patient has actually met the "stressor criterion," which means that he or she has been exposed to an event that is considered traumatic.  Clinical experience with the PTSD diagnosis has shown, however, that there are individual differences regarding the capacity to cope with catastrophic stress.  Therefore, while most people exposed to traumatic events do not develop PTSD, others go on to develop the full-blown syndrome.  Such observations have prompted the recognition that trauma, like pain, is not an external phenomenon that can be completely objectified.  Like pain, the traumatic experience is filtered through cognitive and emotional processes before it can be appraised as an extreme threat.  Because of individual differences in this appraisal process, different people appear to have different trauma thresholds, some more protected from and some more vulnerable to developing clinical symptoms after exposure to extremely stressful situations.

4.  The fifth edition of the DSM was released in May 2013.  This revision includes changes to the diagnostic criteria for PTSD and acute stress disorder.  The PTSD diagnostic criteria were revised to take into account things that have been learned from scientific research and clinical experience.  The revised diagnostic criteria for PTSD include a history of exposure to a traumatic event that meets specific stipulations and symptoms from each of four symptom clusters:  intrusion, avoidance, negative alterations in cognitions and mood, and alterations in arousal and reactivity.  The sixth criterion concerns duration of symptoms, the seventh criterion assesses functioning, and the eighth criterion clarifies symptoms as not attributable to a substance or co-occurring medical condition.

    a.  Criterion A — Stressor:  The person was exposed to:  death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence, as follows (one required):

        (1)  direct exposure;

        (2)  witnessing, in person;

        (3)  indirectly, by learning that a close relative or close friend was exposed to trauma.  If the event involved actual or threatened death, it must have been violent or accidental; or

        (4)  repeated or extreme indirect exposure to aversive details of the event(s), usually in the course of professional duties (e.g., first responders collecting

https://boards.law.af.mil/ARMY/BCMR/CY2016/20160000200.txt

body parts, professionals repeatedly exposed to details of child abuse). This does not include indirect non-professional exposure through electronic media, television, movies, or pictures.

     b. Criterion B — Intrusion Symptoms:  The traumatic event is persistently re-experienced in the following way(s) (one required):

        (1) recurrent, involuntary, and intrusive memories;

        (2) traumatic nightmares;

        (3) dissociative reactions (e.g., flashbacks) which may occur on a continuum from brief episodes to complete loss of consciousness;

        (4) intense or prolonged distress after exposure to traumatic reminders; or

        (5) marked physiologic reactivity after exposure to trauma-related stimuli.

     c. Criterion C — Avoidance:  Persistent effortful avoidance of distressing trauma-related stimuli after the event (one required):

        (1) trauma-related thoughts or feelings or

        (2) trauma-related external reminders (e.g., people, places, conversations, activities, objects, or situations).

     d. Criterion D — Negative Alterations in Cognitions and Mood:  Negative alterations in cognitions and mood that began or worsened after the traumatic event (two required):

        (1) inability to recall key features of the traumatic event (usually dissociative amnesia; not due to head injury, alcohol, or drugs);

        (2) persistent (and often distorted) negative beliefs and expectations about oneself or the world (e.g., "I am bad," "The world is completely dangerous");

        (3) persistent distorted blame of self or others for causing the traumatic event or for resulting consequences;

        (4) persistent negative trauma-related emotions (e.g., fear, horror, anger, guilt, or shame);

        (5) markedly diminished interest in (pre-traumatic) significant activities, feeling alienated from others (e.g., detachment or estrangement); and

        (6) constricted affect, persistent inability to experience positive emotions.

     e. Criterion E — Alterations in Arousal and Reactivity:  Trauma-related alterations in arousal and reactivity that began or worsened after the traumatic event (two required):

        (1) irritable or aggressive behavior,

        (2) self-destructive or reckless behavior,

        (3) hypervigilance,

        (4) exaggerated startle response,

        (5) problems in concentration, and
        (6) sleep disturbance;

     f. Criterion F — Duration:  Persistence of symptoms (in Criteria B, C, D, and E) for more than 1 month.

     g. Criterion G — Functional Significance:  Significant symptom-related distress or functional impairment (e.g., social, occupational).

Case 3:22-cv-00601-JBA   Document 25-3   Filed 09/30/22   Page 61 of 90

    h.  Criterion H — Exclusion:  Disturbance is not due to medication, substance use, or
other illness.

5.  As a result of the extensive research conducted by the medical community and the
relatively recent issuance of revised criteria regarding the causes, diagnosis, and treatment
of PTSD, the Department of Defense (DOD) acknowledges that some Soldiers who were
administratively discharged UOTHC may have had an undiagnosed condition of PTSD at the time
of their discharge.  It is also acknowledged that in some cases this undiagnosed condition of
PTSD may have been a mitigating factor in the Soldiers' misconduct which served as a catalyst
for their discharge.  Research has also shown that misconduct stemming from PTSD is typically
based upon a spur of the moment decision resulting from a temporary lapse in judgment.
Therefore, PTSD is not a likely cause for either premeditated misconduct or misconduct that
continues for an extended period of time.

6.  On 3 September 2014 in view of the foregoing information, the Secretary of Defense
directed the Service Discharge Review Boards (DRBs) and Service Boards for Correction of
Military/Naval Records (BCM/NRs) to carefully consider the revised PTSD criteria, detailed
medical considerations, and mitigating factors when taking action on applications from former
service members administratively discharged UOTHC and who have been diagnosed with PTSD by a
competent mental health professional representing a civilian healthcare provider in order to
determine if it would be appropriate to upgrade the characterization of the applicants'
service.

7.  BCM/NRs are not courts, nor are they investigative agencies.  Therefore, the
determinations will be based upon a thorough review of the available military records and the
evidence provided by each applicant on a case-by-case basis.  When determining if PTSD was
the causative factor for an applicant's misconduct and whether an upgrade is warranted, the
following factors must be carefully considered:

* is it reasonable to determine that PTSD or PTSD-related conditions existed at the time of
discharge?
* does the applicant's record contain documentation of the occurrence of a traumatic event
during the period of service?
* does the applicant's military record contain documentation of a diagnosis of PTSD or PTSD-
related symptoms?
* did the applicant provide documentation of a diagnosis of PTSD or PTSD-related symptoms
rendered by a competent mental health professional representing a civilian healthcare
provider?
* was the applicant's condition determined to have existed prior to military service?
* was the applicant's condition determined to be incurred during or aggravated by military
service?
* do mitigating factors exist in the applicant's case?
* did the applicant have a history of misconduct prior to the occurrence of the traumatic
event?
* was the applicant's misconduct premeditated?
* how serious was the misconduct?

8.  Although DOD acknowledges that some Soldiers who were administratively discharged UOTHC
may have had an undiagnosed condition of PTSD at the time of their discharge, it is presumed
that they were properly discharged based upon the evidence that was available at the time.
Conditions documented in the records that can reasonably be determined to have existed at the
time of discharge will be considered to have existed at the time of discharge.  In cases in
which PTSD or PTSD-related conditions may be reasonably determined to have existed at the
time of discharge, those conditions will be considered potential mitigating factors in the
misconduct that caused the UOTHC characterization of service.  BCM/NRs will exercise caution
in weighing evidence of mitigation in cases in which serious misconduct precipitated a
discharge with a characterization of service of UOTHC.  Potentially mitigating evidence of
the existence of undiagnosed combat-related PTSD or PTSD-related conditions as a causative
factor in the misconduct resulting in discharge will be carefully weighed against the
severity of the misconduct.  PTSD is not a likely cause of premeditated misconduct.  BCM/NRs
will also exercise caution in weighing evidence of mitigation in all cases of misconduct by
carefully considering the likely causal relationship of symptoms to the misconduct.

DISCUSSION:

Case 3:22-cv-00601-JBA Document 25-3 Filed 09/30/22 Page 62 of 90

1.  The applicant's voluntary request for separation for the good of the service in lieu of trial by court-martial under the provisions of Army Regulation 635-200, chapter 10, was administratively correct and in conformance with applicable regulations.  The type of discharge directed and the reason for discharge were appropriate considering all the facts of the case.

2.  Although the applicant contends PTSD affected his mental health and caused him to be AWOL, there is no evidence and he provided no evidence showing he was diagnosed with PTSD.  However, the evidence shows he was diagnosed with schizophrenia 4 months after his discharge from the Army on 6 June 1984.

3.  A clinical psychiatrist reviewed his records and determined:

    a.  Given the proximity of his date of diagnosis of schizophrenia (June 1984) to his date of discharge (February 1984), it is almost certain the applicant was psychotic and suffering from the effects of schizophrenia while serving on active duty.

    b.  The available records do support a boardable diagnosis at the time of discharge — chronic undifferentiated schizophrenia.

    c.  His diagnosis of chronic undifferentiated schizophrenia is a mitigating factor in his misconduct.

4.  As a matter of clemency, this nexus may serve as a basis for a recommendation to upgrade the characterization of his service to general under honorable conditions.

5.  A general discharge is a separation from the Army under honorable conditions.  When authorized, it is issued to a Soldier whose military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge.

6.  His overall service did not rise to a fully honorable character of service.

//NOTHING FOLLOWS//
ABCMR Record of Proceedings                                                            AR20150000953


Enclosure 1

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS




ABCMR Record of Proceedings (cont)       AR20160000200



2

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS



Enclosure 1

ABCMR Record of Proceedings (cont)       AR20160000200

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS

Enclosure 2

# EXHIBIT E

BOARD DATE:  10 February 2020

DOCKET NUMBER:  AR20190013166


APPLICANT REQUESTS:  The applicant requests upgrade of his general discharge
under honorable conditions to honorable.

APPLICANT'S SUPPORTING DOCUMENTS CONSIDERED BY THE BOARD:

*       DD Form 149 (Application for Correction of Military Record)
*       DD Form 214 (Armed Forces of the United States Report of Transfer or
Discharge)

FACTS:

1.  The applicant did not file within the 3-year time frame provided in Title 10 (Armed
Forces), United States Code (USC), section 1552 (b) (Correction of Military Records:
Claims Incident Thereto).  However, the Army Board for Correction of Military Records
(ABCMR) conducted a substantive review of this case and determined it is in the
interest of justice to excuse the applicant's failure to timely file.

2.  The applicant states, in effect, he was actually being hospitalized during a period
listed as absence without leave (AWOL) in his service records; when he reported back
to the Army, they placed him in a military hospital.  He was having health and family
problems.

3.  The applicant's service records show:

        a.  On 13 December 1967, the applicant was inducted into the Army of the United
States.  He was scheduled to report to Fort Benning, GA, on 5 January 1967, for basic
combat training (BCT), but he never arrived; as a result, the applicant's BCT unit
reported him AWOL.

        b.  On 26 January 1968, the Georgia civilian police arrested the applicant and,
effective 27 January 1968, returned him to military control at Fort McPherson, GA; the
applicant had been AWOL 23 days.  On 28 January 1968, the Fort McPherson military
authority placed the applicant on a provisional pass and ordered him to return to his Fort
Benning unit; the applicant failed to show up, and his Fort Benning unit dropped him
from Army rolls.

        c.  On 15 March 1968, the applicant returned to military control and orders
reassigned him to the Fort McPherson U.S. Army Personnel Control Facility (PCF); the
duration of his second period of absence was 47 days.  The applicant subsequently
went AWOL one last time for 3 days (29 March until 1 April 1968).

        d.  On 8 April 1968, the Mental Hygiene Consultation Division at Fort Benning
evaluated the applicant and diagnosed him with having a severely anti-social
personality; the physician noted the applicant had a long history of socially disruptive
behavior, and he recommended the applicant's expeditious separation.

        e.  On 10 April 1968, the Chief of Fort McPherson's Neuropsychiatric Service
examined the applicant and affirmed a diagnosis of sociopathic personality disorder; the
doctor recommended immediate separation under the provisions of Army Regulation
(AR) 635-212 (Personnel Separations — Discharge — Unfitness and Unsuitability).

        f.  On 22 April 1968, the applicant's PCF commander notified him via memorandum
of his intent to separate the applicant under paragraph 6b (2) (Unsuitability — Character
and Behavior Disorders), AR 635-212.  On 23 April 1968, after consulting with counsel,
the applicant acknowledged counsel had advised him of the basis for the separation
action; the applicant elected to waive his rights and declined to submit statements in his
own behalf.

Case 3:22-cv-00601-JBA   Document 25-3   Filed 09/30/22   Page 66 of 90

     g.  In his 24 April 1968 separation recommendation indorsement, the applicant's PCF commander stated the applicant had been AWOL several times, and psychiatric evaluations indicated the applicant had extremely poor judgment and showed no motivation toward any productive goals.

     h.  On 24 April 1968, the separation authority approved the commander's separation recommendation and directed the applicant's general discharge under honorable conditions; on 2 May 1968, the applicant was discharged accordingly.  His DD Form 214 shows he completed 2 months and 7 days of his 2-year active duty induction obligation, with 73 days of lost time.  His DD Form 214 did not list any awards.

4.  During the applicant's era of service, commanders used AR 635-212 to separate Soldiers who were diagnosed with a character or behavior disorder (currently termed personality disorder).  In November 1972, AR 635-200 (Personnel Separations — Enlisted Personnel) superseded AR 635-212, and this change moved character/behavior disorder separations to paragraph 13-5b (2) (Unsuitability of chapter 13 — Character and Behavior Disorders).

     a.  On 1 December 1976, AR 635-200 was further revised as a result of a civil suit settlement.  The revision required a DD Form 214's type of discharge and the character of service to be based solely on the Soldier's service during the specific period addressed in the report.  Further, any Soldier separated for unsuitability based on having a personality disorder were required to have been evaluated and diagnosed by a physician trained in psychiatry.

     b.  Later guidance, with regard to personality disorders, mandated the retroactive application of the foregoing policy changes.  Additionally, the policy was expanded, such that Soldiers diagnosed with personality disorders were deemed upgrade-eligible for honorable characters of service; the exceptions included those Soldiers who had been convicted by a general court-martial, or by more than one special court-martial.

5.  The applicant suggests family issues and health problems caused him to go AWOL, and he asserts he was hospitalized during his unauthorized absence.  The evidence of record indicates two physicians trained in psychiatric medicine subsequently diagnosed the applicant with a personality disorder.  In reaching its determination, the Board can consider the applicant's petition, his service record, and his statements in light of the published guidance on equity, injustice, or clemency.

BOARD DISCUSSION:

1.  The Board carefully considered the applicant's request, supporting documents, evidence in the records and published DoD guidance for liberal consideration of discharge upgrade requests.  The Board considered the applicant's statement, his record and length of service, the frequency and nature of his misconduct, the unit morning report and the reason for his separation.  The Board considered the medical documentation to include the behavioral health evaluations recorded and applicable policy regarding separations where a personality disorder is present.  Based on a preponderance of evidence, the Board determined that liberal consideration applied and that the character of service the applicant received upon separation was harsh and an upgrade as a matter of liberal consideration was appropriate.

2.  After reviewing the application and all supporting documents, the Board found that relief was warranted.

BOARD VOTE:

| Mbr 1 | Mbr 2 | Mbr 3 | |
|-------|-------|-------|--|
| :X    | :X    | :X    | GRANT FULL RELIEF |
| :     | :     | :     | GRANT PARTIAL RELIEF |
| :     | :     | :     | GRANT FORMAL HEARING |

:        :        :        DENY APPLICATION


BOARD DETERMINATION/RECOMMENDATION:


The Board determined the evidence presented is sufficient to warrant a
recommendation for partial relief.  As a result, the Board recommends that all
Department of the Army records of the individual concerned be corrected by amending
the DD Form 214 for the period of service ending 2 May 1968 to reflect in item 13a.
(Character of Service) — "Honorable" vice "Under honorable conditions."




I certify that herein is recorded the true and complete record of the proceedings of the
Army Board for Correction of Military Records in this case.


ADMINISTRATIVE NOTE(S):

Not Applicable

REFERENCES:

1.  Title 10, USC, section 1552(b), provides that applications for correction of military
records must be filed within 3 years after discovery of the alleged error or injustice.  This
provision of law also allows the ABCMR to excuse an applicant's failure to timely file
within the 3-year statute of limitations if the ABCMR determines it would be in the
interest of justice to do so.

2.  Army Regulation (AR) 635-212, in effect at the time, set forth the basic authority for
separating enlisted personnel for reasons of unfitness or unsuitability.  Paragraph
6 (Applicability) stated an individual was subject to separation under the provisions of
this regulation for unsuitability when they had a character and behavior disorder or
displayed a lack of appropriate interest (apathy).  Soldiers involved in frequent acts of a
discreditable nature were separated for unfitness under this regulation.

3.  Special Regulation 40-1025-2, in effect at the time, defined character and behavior
disorders as those indicative of developmental defects or pathological trends in the
personality structure, with minimal subjective anxiety, and little or no sense of distress.
It stated further that, in most instances, the disorder was manifested by a lifelong
pattern of action or behavior ("acting out") rather than by mental or emotional
symptoms.  The associated categories were:

*        pathological personality types — maladjustment of individuals as evidenced by
lifelong abnormal behavior patterns
*        immaturity reactions — physically adult individuals who are unable to maintain
their emotional equilibrium and independence when under minor or major stress
*        alcoholism — character disturbance due to alcohol abuse
*        addiction — includes cases where the use of drugs represent much deeper
character disturbances where individuals engage in antisocial behavior, stealing,
or sexual assault while under the influence of drugs
*        primary childhood behavior reactions — serious emotional difficulties within the
child that are not due to organic defects where emotional displays are carried to
an extreme degree

4.  AR 635-200 (Personnel Separations — Enlisted Personnel) superseded AR 635-212
in November 1972.  It was revised on 1 December 1976 following settlement of a civil
suit.

a.  The revision required the type of discharge and the character of service to be
determined solely by the individual's military records during the current enlistment.
Further, any separation for unsuitability based on personality disorder must include a

diagnosis of a personality disorder made by a physician trained in psychiatry.

b. In connection with these changes, a Department of the Army memorandum, dated 14 January 1977, and better known as the "Brotzman Memorandum," was promulgated. It required retroactive application of revised policies, attitudes and changes in reviewing applications for discharge upgrades based on personality disorders.

c. A second memorandum, dated 8 February 1978, and better known as the "Nelson Memorandum," expanded the review policy and specified that the presence of a personality disorder diagnosis would justify an upgrade of a discharge to fully honorable except in cases where there are "clear and demonstrable reasons" why a fully honorable discharge should not be given. Conviction by a general court-martial or by more than one special court-martial was determined to be "clear and demonstrable reasons" which would justify a less than fully honorable discharge.

5. AR 635-200 (Active Duty Enlisted Administrative Separations), currently in effect, states in paragraph 3-7a, an honorable discharge is a separation with honor and entitles the recipient to benefits provided by law. The honorable characterization is appropriate when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for Army personnel or is otherwise so meritorious that any other characterization would be clearly inappropriate.

6. On 3 September 2014, the Secretary of Defense directed the Service Discharge Review Boards (DRBs) and Service Boards for Correction of Military/Naval Records (BCM/NRs) to carefully consider the revised PTSD criteria, detailed medical considerations and mitigating factors when taking action on applications from former service members administratively discharged UOTHC and who have been diagnosed with PTSD by a competent mental health professional representing a civilian healthcare provider in order to determine if it would be appropriate to upgrade the characterization of the applicant's service.

7. On 25 August 2017, the Office of the Undersecretary of Defense for Personnel and Readiness issued clarifying guidance for the Secretary of Defense Directive to Discharge Review Boards (DRBs) and Board for Correction of Military/Naval Records (BCM/NRs) when considering requests by Veterans for modification of their discharges due in whole or in part to: mental health conditions, including Post Traumatic Stress Disorder (PTSD); Traumatic Brain Injury (TBI); sexual assault; or sexual harassment. Boards are to give liberal consideration to Veterans petitioning for discharge relief when the application for relief is based in whole or in part to those conditions or experiences. The guidance further describes evidence sources and criteria and requires Boards to consider the conditions or experiences presented in evidence as potential mitigation for misconduct that led to the discharge.

8. On 25 July 2018, the Under Secretary of Defense for Personnel and Readiness issued guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records (BCM/NRs) regarding equity, injustice, or clemency determinations. Clemency generally refers to relief specifically granted from a criminal sentence. BCM/NRs may grant clemency regardless of the type of court-martial. However, the guidance applies to more than clemency from a sentencing in a court-martial; it also applies to other corrections, including changes in a discharge, which may be warranted based on equity or relief from injustice. This guidance does not mandate relief, but rather provides standards and principles to guide Boards in application of their equitable relief authority. In determining whether to grant relief on the basis of equity, injustice, or clemency grounds, BCM/NRs shall consider the prospect for rehabilitation, external evidence, sworn testimony, policy changes, relative severity of misconduct, mental and behavioral health conditions, official governmental acknowledgement that a relevant error or injustice was committed, and uniformity of punishment. Changes to the narrative reason for discharge and/or an upgraded character of service granted solely on equity, injustice, or clemency grounds normally should not result in separation pay, retroactive promotions, and payment of past medical expenses or similar benefits that might have been received if the original discharge had been for the revised reason or had the upgraded service characterization.

//NOTHING FOLLOWS//
ABCMR Record of Proceedings (cont)          AR20190013166

3

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS

RECORD OF PROCEEDINGS

1
ABCMR Record of Proceedings (cont)      AR20190013166

7
ABCMR Record of Proceedings (cont)      AR20190013166

4

# EXHIBIT F

100th Congress — 2d Session   •   January 25–October 22, 1988

# Senate Reports

## Nos. 439–465



## United States Congressional Serial Set

### Serial Number 13864

United States Government Printing Office
Washington : 1990

# CONTENTS

No.
439. Veterans' Benefits and Programs Improvement Act of 1988.
440. Federal Aviation Administration Independent Establishment Act of 1988.
441. Drunk Driving Prevention Act of 1988.
442. Indoor Air Quality Act of 1988.
443. Steel and Aluminum Energy Conservation and Technology Competitiveness Act of 1988.
444. Public Telecommunications Act of 1988.
445. Technical Corrections Act of 1988.
446. Indian Gaming Regulatory Act.
447. Parental and Medical Leave Act of 1988.
448. Dire Emergency Supplemental Appropriations Bill, 1988.
449. Congaree Swamp National Monument Expansion and Wilderness Act.
450. Constitution Heritage Act of 1988.
451. Release reversionary interest of U.S. in parcel of land in Bay County, Florida.
452. Extend authorization of Upper Delaware Citizens Advisory Council for additional 10 years.
453. Establish Charles Pinckney National Historic Site in South Carolina.
454. Protection and advocacy for Mentally Ill Individuals Amendments Act of 1988.
455. United States Grain Standards Act Amendments of 1988.
456. National Commission on Thrift Industry.
457. Renewable Energy/Fuel Cell Systems Integration Act of 1988.
458. Fuel Cells Energy Utilization Act of 1988.
459. Amend Racketeer Influenced and Corrupt Organizations Act.
460. Require Secretary of Treasury to mint, etc., five-dollar coins in commemoration of 100th anniversary of statehood of Idaho, Montana, North Dakota, South Dakota, Washington, and Wyoming.
461. International Securities Enforcement Cooperation Act of 1988
462. Amend Pennsylvania Avenue Development Corporation Act of 1972.
463. General Accounting Office Personnel Amendments Act of 1988.
464. Telecommunications services for hearing-impaired.
465. Local Rail Service Assistance Reauthorization Act of 1988.

III



**Calendar No. 853**

| 100TH CONGRESS 2d Session | SENATE | REPORT 100–439 |
|---|---|---|

# VETERANS' BENEFITS AND PROGRAMS IMPROVEMENT ACT OF 1988

---

# R E P O R T

OF THE

## COMMITTEE ON VETERANS' AFFAIRS UNITED STATES SENATE

TO ACCOMPANY

## S. 2011

together with

## ADDITIONAL VIEWS



AUGUST 1, 1988.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1988

87–360

## COMMITTEE ON VETERANS' AFFAIRS

ALAN CRANSTON, California, *Chairman*

| | |
|---|---|
| SPARK M. MATSUNAGA, Hawaii | FRANK H. MURKOWSKI, Alaska |
| DENNIS DeCONCINI, Arizona | ALAN K. SIMPSON, Wyoming |
| GEORGE J. MITCHELL, Maine | STROM THURMOND, South Carolina |
| JOHN D. ROCKEFELLER IV, West Virginia | ROBERT T. STAFFORD, Vermont |
| BOB GRAHAM, Florida | ARLEN SPECTER, Pennsylvania |

JONATHAN R. STEINBERG, *Chief Counsel/Staff Director*
ANTHONY J. PRINCIPI, *Minority Chief Counsel/Staff Director*

(II)

Digitized by Google

# CONTENTS

————

|  | Page |
|---|---|
| Committee [Amendments] | 1 |
| Introduction | 38 |
| Summary of S. 2011 as Reported | 47 |
| Discussion: |  |
| Title I—Compensation and Related Benefits | 60 |
| Disability Compensation and Dependency and Indemnity Compensation Cost-of-Living Adjustments | 60 |
| Expansion of Clothing Allowance | 63 |
| Title II—Agent Orange and Related Provisions | 64 |
| Interim Period for Award of Benefits for Vietnam Veterans with Non-Hodgkin's Lymphoma | 64 |
| Presumptive Service Connection of Chloracne for Vietnam Veterans | 77 |
| Extension of Health-Care Eligibility Based on Agent Orange or Radiation Exposure | 79 |
| Income exclusion of certain payments for purposes of eligiblity for certain needs-based veterans benefits | 79 |
| Agent Orange Scientific Evidence Review | 82 |
| Modification of Procedures for Consideration of Certain Studies | 83 |
| Title III—Education and Rehabilitation | 84 |
| Part A—Rehabilitation for Veterans with Service-Connected Disabilities | 84 |
| Training and Work Experience Without Pay in States and Local Government Agencies | 84 |
| Removal of Bar to Use of For-Profit Organizations for Employment Assistance and Independent Living Programs | 85 |
| Extension of Temporary Programs of Trial Work Periods and Vocational—Rehabilitation Evaluations | 86 |
| Part B—Education Programs | 87 |
| Subpart 1—Montgomery GI Bill Provisions | 87 |
| Eligibility for Individuals Discharged for Pre-Service Medical Conditions or Due to Reductions in Force | 87 |
| Opportunity for Enrollment for Certain Active-Duty Nonparticipants | 90 |
| Secondary School Diploma Requirements | 91 |
| Choice of Benefits for Certain Reservists | 92 |
| Subpart 2—Provisions Relating to Montgomery GI Bill and Certain Other Programs | 93 |
| Refresher, Remedial, and Deficiency Courses | 93 |
| Tutorial Assistance | 94 |
| Cooperative Training | 95 |
| Tolling of Delimiting Periods by Reason of Drug or Alcohol Conditions | 96 |
| Subpart 3—Administrative and Miscellaneous Provisions | 100 |
| Course Withdrawals | 100 |
| Funding of Educational and Vocational Counseling Services | 103 |
| Measurement of Full-Time Study | 104 |
| Educational Assistance for Certain Incarcerated Veterans Under the Post-Vietnam Era Veterans' Educational Assistance Program | 105 |
| Veterans' Advisory Assistance Committee on Education | 105 |
| Vietnam-Era GI Bill Eligibility for Certain Service Academy Graduates | 106 |
| Repeal of Expired Program of Accelerated-Payment Loans | 108 |

IV

Discussion—Continued
  Title III—Education and Rehabilitation—Continued    Page
    Part C—Non-Service-Connected Disability Pension Recipient Vocational Training Program ........................................................................... 109
      Extension of Program Period ................................................................ 109
  Title IV—Miscellaneous Benefits Provisions .................................................. 110
    Part A—Insurance Programs ....................................................................... 110
      Payment of Interest on Settlements .................................................... 110
      Adjustment of Discount Rates for Advance Payment of Premiums ................................................................................................... 111
    Part B—State Cemetery Construction Grant Program............................ 112
      Extension of Authorization of Appropriations................................... 112
    Part C—Home Loan Guaranty Program .................................................... 112
      Waiver of Indebtedness ......................................................................... 112
  Title V—Board of Veterans' Appeals .............................................................. 113
    Independence of the Chairman .................................................................... 113
    Timeliness of Dispositions............................................................................. 114
    Appointment and Removal of the Chairman and Members ................... 114
    Salary of Chairman ........................................................................................ 115
    Reports on Board Activities and Resources............................................... 115
    Prohibition of Bonuses for Members .......................................................... 115
    Voting by the Board ....................................................................................... 116
    Reopening of Disallowed Claims ................................................................. 116
    Notice and Content of Decisions.................................................................. 117
    Prohibition Against Presumption of Agreement ...................................... 117
    Medical Opinions ........................................................................................... 117
    Adjudication Procedures ............................................................................... 118
    Notices of Procedures ................................................................................... 121
    Effective Date of Awards in Reopened Cases ........................................... 121
    Attorneys' Fees .............................................................................................. 121
  Title VI—Health Care ........................................................................................ 122
    Part A—Programs Relating to Post-Traumatic Stress Disorder and Mental Health ............................................................................................ 122
      Care for Vietnam Veterans with Service-Related Post-Traumatic Stress Disorder ................................................................................... 122
      Special Committee on Post-Traumatic Stress Disorder................... 127
      Study of Psychological Problems Among Asian-American, American Indian, Native-Hawaiian, other Native-American Pacific Islander (including American Samoan Native), and Alaska Native Vietnam Veterans ............................................................. 128
      Mental Illness Research, Education, and Clinical Centers.............. 129
      Readjustment Counseling Eligibility Extension ............................... 132
      Community-Based Alcohol and Drug Treatment Services............... 135
    Part B—Other Health-Care Programs ....................................................... 137
      Respite Care ............................................................................................ 137
      Contracts and Grants for Care in the Philippines .......................... 139
      Sharing of Specialized Medical Resources ........................................ 143
      State Home Construction Grants......................................................... 145
      Pilot Programs for Providing Assistive Animals .............................. 146
    Part C—Health-Care Personnel................................................................... 150
      Appointment of Veterans' Administration-Trained Personnel........ 151
      Approval of Special Rates of Pay........................................................ 152
      Health Professional Scholarship Award.............................................. 154
      Assistance to Health-Personnel Educational Institutions................ 155
      Pilot Program of Pay and Personnel Management Practices.......... 158
      Conversion of Non-Physician Medical Center Directors to the Senior Executive Service ................................................................... 163
      Disciplinary Actions and Grievances ................................................. 164
  Title VII—Miscellaneous ................................................................................... 167
    Definition of Vietnam Era ............................................................................ 167
    Extension of Authority for Regional Office in the Philippines .............. 169
    Use of Internal Revenue Service and Social Security Administration Data for Income Verification.................................................................. 169
    Procurement Through Local Contracts....................................................... 174
Cost Estimate ........................................................................................................... 176
Regulatory Impact Statement ............................................................................... 193
Tabulation of Votes Cast in Committee ............................................................... 193
Agency Reports......................................................................................................... 193

Digitized by Google

V

|  | Page |
|---|---|
| Additional Views of Senator Murkowski, Senator Simpson, Senator Thurmond and Senator Stafford on Sections 205, 601 and 605 of S. 2011, The Proposed "Veterans Benefits and Programs Improvement Act of 1988" | 236 |
| Changes in Existing Law Made by S. 2011 as Reported | 241 |

.

.

Digitized by Google

Calendar No. 853

| 100TH CONGRESS 2d Session | SENATE | REPORT 100–439 |
|---|---|---|

## VETERANS' BENEFITS AND PROGRAMS IMPROVEMENT ACT OF 1988

AUGUST 1, 1988.—Ordered to be printed

Mr. CRANSTON, from the Committee on Veterans' Affairs, submitted the following

# REPORT

together with

## ADDITIONAL VIEWS

[To accompany S. 2011]

The Committee on Veterans' Affairs, to which was referred the bill (S. 2011) to increase the rates of Veterans' Administration compensation for veterans with service-connected disabilities and dependency and indemnity compensation for the survivors of certain disabled veterans, having considered the same, reports favorably thereon with an amendment in the nature of a committee substitute and an amendment to the title, and recommends that the bill, as amended, do pass.

### COMMITTEE AMENDMENTS

The amendments are as follows:
Strike out all after the enacting clause as follows:

〖SECTION 1. SHORT TITLE.

〖This Act may be cited as the "Veterans' Compensation Cost-of-Living Adjustment Act of 1988".

〖SEC. 2. DISABILITY COMPENSATION AND DEPENDENCY AND INDEMNITY COMPENSATION RATE INCREASES.

〖(a) IN GENERAL.—(1) The Administrator of Veterans' Affairs shall, as provided in paragraph (2), increase, effective December 1, 1988, the rates of and limitations on Veterans' Administration disability compensation and dependency and indemnity compensation.

〖(2XA) In the case of each of the rates and limitations in sections 314, 315(1), 362, 411, 413, and 414 of title 38, United States Code, that were increased by amend-

Digitized by Google

96

*Background*

Cooperative training consists of courses in which instruction alternated between formal classroom, laboratory or similar instruction and practical training in a business or industrial establishment. Under section 1682(a)(2) of title 38, the training in business or industry must be "strictly supplemental to the institutional portion."

Under current law, benefits for cooperative training are not provided to MGIB or VEAP participants. However, cooperative courses have been a successful part of the training pursued by veterans under the Vietnam-era and prior GI Bills, permitting veterans to gain "hands-on" experience in their field of training with an employer. The practical experience phase of a cooperative program represents a valuable opportunity to apply—in the workplace—the theoretical knowledge gained in the classroom.

All witnesses at the Committee's May 25 hearing who testified on this provision supported it.

*Committee bill*

The Committee bill would provide for payment of cooperative training benefits to MGIB and VEAP participants after their release from active duty, with payment authorized at 80 percent of the basic full-time monthly rate otherwise payable, with entitlement charged proportionately.

The Committee believes that the program of cooperative training has been a valuable experience for the 5,282 Vietnam-era veterans who have used it and can be just a valuable for VEAP and MGIB participants.

### Tolling of Delimiting Periods by Reason of Drug or Alcohol Conditions

Section 324 of the Committee bill contains an amendment proposed by Chairman Cranston and based on legislation six times previously reported by the Committee and passed by the Senate that would amend chapters 30, 31, 32, 34, and 35 of title 38 to extend the delimiting periods in the cases of certain veterans and other eligible persons who have been prevented from using their education or rehabilitation entitlements under title 38 as a result of alcohol or dug dependence or abuse conditions. The effect of the Committee bill would be, in part, to overturn the result in the case of *Traynor* v. *Turnage*, — U.S. —, 56 U.S.L.W. 4319 (1988), in which the Supreme Court upheld the VA regulations which generally preclude granting delimiting-period extensions on the basis of alcohol or drug conditions.

*Background*

In the GI Bill Improvement Act of 1977 (Public Law 95-202, the Congress provided for the granting of extensions of the Vietnam-era GI Bill (Chapter 34) 10-year delimiting period veterans—and of the service-connected disabled veterans dependents education program (chapter 35) 10-year delimiting period for spouses or surviving spouses—who are prevented from pursuing a program of education during the delimiting period due to a mental or physical dis-

Digitized by Google

# EXHIBIT G





*Review*

# The Classification of Substance Use Disorders: Historical, Contextual, and Conceptual Considerations

**Sean M. Robinson [1,\*] and Bryon Adinoff [1,2]**

1   Veterans Affairs North Texas Health Care System, 4500 S. Lancaster Road, Dallas, TX 75216, USA; Bryon.Adinoff@va.gov
2   University of Texas Southwestern Medical Center, 5323 Harry Hines Blvd., Dallas, TX 75390, USA; bryon.adinoff@utsouthwestern.edu
\*   Correspondence: sean.robinson@va.gov; Tel.: +1-214-857-4495

Academic Editors: Karen McElrath, Carol North and Alina Suris
Received: 20 April 2016; Accepted: 1 August 2016; Published: 18 August 2016

**Abstract:** This article provides an overview of the history of substance use and misuse and chronicles the long shared history humans have had with psychoactive substances, including alcohol. The practical and personal functions of substances and the prevailing views of society towards substance users are described for selected historical periods and within certain cultural contexts. This article portrays how the changing historical and cultural milieu influences the prevailing medical, moral, and legal conceptualizations of substance use as reflected both in popular opinion and the consensus of the scientific community and represented by the American Psychiatric Association's (APA) Diagnostic and Statistical Manual of Mental Disorders (DSM). Finally, this article discusses the efforts to classify substance use disorders (SUDs) and associated psychopathology in the APA compendium. Controversies both lingering and resolved in the field are discussed, and implications for the future of SUD diagnoses are identified.

**Keywords:** DSM; diagnostic classification; nosology; substance use disorders; historical; opioids; alcohol; cocaine; cannabis; addiction

## 1. Introduction

Today, the Diagnostic and Statistical Manual of Mental Disorders (DSM) is regarded as the defining standard for mental health diagnoses (including substance use disorders (SUDs)) in America and increasingly abroad. While the fact that the DSM identifies SUDs *as primary mental health disorders* may be taken for granted today, it is noteworthy that SUDs were, prior to the third publication of the DSM (1980), largely conceptualized as manifestations of underlying primary psychopathology [1]. Thus, a large paradigm shift in SUD nosology is apparent in less than half a century's time. Taking an even longer perspective reveals that, although psychoactive substances (including alcohol) have been around for nearly as long as recorded history, the scientific classification of SUDs only began in the early 19th century. Taken together, these observations suggest that the complex relationships human societies have had with substances over time may provide a rich and valuable backdrop of contextual and conceptual considerations for the eventual rise of nosological science. While it is beyond the scope of this article to provide a well-rounded historical account of the complex history of substance use in its entirety, the general purpose is to provide a historical framework by which the reader can contextualize and therefore better understand those influences which have shaped development of the DSM nosology of SUDs. Because the development of the DSM is singularly tied to cultural and historical developments in both Europe and the United States of America (i.e., "US", "American"), this

review takes a decidedly Western-oriented outlook on modern nosology and focuses almost exclusively on the American classification system (i.e., that which is associated with the American Psychiatric Association (APA)). Also of note: consistent with the most recent DSM, this manuscript generally uses the terminology "substance use disorder(s)" to refer to a superordinate category which is comprised of a number of singular disorders (e.g., alcohol use disorder (AUD), cannabis use disorder, etc.). In order to most effectively contrast this modern diagnostic label with earlier conceptualizations, this term is often used alongside and in comparison to earlier terms and labels.

First, a relatively brief historical overview of the long and complicated relationships humans have had with substances is provided, including the historical context of both medical and non-medical use preceding the advent of the modern diagnostic system. In order to provide a detailed yet bounded overview, this review focuses on a number of substances (including their pharmacological progenitors and/or descendants), which have, arguably, played more prominent historical roles (i.e., opium, cannabis, alcohol, cocaine). Second, this article provides demonstrative historical examples of the top-down impact that societal factors have had on substance use and substance use conceptualization and also discusses a number of influences (i.e., cultural, industrial, socio-political) which have impacted the development of the APA compendium. Third, the impact of substance use on society today is discussed in terms of substance use-related costs. Finally, following an account of the development of each version of the DSM, a few of the lingering controversies in the field are identified, and future considerations are discussed for SUD diagnoses specifically and for the addiction field as a whole.

## 2. Historical Considerations: A Long History of Psychoactive Substances

### 2.1. Opioids

The history of psychoactive drugs is closely entwined with the lives and histories of the humans that cultivated and used them. Likely one of the first drugs known to humans, opium and its derivatives, have been associated with its human cultivators for millennia (for an in-depth review of the history of opium/narcotics, the reader is referred to Davenport-Hines [2] and Booth [3]). Opium itself (which contains the active opioid alkaloids *morphine* and *codeine*) is derived from a species of poppy flower, *Papaver somniferum* (Latin for "sleep inducing poppy"). Knowledge of the effects of opium in the ancient world most likely originated in Egypt, the Balkans, or the Black Sea, and the substance was obtained through relatively simple harvesting and preparation methods. The promulgation of opium throughout Persia, India, China, North Africa, and Spain by Arab traders allowed for the quick spread of the drug throughout the ancient world, leaving behind well-known written records of is properties and uses. One written account believed to reference an opium concoction, known as *nepenthe*, takes place in Homer's *The Odyssey*, where he gives an account of "a drug that had the power of robbing grief and anger of their sting and banishing all painful memories." This mixture may refer to opium and alcohol, a mixture later known as laudanum. Figure 1 provides additional points of historical reference. Advancing to more recent times, it was in the 19th century that experimentation with morphine for non-nonmedicinal purposes by Europeans increased while physicians concurrently came to recognize the negative effects of the drug—especially with regards to prolonged medical use.

# EXHIBIT H



# Understanding Alcohol Use Disorder

Alcohol use disorder (AUD) is a medical condition characterized by an impaired ability to stop or control alcohol use despite adverse social, occupational, or health consequences. It encompasses the conditions that some people refer to as alcohol abuse, alcohol dependence, alcohol addiction, and the colloquial term, alcoholism. Considered a brain disorder, AUD can be mild, moderate, or severe. Lasting changes in the brain caused by alcohol misuse perpetuate AUD and make individuals vulnerable to relapse. The good news is that no matter how severe the problem may seem, evidence-based treatment with behavioral therapies, mutual-support groups, and/or medications can help people with AUD achieve and maintain recovery. According to a national survey, 14.1 million adults ages 18 and older[1] (5.6 percent of this age group[2]) had AUD in 2019. Among youth, an estimated 414,000 adolescents ages 12–17[1] (1.7 percent of this age group[2]) had AUD during this timeframe.



## What Increases the Risk for AUD?

A person's risk for developing AUD depends, in part, on how much, how often, and how quickly they consume alcohol. Alcohol misuse, which includes binge drinking* and heavy alcohol use,** over time increases the risk of AUD. Other factors also increase the risk of AUD, such as:

- **Drinking at an early age.** A recent national survey found that among people ages 26 and older, those who began drinking before age 15 were more than 5 times as likely to report having AUD in the past year as those who waited until age 21 or later to begin drinking. The risk for females in this group is higher than that of males.
- **Genetics and family history of alcohol problems.** Genetics play a role, with hereditability approximately 60 percent; however, like other chronic health conditions, AUD risk is influenced by the interplay between a person's genes and their environment. Parents' drinking patterns may also influence the likelihood that a child will one day develop AUD.
- **Mental health conditions and a history of trauma.** A wide range of psychiatric conditions—including depression, post-traumatic stress disorder, and attention deficit hyperactivity disorder—are comorbid with AUD and are associated with an increased risk of AUD. People with a history of childhood trauma are also vulnerable to AUD.

---

\* The National Institute on Alcohol Abuse and Alcoholism (NIAAA) defines binge drinking as a pattern of drinking alcohol that brings blood alcohol concentration (BAC) to 0.08 percent—or 0.08 grams of alcohol per deciliter—or higher. For a typical adult, this pattern corresponds to consuming 5 or more drinks (male), or 4 or more drinks (female), in about 2 hours.

\*\* NIAAA defines heavy alcohol use as consuming more than 4 drinks on any day for men or more than 3 drinks for women.

## What Are the Symptoms of AUD?

Healthcare professionals use criteria from the *Diagnostic and Statistical Manual of Mental Disorders,* Fifth Edition (DSM-5), to assess whether a person has AUD and to determine the severity if the disorder is present. Severity is based on the number of criteria a person meets based on their symptoms—mild (2–3 criteria), moderate (4–5 criteria), or severe (6 or more criteria).

A healthcare provider might ask the following questions to assess a person's symptoms.

In the past year, have you:

- Had times when you ended up drinking more, or longer, than you intended?
- More than once wanted to cut down or stop drinking, or tried to, but couldn't?
- Spent a lot of time drinking? Or being sick or getting over other aftereffects?
- Wanted a drink so badly you couldn't think of anything else?
- Found that drinking—or being sick from drinking—often interfered with taking care of your home or family? Or caused job troubles? Or school problems?
- Continued to drink even though it was causing trouble with your family or friends?
- Given up or cut back on activities that were important or interesting to you, or gave you pleasure, in order to drink?
- More than once gotten into situations while or after drinking that increased your chances of getting hurt (such as driving, swimming, using machinery, walking in a dangerous area, or having unprotected sex)?
- Continued to drink even though it was making you feel depressed or anxious or adding to another health problem? Or after having had a memory blackout?
- Had to drink much more than you once did to get the effect you want? Or found that your usual number of drinks had much less effect than before?
- Found that when the effects of alcohol were wearing off, you had withdrawal symptoms, such as trouble sleeping, shakiness, restlessness, nausea, sweating, a racing heart, or a seizure? Or sensed things that were not there?

Any of these symptoms may be cause for concern. The more symptoms, the more urgent the need for change.


## What Are the Types of Treatment for AUD?

Several evidence-based treatment approaches are available for AUD. One size does not fit all and a treatment approach that may work for one person may not work for another. Treatment can be outpatient and/or inpatient and be provided by specialty programs, therapists, and doctors.

### Medications

Three medications are currently approved by the U.S. Food and Drug Administration to help people stop or reduce their drinking and prevent relapse: naltrexone (oral and long-acting injectable), acamprosate, and disulfiram. All these medications are non-addictive, and they may be used alone or combined with behavioral treatments or mutual-support groups.

### Behavioral Treatments

Behavioral treatments, also known as alcohol counseling or "talk therapy," provided by licensed therapists are aimed at changing drinking behavior. Examples of behavioral treatments are brief interventions and reinforcement approaches, treatments that build motivation and teach skills for coping and preventing relapse, and mindfulness-based therapies.

### Mutual-Support Groups

Mutual-support groups provide peer support for stopping or reducing drinking. Group meetings are available in most communities, at low or no cost, at convenient times and locations—including an increasing presence online. This means they can be especially helpful to individuals at risk for relapse to drinking. Combined with medications and behavioral treatment provided by health professionals, mutual-support groups can offer a valuable added layer of support.

Please note: People with severe AUD may need medical help to avoid alcohol withdrawal if they decide to stop drinking. Alcohol withdrawal is a potentially life-threatening process that can occur when someone who has been drinking heavily for a prolonged period of time suddenly stops drinking. Doctors can prescribe medications to address these symptoms and make the process safer and less distressing.

## Can People With AUD Recover?

Many people with AUD do recover, but setbacks are common among people in treatment. Seeking professional help early can prevent relapse to drinking. Behavioral therapies can help people develop skills to avoid and overcome triggers, such as stress, that might lead to drinking. Medications also can help deter drinking during times when individuals may be at greater risk of relapse (e.g., divorce, death of a family member).

## Need Help?

If you are concerned about your alcohol use and would like to explore whether you might have AUD, please visit the Rethinking Drinking website.

To learn more about alcohol treatment options and search for quality care near you, please visit the NIAAA Alcohol Treatment Navigator.

## For more information about alcohol and your health, please visit: https://niaaa.nih.gov

1 Substance Abuse and Mental Health Services Administration (SAMHSA), Center for Behavioral Health Statistics and Quality. 2019 National Survey on Drug Use and Health. Table 5.4A—Alcohol Use Disorder in Past Year Among Persons Aged 12 or Older, by Age Group and Demographic Characteristics: Numbers in Thousands, 2018 and 2019. https://www.samhsa.gov/data/sites/default/files/reports/rpt29394/NSDUHDetailedTabs2019/NSDUHDetTabsSect5pe2019.htm?s=5.4&#tab5-4a. Accessed November 6, 2020.

2 SAMHSA, Center for Behavioral Health Statistics and Quality. 2019 National Survey on Drug Use and Health. Table 5.4B—Alcohol Use Disorder in Past Year Among Persons Aged 12 or Older, by Age Group and Demographic Characteristics: Percentages, 2018 and 2019. https://www.samhsa.gov/data/sites/default/files/reports/rpt29394/NSDUHDetailedTabs2019/NSDUHDetTabsSect5pe2019.htm?s=5.4&#tab5-4b. Accessed November 6, 2020.



National Institute on Alcohol Abuse and Alcoholism

*NIH . . . Turning Discovery Into Health*®
National Institute on Alcohol Abuse and Alcoholism
https://www.niaaa.nih.gov • 301–443–3860

*April 2021*

# EXHIBIT I

*The* NEW ENGLAND JOURNAL *of* MEDICINE

# Perspective

APRIL 2, 2020

## Stigma and the Toll of Addiction

Nora D. Volkow, M.D.

Each day in 2018, an average of 185 people in the United States died from a drug overdose.[1] In fact, recent declines in U.S. life expectancy are being attributed to direct and indirect effects of alcohol and drug use disorders. Expanding the number of people receiving evidence-based addiction treatment is crucial for reversing these trends. But among the many challenges in delivering appropriate care to the nearly 20 million people in the United States with substance use disorders is the chilling effect of stigma. Stigma not only impedes access to treatment and care delivery; it also contributes to the disorder on the individual level.

Stigma associated with many mental health conditions is a well-recognized problem. But whereas considerable progress has been made in recent decades in reducing the stigma associated with some psychiatric disorders such as depression, such change has been much slower in relation to substance use disorders.[2] One obstacle is that this stigma has causes beyond those that apply to most other conditions. People who are addicted to drugs sometimes lie or steal and can behave aggressively, especially when experiencing withdrawal or intoxication-triggered paranoia. These behaviors are transgressions of social norms that make it hard even for their loved ones to show them compassion, so it is easy to see why strangers or health care workers may be rejecting or unsympathetic.

Tacit beliefs or assumptions about personal responsibility — and the false belief that willpower should be sufficient to stop drug use — are never entirely absent from most people's thoughts when they interact with someone with a drug problem. Health care professionals are not immune to these assumptions. Indeed, they may hold stigmatizing views of people with addictions[3] that may even lead them to withhold care. In emergency departments, for instance, health care professionals may be dismissive of someone with an alcohol or drug problem because they don't view it as a medical condition and therefore don't see its treatment as part of their job. People who inject drugs are sometimes denied care in emergency departments and other hospital settings because they are believed to be drug-seeking.

In part, the difficulty reflects continued resistance to the idea that addiction is a disease. Drug use alters brain circuitry that is involved in self-regulation and reward processing, as well as brain circuits that process mood and stress. For a person with a serious substance use disorder, taking drugs is no longer pleasurable or volitional, for the most part, but is instead a means of diminishing excruciating distress and satisfying powerful cravings — despite often devastating consequences. Some people are more vulnerable than others to developing a sub-

The New England Journal of Medicine
Downloaded from nejm.org on September 30, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

stance use disorder because of a genetic predisposition, adverse social environmental exposures, traumatic life experiences, or other factors. To recover, they often need external help and support — evidence-based treatment, with medication when possible. Unfortunately, their encounters with health care providers may serve only to reinforce their disorder.

While visiting a makeshift heroin "shooting gallery" in San Juan, Puerto Rico, I urged a man who had what appeared to be a massive abscess in his leg to go to an emergency room to get it treated. He refused to even consider it, and told me that when he had previously sought medical help, he had been so badly mistreated that he was frightened of returning. He would rather jeopardize his life or risk a leg amputation than endure being dismissed as a "drug addict."

Stigma not only impedes care delivery, it also most likely causes us to underestimate the burden of substance use disorders in the population. But stigma plays an even larger role in this crisis, one that has been less discussed: when internalized, stigma and the painful isolation it produces encourage further drug taking, directly exacerbating the disease.

Ever since the "Rat Park" experiments of the 1970s, which showed that animals housed in enriched environments with access to other rats self-administered morphine much less frequently than those housed in isolation, social isolation has been known to play a crucial role in vulnerability to and difficulty of recovering from addiction. Research on social reinforcement and its neurobiologic mechanisms has illuminated the links between stig-

ma and drug use. For one thing, there is substantial overlap between the neurologic underpinnings of drug rewards and those of social rewards. Research by Naomi Eisenberger at UCLA has found that social pain is processed in some of the same brain areas that process physical pain and is quelled by pain relievers.[4] Strikingly, a recent article by Venniro and colleagues reported that when given a choice between self-administering a drug and interacting with another animal, methamphetamine- or heroin-dependent rats chose the social interaction. However, when they were punished for the social choice with an electric shock before the interaction, the rats reverted to choosing the drug.[5]

In a sense, stigmatizing treatment of people who use drugs, such as ignoring or rejecting them, may be the equivalent of an electric shock in the cycle of drug addiction: it's a powerful social penalty that spurs further drug taking.

Stigma is not the only factor impeding adequate treatment of people with substance use disorders, but if we are to achieve the public health goal of getting and retaining many more people with substance use disorders in treatment, we have to ensure that the health care system will not penalize people who are addicted to drugs for their condition. Among other steps, improving treatment will require training physicians, nurses, nurse practitioners, physician assistants, and emergency department staff in providing compassionate care to patients who may display the difficult, sometimes frightening behaviors associated with drug addiction and withdrawal.

It is also necessary to promote

awareness of addiction as a chronic relapsing and treatable) brain disease. This effort should include promoting understanding of the disease's behavioral consequences as well as of the factors that make certain people particularly vulnerable. Susceptibility to the brain changes leading to compulsive substance use is substantially modulated by genetic, developmental, psychiatric, and social factors, many of which are out of the person's control.

Given the gravity of the current overdose crisis, it is urgent that we conduct research aimed at overcoming stigma toward people with addiction. Yet even in the absence of research, common sense can guide us: respect and compassion are essential. People working in health care should be made aware that stigmatizing people who are addicted to opioids or other drugs inflicts social pain that not only impedes the practice of medicine but also further entrenches the disorder.

Disclosure forms provided by the author are available at NEJM.org.

From the National Institute on Drug Abuse, Bethesda, MD.

1. Hedegaard H, Miniño AM, Warner M. Drug overdose deaths in the United States, 1999–2018: NCHS data brief no 356. Hyattsville, MD: National Center for Health Statistics, January 2020 (https://www.cdc.gov/nchs/products/databriefs/db356.htm).
2. Corrigan PW, Nieweglowski K. Stigma and the public health agenda for the opioid crisis in America. Int J Drug Policy 2018;59: 44-9.
3. Kennedy-Hendricks A, Busch SH, McGinty EE, et al. Primary care physicians' perspectives on the prescription opioid epidemic. Drug Alcohol Depend 2016;165:61-70.
4. Dewall CN, Macdonald G, Webster GD, et al. Acetaminophen reduces social pain: behavioral and neural evidence. Psychol Sci 2010;21:931-7.
5. Venniro M, Zhang M, Caprioli D, et al. Volitional social interaction prevents drug addiction in rat models. Nat Neurosci 2018; 21:1520-9.

DOI: 10.1056/NEJMp1917360
Copyright © 2020 Massachusetts Medical Society.

*An audio interview with Dr. Volkow is available at NEJM.org*

The New England Journal of Medicine
Downloaded from nejm.org on September 30, 2022. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.